## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DWAYNE TREECE, ET AL.**                          **CIVIL ACTION**
     **Plaintiffs**

**VERSUS**                                            **NO. 17-10153**

**PERRIER CONDOMINIUM OWNERS**          **SECTION: "E"**
**ASSOCIATION, INC., ET AL.,**
     **Defendants**

## ORDER AND REASONS

Before the Court are two motions for partial summary judgment, one filed by Defendants Katherine Acuff, Chris Jablonowski, Hanna Haile, and the Perrier Condominium Owners Association, Inc (PCOA),[1] and one filed by Plaintiffs Dwayne and Phallon Treece and Clifford Harlan.[2] Defendants filed an opposition to Plaintiffs' motion,[3] and Plaintiffs filed an opposition to Defendants' motion.[4] Plaintiffs and Defendants both filed replies in support of their respective motions.[5] Plaintiffs filed a supplemental opposition to Defendants' motion.[6] For the following reasons, Defendants' motion for partial summary judgment is **DENIED**, and Plaintiffs' motion for partial summary judgment is **GRANTED IN PART**, **DEFERRED IN PART**, and **DENIED IN PART.**

Also before the Court, are two motions in limine. Plaintiffs filed a motion in limine to exclude the testimony of Dr. Russell Robins.[7] Defendants filed a motion in limine to exclude the testimony of Dr. Calvin P. Bradford.[8] Defendants filed a response to Plaintiffs'

---

[1] R. Doc. 204.
[2] R. Doc. 212.
[3] R. Doc. 268.
[4] R. Doc. 262.
[5] R. Doc. 288; R. Doc. 293.
[6] R. Doc. 301.
[7] R. Doc. 206.
[8] R. Doc. 207.

motion,[9] and Plaintiffs filed a response to Defendants' motion.[10] Defendants filed a reply in support of their motion.[11] For the following reasons, Plaintiffs' motion in limine to exclude the testimony of Dr. Russell Robins is **GRANTED**, and Defendants' motion in limine to exclude the testimony of Dr. Calvin P. Bradford is **GRANTED**.

## BACKGROUND

In August 2017, Plaintiffs Dwayne and Phallon Treece, along with their four children, rented a condominium unit in a four-unit building located at 6032–6038 Perrier Street, New Orleans, Louisiana ("the Perrier Condominium").[12] Plaintiff Clifford Harlan owns the unit the Treeces rented.[13] Defendants Acuff, Jablonowski, and Haile individually own the other three units.[14] The four unit owners are the sole members of the Perrier Condominium Owner's Association (PCOA), which governs the Perrier Condominium regime.[15]

Plaintiffs allege Defendants violated the Fair Housing Act by enacting and enforcing an occupancy limit on the Perrier Condominium that has a disparate impact on families with children, discriminating against the Treeces based on their familial status, attempting to evict the Treeces based on their familial status, and attempting to force Harlan to evict the Treeces based on their familial status.[16] Plaintiffs seek declaratory relief, injunctive relief, and damages for these alleged violations.[17] The parties now, in effect, cross move for partial summary judgment on Plaintiffs' disparate impact claim

---

[9] R. Doc. 245.
[10] R. Doc. 249.
[11] R. Doc. 283.
[12] R. Doc. 16 ¶ 1; R. Doc. 49 ¶ 1.
[13] R. Doc. 16 ¶ 13; R. Doc. 49 ¶ 13.
[14] R. Doc. 16 ¶¶ 14–17; R. Doc. 49 ¶¶ 14–17.
[15] *Id.*
[16] R. Doc. 16. ¶¶ 2–3.
[17] *Id.* at 17–18.

under 42 U.S.C. § 3604(a). Defendants move for summary judgment on Plaintiffs' § 3617 claim.[18] The parties also seek to exclude each other's expert witnesses.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] "An issue is material if its resolution could affect the outcome of the action."[20] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[21] All reasonable inferences are drawn in favor of the nonmoving party.[22] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[23]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[24] If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1)

---

[18] In their opposition to Plaintiffs' motion for partial summary judgment, Defendants argue Plaintiffs lack standing to pursue certain claims. R. Doc. 268, at 6. Standing arguments are properly made in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). In this case, Defendants have already brought a motion to dismiss for lack of jurisdiction. R. Doc. 30. The Court denied that motion in part and held Plaintiffs have standing to seek declaratory and injunctive relief. R. Doc. 41, at 8. The sole requirement for standing under the FHA, is the "[Article] III minima of injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372 (1982). Plaintiffs' pleadings satisfy the FHA's permissive standing requirements.

[19] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

[20] *DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir. 2005).

[21] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000).

[22] *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

[23] *Smith v. Amedisys, Inc.,* 298 F.3d 434, 440 (5th Cir. 2002).

[24] *Celtic Marine Corp. v. James C. Justice Cos.,* 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Celotex,* 477 U.S. at 323).

submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[25]

When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[26] When proceeding under the second option, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[27] The burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[28] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[29] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the

---

[25] *Celotex*, 477 U.S. at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the movants to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).
[26] *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[27] *Celotex*, 477 U.S. at 332–33.
[28] *Id.*
[29] *Id.* at 332–33 & n.3.

moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[30]

"[U]nsubstantiated assertions are not competent summary judgment evidence."[31] The opposing party must "identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[32]

## FACTS

### I.     Undisputed Facts[33]

The Perrier Condominium contains four units.[34] Plaintiff Harlan and Defendants Acuff, Jablonowski, and Haile each own one of the units.[35] The four unit owners are the sole members of the Perrier Condominium Owners Association (PCOA), which governs the Perrier Condominium regime.[36] In August 2017, the Treeces, a family of six, rented Unit 6036 from Plaintiff Harlan.[37]

The Perrier Condominium is subject to a facially neutral use and occupancy rule stated in the Condominium Declaration.[38] The occupancy rule states "no unit shall be occupied, even for permitted use, by more than one (1) person making such Unit his or her residence for each two hundred fifty (250) square feet of floor area within the Unit."[39]

---

[30] *Id.; see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).
[31] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324).
[32] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[33] Several of the facts recited in this section are undisputed for purposes of this motion only.
[34] R. Doc. 204-1, at 8; R. Doc. 262-1, at 1.
[35] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2.
[36] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2.
[37] R. Doc. 16 ¶ 1; R. Doc 49 ¶ 1.
[38] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2.
[39] R. Doc. 204-2, at 8; R. Doc. 262-1, at 2.

The occupancy rule allows up to five people to occupy Unit 6036.[40] The Treece family exceeds the occupancy limit as applied to Unit 6036.[41]

The PCOA, in part, justifies the occupancy limit as necessary to reduce wear and tear on the Perrier Condominium and its infrastructure.[42] PCOA governing documents empower the PCOA to make repairs to units at the expense of the unit owners.[43] The PCOA has not computed the maximum number of residents that the Perrier Condominium's infrastructure can handle.[44]

The PCOA also justifies its occupancy rule based on "quality of life" concerns such as street parking, backyard space, garbage can management, laundry use, and noise.[45] The Perrier Condominium does not have a parking lot.[46] The Perrier Condominium has four garbage cans.[47] The PCOA rules include a rule governing noise and nuisance.[48] Harlan's unit could be modified to ameliorate noise concerns.[49]

On August 16, 2017, Harlan informed Acuff, Jablonowski, and Haile by email that he had rented his unit to the Treeces.[50] Acuff, whose unit abuts Harlan's unit, responded by email asking, "How long is their lease? And how many children do they have? They are moving in as I write this and I am listening to a kid screaming through the wall and running all over the floors."[51] Haile responded to Harlan's email and stated, "[t]his renter,

---

[40] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2.
[41] R. Doc. 16 ¶ 41; R. Doc 49 ¶ 41.
[42] R. Doc. 212-2 ¶ 12; R. Doc. 268-1 ¶ 12.
[43] R. Doc. 212-2 ¶ 46; R. Doc. 268-1 ¶ 46.
[44] R. Doc. 212-2 ¶ 27; R. Doc. 268-1 ¶ 27. Defendants argue making this computation is cost-prohibitive, but they do not contest that it has not occurred.
[45] R. Doc. 212-2 ¶¶ 30–31; R. Doc. 268-1 ¶¶ 30–31.
[46] R. Doc. 212-2 ¶ 34; R. Doc. 268-1 ¶ 34.
[47] R. Doc. 212-2 ¶ 35; R. Doc. 268-1 ¶ 35.
[48] R. Doc. 212-2 ¶ 40; R. Doc. 268-1 ¶ 40.
[49] R. Doc. 212-2 ¶ 44; R. Doc. 268-1 ¶ 44.
[50] R. Doc. 212-2 ¶ 55; R. Doc. 268-1 ¶ 55.
[51] R. Doc. 212-2 ¶ 56; R. Doc. 268-1 ¶ 56; R. Doc. 128-3, at 1.

Dwayne, had actually contact me in regards to renting my unit the very first week I posted it. He came to look with his youngest child. He is a nice guy but I decided the condo was not the best fit as they have 3 small children."[52] Acuff responded by stating "this could be a serious issue. Reasonable limitations on occupancy are 2 people per bedroom. I don't even know that the systems in this building can handle that many people in one unit."[53]

The next day, Acuff emailed the unit owners and stated she had conducted a social media search confirming the Treeces had three children, maybe four.[54] Acuff then texted Haile and Jablonowski a picture of the Treeces' stroller parked in a common area of the Perrier Condominium.[55] Haile responded, "This is completely unacceptable, they will not be storing strollers like that."[56] Soon after, Acuff shared with Haile that she had suggested to Harlan he could evict the Treeces for lying on their application by not listing all of their children.[57] Haile said Harlan needed to get this "sorted out" and that he should be able to break the lease.[58] An hour later, Acuff texted Harlan and Haile that "the bylaws also require 250 per square feet, which means you need 1500" square feet to accommodate six people.[59]

The next day, on August 18, 2017, Acuff texted Haile that she was going to propose a change to the bylaws to limit occupancy to three people per unit.[60] Five days later, on August 21, 2017, Acuff emailed the other three owners to say she would like to have a condominium association meeting "to discuss possible amendments to our bylaws in light

[52] R. Doc. 212-2 ¶ 57; R. Doc. 268-1 ¶ 57; R. Doc. 128-3, at 1.
[53] R. Doc. 212-2 ¶ 58; R. Doc. 268-1 ¶ 58; R. Doc. 117-5, at 14.
[54] R. Doc. 212-2 ¶ 60; R. Doc. 268-1 ¶ 60; R. Doc. 128-5.
[55] R. Doc. 212-2 ¶ 61; R. Doc. 268-1 ¶ 61.
[56] R. Doc. 212-2 ¶ 61; R. Doc. 268-1 ¶ 61.
[57] R. Doc. 212-2 ¶ 62; R. Doc. 268-1 ¶ 62.
[58] R. Doc. 212-2 ¶ 62; R. Doc. 268-1 ¶ 62.
[59] R. Doc. 212-2 ¶ 63; R. Doc. 268-1 ¶ 63.
[60] R. Doc. 212-2 ¶ 64; R. Doc. 268-1 ¶ 64.

of recent events. In that same vein, I think we need to have our bylaws reviewed and updated by an attorney."[61] Acuff also emailed Harlan suggesting various bases on which Harlan could seek to terminate the Treeces' lease, including violations of noise restrictions and the occupancy limit.[62] Harlan wrote back that "the fair housing act says one can't be discriminated against based on family status," and he was concerned evicting a family for failing to list their minor children on the lease might violate the Fair Housing Act.[63] Acuff responded on August 21, 2017, stating "[y]ou can't discriminate on family status, but you can reasonably restrict occupancy levels."[64]

On August 22, 2017, Harlan delivered to Dwayne and Phallon Treece a "Five (5) Day Notice to Vacate Premises."[65] The notice stated,

> **PLEASE TAKE NOTICE** that you have violated the following terms in your lease agreement dated August 16, 2017: Section 4: USE OF PREMISES Tenants have violated the lease agreement by occupying the premises with six (6) individuals, rather than the two (2) individuals disclosed and named on the lease agreement. Six (6) occupants is over the Landlord's Condominium Owners' Association Use and Occupancy Restrictions which state "The Units are also restricted to occupancy by no more than one (1) person per two hundred fifty (250) square feet of Unit floor space."

That same evening the unit owners met and by a vote of three in favor and one (Harlan) against, voted to change the occupancy restriction to read, "The Units are also restricted to occupancy by no more than one (1) person per FOUR HUNDRED (400) square feet of Unit floor space" (the "400 square foot rule").[66] The PCOA and its members have not voted to rescind the 400 square foot occupancy standard.[67] The PCOA submitted the 400

---

[61] R. Doc. 212-2 ¶ 65; R. Doc. 268-1 ¶ 65; R. Doc. 128-6, at 3.
[62] R. Doc. 212-2 ¶ 66; R. Doc. 268-1 ¶ 66; R. Doc. 128-7, at 2.
[63] R. Doc. 212-2 ¶ 67; R. Doc. 268-1 ¶ 67; R. Doc. 128-7, at 1.
[64] R. Doc. 212-2 ¶ 68; R. Doc. 268-1 ¶ 68; R. Doc. 128-7, at 1.
[65] R. Doc. 212-2 ¶ 69; R. Doc. 268-1 ¶ 69.
[66] R. Doc. 212-2 ¶ 70; R. Doc. 268-1 ¶ 70; R. Doc 128-10; R. Doc. 128-11. Defendants do not deny this vote and meeting occurred.
[67] R. Doc. 212-2 ¶ 72; R. Doc. 268-1 ¶ 72. Defendants do not deny they have not voted to rescind their previous vote.

square foot occupancy restriction to an attorney for "review, advice, approval, and implementation."[68] The amendment was never recorded on the public record.[69]

Despite the notice to vacate, Harlan never evicted the Treeces, and on August 31, 2017, Acuff emailed Harlan stating, "If this isn't resolved in a timely manner, we, as an association, can also levy penalties for failure to observe the terms and conditions of the rules. Any expenses we incur as an association can also be assessed against the defaulting owner."[70] On September 8, 2017, Harlan informed the condominium association members "I feel that I am being forced to evict by the other members of the condo association."[71]

The other PCOA members then decided to pursue an eviction themselves.[72] Defendant Haile emailed the other PCOA members, "I believe we need to move on with an eviction ASAP. If they sue us, they will sue us. But at least they will be out . . . . I believe time for nice is over. It's been over."[73] The PCOA members held a special meeting on September 29, 2017.[74] The owners voted, over Harlan's objection, to (1) impose a fine of $100 per day against Harlan beginning Monday, October 2, 2017 for his continued lease of his unit to Dwayne and Phallon and their family and violating the occupancy limit; (2) pursue Dwayne and Phallon's eviction; (3) assess legal fees associated with such eviction against Harlan if the eviction were successful; (4) retain the professional services of an

[68] R. Doc. 212-2 ¶ 73; R. Doc. 268-1 ¶ 73; R. Doc. 128-31, at 8. Defendants do not point to any evidence denying the amendment was submitted to their attorney for implementation.
[69] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2. Plaintiffs do not point to any evidence showing the amendment has been filed on the public record.
[70] R. Doc. 212-2 ¶ 79; R. Doc. 268-1 ¶ 79; R. Doc. 128-15.
[71] R. Doc. 212-2 ¶ 83; R. Doc. 268-1 ¶ 83; R. Doc. 128-17, at 3.
[72] R. Doc. 212-2 ¶ 84; R. Doc. 268-1 ¶ 84; R. Doc. 128-18, at 5.
[73] R. Doc. 212-2 ¶ 85; R. Doc. 268-1 ¶ 85; R. Doc. 128-18 at 8.
[74] R. Doc. 212-2 ¶ 87; R. Doc. 268-1 ¶ 87.

attorney to represent the Association; and (5) install a camera in the Perrier Condominium's common stairwell.[75]

The following material statistics are not in dispute.[76] Based on the United States Census Bureau's Public Use Microdata Sample, there are 82,003 renter households in New Orleans.[77] Of those renter households, 19,034 are families with children, and 62,969 are households without children.[78] Of the renter households with children, 758 are households of six persons, and 7,844 are households of four to six persons.[79] Of the renter households without children, 24 are households of six persons and 851 are households of four to six persons.[80]

## II.   Disputed Facts

Defendants assert it is undisputed that the Perrier Condominium building is over a hundred years old and has terra cotta waste piping, which is beyond its useful life and subject to failure.[81] The sewer line has been mechanically snaked numerous times because of clogs, which increases the likelihood of irreparable damage to the pipe.[82] Additional usage of the sewer line, from an increased number of occupants, heightens the likelihood of clogs, damage from snaking, and failure in the sewer line[83] and shortens the interim

---

[75] R. Doc. 212-2 ¶ 87; R. Doc. 268-1 ¶ 87.

[76] R. Doc. 204, at 8; R. Doc. 212-2 ¶¶ 1–10; R. Doc. 262, at 7–8; R. Doc. 262-1, at 3; R. Doc. 268-1, at ¶¶ 1–10. The parties dispute the relevance of each of these statistics, to some extent, but they do not dispute the accuracy of them. Further, the Court takes judicial notice of the United States Census Bureau's Public Use Microdata Sample. FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[77] U.S. CENSUS BUREAU, https://data.census.gov/cedsci/table?q=New%20Orleans%20s2501&tid =ACSST5Y2017.S2501&layer=place&cid=S2501_C01_001E&vintage=2018&hidePreview=false.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] R. Doc. 204-1, at 9 (citing Ehlinger Rep. 2–3; Jablonowski Dep. 253:6–13; PCOA Dep. 295:5–302:12, 329:8–11; R. Doc. 204-2, at 78–86; R. Doc. 204-2, at 96).

[82] *Id.* (citing Ehlinger Rep. 2–3; Jablonowski Dep. 253:6–13; PCOA Dep. 295:5–302:12, 329:8–11; R. Doc. 204-2, at 78–86; R. Doc. 204-2, at 96).

[83] *Id.* (citing Ehlinger Dep. 100:22–102:19; Jablonowski Dep. 254:3–9).

period within which an expensive replacement will be needed.[84] Defendants further assert the Perrier Condominium is serviced by a single, undersized water supply line made of low quality, galvanized steel, which is beyond its useful life and has corroded from within.[85] As a result, the water flow and pressure has been reduced, and increased usage of the water supply line would exacerbate the corrosion and likelihood of failure.[86] Defendants state it will cost approximately $63,685.00 to correct the Perrier Condominium's existing terra cotta waste piping.[87]

Plaintiffs dispute these assertions and offer evidence the piping has not been fully inspected,[88] exactly how much of the building's piping and water line are made of galvanized steel or terra cotta is unknown,[89] and the PCOA has not conducted a study to quantify the risk to the building's infrastructure that would be caused by additional occupants above what current rules allow.[90] Plaintiffs also dispute the amount it would cost to repair the plumbing in Perrier Condominium.[91]

Defendants next assert it is an undisputed fact the number of occupants per unit bears directly on the quality of life in the Perrier Condominium.[92] Defendants state more occupants would increase demands on the water supply, which will lower water pressure and flow, and will compete for the use of the Perrier Condominium's common areas and

---

[84] *Id*. (citing Ehlinger Rep. 2).

[85] *Id*. (citing PCOA Dep. 252:11–259:7; Ehlinger Rep. 3; Ehlinger Dep. 103:23–25; Jablonowski Dep. 254:3–9).

[86] *Id*. (citing PCOA Dep. 252:11–259:7; Ehlinger Rep. 3; Ehlinger Dep. 103:23–25; Jablonowski Dep. 254:3–9).

[87] *Id*. (citing Ehlinger Rep. 1).

[88] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 15 (citing Ehlinger Dep. 108:17–15, 41:14–43:16; 109:19–110:21; 123:12–21; 97:25–98; 96:10–97:18).

[89] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 17 (citing PCOA Dep. 292:6–13; 300:15-303:3; Ehlinger Dep. 44:17–44:25, 41:14–43:16, 41:14–43:16, 41:14–43:16, 109:19–110:21).

[90] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 18 (citing PCOA Dep. 297:13–20).

[91] R. Doc. 262-1, at 3.

[92] R. Doc. 204-1, at 10.

amenities such as the laundry room, shed, backyard, and off street parking.[93] More occupants would also increase the need for garbage facilities and increase the likelihood of sound disturbances and unreasonable noise.[94]

Plaintiffs dispute these claims[95] by pointing to evidence that (1) the PCOA was unable to identify how an additional child, who cannot drive, would impact street parking;[96] (2) a rule restricting the number of cars, rather than the number of occupants, is a possible alternative to reducing congestion;[97] (3) the PCOA was unable to quantify how many additional garbage cans they might need to acquire if the total occupancy of the building increased;[98] (4) two of the four units, including the one in which the Treeces resided, had their own, in-unit washing machines;[99] (5) a rule restricting usage, rather than occupancy, would ameliorate wear and tear concerns with the laundry facilities;[100] (6) there have been no issues coordinating back yard usage to date, even when unit owners had parties and houseguests increasing the number of people in the backyard;[101] (7) the PCOA's governing documents include rules prohibiting unreasonable noise and nuisances,[102] and enforcement of those restrictions is an alternative to address the noise concerns;[103] and (8) there are structural modifications to Harlan's unit that could be made to ameliorate noise concerns.[104]

---

[93] *Id.* (citing PCOA Dep. 264:9–275:5).
[94] *Id.* (citing PCOA Dep. 264:9–275:5; Favalora Dep. 97).
[95] R. Doc. 262-1, at 3–4.
[96] R. Doc. 212-2 ¶ 32 (citing PCOA Dep. 271:8–271:17).
[97] *Id.* ¶ 33 (citing PCOA Dep. 268:12–270:4).
[98] *Id.* ¶ 36 (citing PCOA Dep. 273:25–274:6).
[99] *Id.* ¶ 37 (citing P. Treece Dep. 350:18–24 Acuff Dep. 113:13–114:9).
[100] *Id.* ¶ 38 (citing PCOA Dep. 303:12–303:20).
[101] *Id.* ¶ 39 (citing PCOA Dep. 264:12–266:12).
[102] *Id.* ¶ 40 (citing PCOA Decl. § 7.4; PCOA Rules and Regulations § 11).
[103] *Id.* ¶ 41 (citing PCOA Dep. 212:24–2:12:3, 237:1–238:21).
[104] *Id.* ¶ 44 (citing PCOA Dep. 235:5–21; Acuff Dep. 198:1–20; Haile Dep. 209:19–210:4; Jablonowksi Dep. 23:22–38:9; R. Doc. 128-19, at 6–7).

## LAW AND ANALYSIS

The Fair Housing Act (FHA),[105] "prohibits discrimination in the rental or sale of a dwelling based on certain protected characteristics."[106] The statute "reflects 'the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States.'"[107] "The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin."[108] "In 1988, Congress extended coverage to persons with handicaps and also prohibited 'familial status' discrimination, i.e., discrimination against parents or other custodial persons domiciled with children under the age of 18."[109]

Plaintiffs claim they are entitled to relief under the FHA based on Defendants' violations of 42 U.S.C. § 3604(a), (b), (c), and (d) and § 3617.[110] The instant cross motions seek summary judgment on Plaintiffs' "disparate impact" claim under 42 U.S.C. § 3604(a), which provides:

> [I]t shall be unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

Defendants' motion also seeks summary judgment on Plaintiffs' claim under 42 U.S.C. § 3617, which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

---

[105] 42 U.S.C. §§ 3601–3631.
[106] *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).
[107] *Id.* at 900–01 (citing 42 U.S.C. § 3604).
[108] *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995).
[109] *Id.* (citing 42 U.S.C. § 3602(k)).
[110] R. Doc. 16 ¶¶ 70–79.

Plaintiffs argue they are entitled to summary judgment on their disparate impact claim because Defendants violated § 3604(a) by enacting and enforcing an occupancy restriction that has a disparate impact on families with children. Defendants, on the other hand, argue they are entitled to summary judgment that the occupancy rule did *not* violate § 3604(a), and for that same reason, they cannot be held not liable under § 3617 for interfering with Plaintiffs' rights under § 3604(a).

## I.   The 400 Square Foot Rule Is Not Currently in Effect, but Its Future Enforcement May Be Challenged.

It is undisputed that, on August 22, 2017, the Perrier Condominium unit owners met and, by a vote of three in favor and one (Harlan) against, voted to change the occupancy restriction to read, "The Units are also restricted to occupancy by no more than one (1) person per FOUR HUNDRED (400) square feet of Unit floor space" (the "400 square foot rule").[111] It also is undisputed the PCOA and its members have not voted to rescind the 400 square foot occupancy standard,[112] and the PCOA submitted the four hundred square foot occupancy rule to an attorney for "review, advice, approval, and implementation."[113] The amendment was never recorded in the public record.[114]

Plaintiffs seek to enjoin the Defendants from taking any further action to implement the "400 square foot rule" because it allegedly will have a disparate impact on families with children. Defendants correctly point out the 400 square foot rule has never gone into effect because it has not been registered with the Conveyance Office of Orleans

---

[111] R. Doc. 212-2 ¶ 70; R. Doc. 268-1 ¶ 70; R. Doc 128-10; R. Doc. 128-11. The Defendants do not deny this vote and meeting occurred.

[112] R. Doc. 212-2 ¶ 72; R. Doc. 268-1 ¶ 72; R. Doc. 128-19. Defendants do not contend they have voted to rescind their previous vote.

[113] R. Doc. 212-2 ¶ 73; R. Doc. 268-1 ¶ 73; R. Doc. 128-31, at 8. Defendants do not point to any evidence denying the amendment was submitted to their attorney for implementation.

[114] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2. Plaintiffs do not point to any evidence showing the amendment has been filed on the public record.

Parish, Louisiana, as required by the Perrier Condominium Declaration.[115] Plaintiffs' right to seek injunctive relief with respect to this rule does not depend on the rule being in effect. As a result, the Court will address below whether the 400 square foot rule would have a disparate impact on families with children if implemented.

## II. Plaintiffs Are Entitled to Partial Summary Judgment that the PCOA Has in Place, or May in the Future Put into Effect, Policies that Have a Substantial Discriminatory Effect on a Protected Class.

In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,[116] the Supreme Court affirmed a long line of circuit court precedent[117] and held disparate impact claims are cognizable under § 3604(a) of the FHA. The Court found "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose . . . [of] eradicat[ing] discriminatory practices within a sector of our Nation's economy."[118]

A disparate impact claim asserts a policy or practice has an "unjustified, disproportionally adverse effect on [a protected class]."[119] In other words, the policy or practice has a significant discriminatory effect.[120] The relevant question in a disparate impact claim "is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class."[121]

---

[115] Section 14.3(c) of the Perrier Condominium's Declaration states "[an] amendment shall be effective when registered in the Conveyance Office of Orleans Parish, Louisiana." R. Doc. 212-17, at 26.
[116] 135 S. Ct. 2507 (2015).
[117] *E.g. Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996) ("We agree that a violation of the FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect." (citing *Hanson v. Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir. 1986)).
[118] *Id.* at 2521.
[119] *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 901 (5th Cir. 2019) (citing *ICP*, 135 S. Ct. at 2513 (2015)).
[120] *Simms*, 83 F.3d at 1555 (citing *Hanson*, 800 F.2d at 1386)).
[121] *Id.* (citing *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 (5th Cir. 1994), *cert. denied*, 513 U.S. 1149 (1995)).

To assert a disparate impact claim under the FHA, a plaintiff must first prove a prima facie case of discrimination by showing (1) a challenged policy or practice (2) robustly causes a (3) substantial (4) discriminatory effect on a (5) protected class.[122] If the plaintiff makes a prima facie case, the defendant must then prove the challenged practice is necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests.[123] If the defendant meets its burden, the plaintiff must then show the defendant's interests "could be served by another practice that has a less discriminatory effect."[124]

In this case, Plaintiffs identify the Perrier Condominium's "250 square foot per person" occupancy limit (the "250 square foot rule") and the Perrier Condominium's "400 square foot per person" occupancy limit (the "400 square foot rule") as the "policies" that allegedly have a disparate impact on families with children.[125] Plaintiffs identify "families with children" as the affected protected class under the FHA.[126]

The only disputed elements of Plaintiffs' prima facie claim, then, are whether the occupancy rules (1) "robustly cause" a (2) "substantial" (3) "discriminatory effect" on families with children.

### A. Plaintiffs have shown the 250 square foot rule and 400 square foot rule have a discriminatory effect on families with children.

To prove a policy or practice has a discriminatory effect on a protected class, a plaintiff must prove the policy "actually or predictably results in . . . discrimination."[127]

---

[122] *ICP*, 135 S. Ct. at 2514 (quoting 24 C.F.R. § 100.500(c)(1)).

[123] *Id*. at 2514–15 (quoting 24 C.F.R. § 100.500(c)(2)).

[124] *Id*. at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).

[125] R. Doc. 16, at 17–18; R. Doc. 268, at 6–7 (conceding Harlan has standing to challenge the 250 square foot rule as it applies to unit 6036).

[126] 42 U.S.C. § 3602 ("(K) 'Familial status' means one or more individuals (who have not attained the age of 18 years) being domiciled with—(1) a parent or another person having legal custody of such individual or individuals. . . .").

[127] *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

"[N]ormally a plaintiff must provide comparative statistical evidence demonstrating a disparity in impact of a particular policy" to show the policy predictably results in discrimination and does not "merely raise[] an inference of discriminatory impact."[128] This is often referred to as the "statistical disparity" requirement.[129]

In this case, the parties dispute the proper method for calculating whether there is a statistical disparity in a disparate impact case under the FHA. Neither the Supreme Court nor the Fifth Circuit has delineated a single method by which a plaintiff must prove a statistical disparity in the FHA context, but the Supreme Court and the Fifth Circuit have analogized disparate impact cases arising under the FHA to disparate impact cases arising under other civil rights laws.[130] As a result, the Court turns to the Fifth Circuit's decision in the non-FHA case of *Veasey v. Abbott* for guidance.[131]

In *Veasey*, the plaintiffs challenged, under the Voting Rights Act, a Texas voter identification (ID) law, titled Senate Bill 14 (SB 14).[132] SB 14 required "individuals to present one of several forms of photo identification in order to vote" (SB 14 ID).[133] The plaintiffs claimed this law disproportionately prevented minorities from voting because minority members were more likely to lack SB 14 ID.[134] The Fifth Circuit concluded the district court did not err in finding SB 14 had a disparate impact on minorities and relying on expert testimony as to SB 14's statistical impact on minority voters to make that

---

[128] *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (*citing Munoz v. Orr*, 200 F.3d 291, 299–300 (5th Cir. 2000)).

[129] *ICP*, 135 S. Ct. at 2523 (holding a disparate-impact claim may rely on a statistical disparity so long as the plaintiff points "to a defendant's policy or policies causing that disparity").

[130] *ICP*, 135 S. Ct. at 2510 ("Two antidiscrimination statutes that preceded the FHA are relevant to its interpretation. Both § 703(a)(2) of Title VII of the Civil Rights Act of 1964 and § 4(a)(2) of the Age Discrimination in Employment Act of 1967 (ADEA) authorize disparate-impact claims."); *Simms*, 83 F.3d at 1555.

[131] 830 F.3d 216 (5th Cir. 2016).

[132] *Id.* at 225.

[133] *Id.*

[134] *Id.* at 250.

finding.[135] To determine whether SB 14 had a discriminatory effect on minorities, the Fifth Circuit referenced the following results of four methods of analysis used to determine the races of those voters who lacked SB 14 ID:[136]

- Analysis A "revealed Hispanic registered voters and Black registered voters were respectively 195% and 305% more likely than [or 2.95 and 4.05 times as likely as] their Anglo peers to lack SB 14 ID."[137]

- Analysis B "concluded that Blacks were 1.78 times more likely than Whites, and Latinos 2.42 times more likely [than Whites], to lack SB 14 ID."[138]

- Analysis C "found that 4% of eligible White voters lacked SB 14 ID, compared to 5.3% of eligible Black voters and 6.9% of eligible Hispanic voters."[139]

- Analysis D "concluded that SB 14 disproportionately impacts the poor" based on "expert testimony that 21.4% of eligible voters earning less than $20,000 per year lack SB 14 ID, compared to only 2.6% of voters earning between $100,000 and $150,000 per year."[140]

These results share a common thread—they compare the percentage of protected class members (i.e. minority voters, poor voters) affected by the law to the percentage of non-protected class members (i.e. White voters, wealthy voters) affected by the law[141] and show the percentage of affected protected class members is larger than the percentage of affected non-protected class members.[142] The Second Circuit, in *Tsombanidis v. West*

---

[135] *Id.*

[136] In *Veasey*, the court relied on multiple data sources used by the parties' experts. *Id.* In the instant case, the parties agree that one source, the United States Census Bureau's Public Use Microdata Sample, should be used to determine the number of renters in New Orleans who do and do not have children in their households. Accordingly, the Court's focus is not on which data sources were used in *Veasey*. Instead, the Court is concerned with how the Fifth Circuit analyzed the statistics presented to it, assuming the sources were reliable.

[137] *Id.* at 250.

[138] *Id.* at 251.

[139] *Id.*

[140] *Id.*

[141] *United States v. St. Bernard Par.,* No. CIV.A. 12-321, 2013 WL 1707829, at *4 (E.D. La. Apr. 19, 2013).

[142] *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 575 (2d Cir. 2003). This method can also be represented by comparing the percentage of minority representation in the affected group against that minority's representation in the general population. *See, e.g., Nat'l Fair Hous. All. v. Travelers Indem. Co.,* 261 F. Supp. 3d 20, 34 (D.D.C. 2017) ("NFHA pleaded facts that show that because of the different composition of the affected population (voucher recipients) as compared to the District's population as a whole, members of a protected class are more likely to be harmed by Travelers' policy than are other

18

*Haven Fire Department*, an FHA case, endorsed this approach, which it expressed in the following formula (sometimes referred to by this Court as the "*Veasey/Tsombanidis* formula"):

> To succeed on a disparate impact claim under the FHA, a plaintiff must show:
>
> 1. "that $x\%$ of all of the [protected class members are] prohibited [from an activity] by the facially neutral [policy] at issue,"
>
> 2. "that $y\%$ of all of the [non-protected class members are] prohibited [from an activity] by the [facially neutral policy], and, crucially,"
>
> 3. "that $x$ is significantly greater than $y$."[143]

To confirm that this formula is consistent with the Fifth Circuit's reasoning in *Veasey*, one may express the results of statistical analysis C in *Veasey* using the *Tsombanidis* formula:

> 1. "5.3% [$x\%$] of eligible Black voters and 6.9% [$x\%$] of eligible Hispanic voters" lacked SB 14 ID
>
> 2. "4% [$y\%$] of eligible White voters" lacked SB 14 ID, and
>
> 3. 5.3% [$x$] and 6.9% [$x$] are significantly greater than 4% [$y$].[144]

Likewise, the results of statistical analysis D may be expressed using this formula:

> 1. "21.4% [$x\%$] of eligible voters earning less than $20,000 per year lack[ed] SB 14 ID," while
>
> 2. "2.6% [$y\%$] of voters earning between $100,000 and $150,000 per year" lacked SB 14 ID, and

---

individuals." For example, "92% of participating households [we]re non-Hispanic African American or Black (compared to 45.2% in the whole D.C. population)."; *see also Hous. Inv'rs, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999) ("Whether the measure of disparate impact used is disproportional representation, in which the percentage of minority representation in the affected group is compared against that minority's representation in the general population, or disproportionate adverse impact, in which the minority group's percentage representation in the affected group is compared against the majority group's representation in the affected group, the starting point is always the subset of the population that is affected by the disputed decision.").

[143] *Tsombanidis*, 352 F.3d at 575–76.

[144] 830 F.3d at 251.

3. 21.4% [$x$] is significantly greater than 2.6% [$y$].[145]

Within the FHA context, courts routinely apply the *Veasey/Tsombanidis* formula. For instance, in *Gashi v. Grubb & Ellis Property Management Services, Inc.*, the District Court for the District of Connecticut relied on the United States Census Bureau's Public Use Microdata Sample and the analysis of Dr. Calvin Bradford to determine an occupancy limit of "two persons per bedroom" had a disparate impact on families with children in violation of the FHA.[146] Employing the method used by the Fifth Circuit in *Veasey* and articulated in the *Veasey/Tsombanidis* formula, the Court stated:

1. "[T]here are 14,540 households with children in the city of Stamford. Of those, 4,473 are estimated to be three person households. Accordingly, three person families with children represent 30.76% [$x\%$] of all households with children,"

2. "Additionally, Dr. Bradford estimates there are 31,634 households with no related children in Stamford. Of these households, 3,125, or 9.88% [$y\%$], are three person households without children," and

3. "30.76% [$x\%$] of households with children are affected by the occupancy policy, while only 9.88% [$y\%$] of households without children are affected [$x$ is significantly greater than $y$]."[147]

---

[145] *Id.* The results of statistical analysis A and B also may be expressed using the *Veasey/Tsombanidis* formula. Analyses A and B revealed minority voters were a certain number of "times more likely" than White voters to lack SB 14 ID. *Id.* at 250–51. This is simply a statement of the conclusion of the *Veasey/Tsombanidis* formula—that $x$ is significantly greater, or a certain number of "times" greater, than $y$. For example, Analysis B found Black voters were 1.78 times more likely than White voters to lack SB 14 ID. *Id.* at 251. Within the *Veasey/Tsombanidis* formula, this means the percentage of Black voters who lacked SB 14 ID [$x\%$] was 1.78 times larger than the percentage of White voters who lacked SB 14 ID [$y\%$]. While the results of analysis B did not reveal exactly what the $x$ and $y$ numbers were, they did reveal that $x$ was 1.78 times larger than $y$. In other words, $x$ was "significantly greater than" $y$.

In *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, the Third Circuit made it clear that the *Veasey/Tsombanidis* formula leads to the conclusion that a group is a certain number of "times more likely" to be affected by a policy. 658 F.3d 375, 382 (3d Cir. 2011). The court found a housing policy had a disparate impact on families with children and stated, "22.54% of African–American households and 32.31% of Hispanic households in Mount Holly will be affected by the [housing policy]. The same is true for only 2.73% of White households. In short, the Residents' statistical expert has calculated that African–Americans would be 8 times more likely to be affected by the project than Whites [22.54% is about eight times as large as 2.73%], and Hispanics would be 11 times more likely to be affected [32.31% is about 11 times larger than 2.73%]. *Id.*

[146] 801 F. Supp. 2d 12, 16–17 (D. Conn. 2011).

[147] *Id.*

In *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish,* another section of this court held a moratorium on constructing multi-family housing had "a disparate impact on African–Americans by reducing the amount of available housing structures with 5 or more units" finding:

1. "17.61% [*x%*] of African–American households in the New Orleans metropolitan area live in structures with 5 or more units,"

2. "compared to only 9.54% [*y%*] of Caucasian households," and

3. "African–American households are 85% more likely to live in structures with more than 5 units than Caucasian households [*x* is significantly greater than *y*]."[148]

While another methodology might prove more apt in a different case,[149] the Court has found no cases repudiating the method used by the Fifth Circuit in *Veasey* and articulated as a formula by the Second Circuit in *Tsombanidis.*[150]

---

[148] 641 F. Supp. 2d 563, 567–68 (E.D. La. 2009).

[149] The Supreme Court has approved the use of a case-by-case approach for establishing a statistical disparity in a disparate impact case, recognizing that statistics "come in infinite variety and . . . their usefulness depends upon all of the surrounding facts and circumstances." *Teamsters v. United States,* 431 U.S. 324, 339–40 (1977); *see also Mt. Holly Gardens,* 658 F.3d at 382 ("'[N]o single test controls in measuring disparate impact,' but the [plaintiff] must offer proof of disproportionate impact, measured in a plausible way." (quoting *Hallmark Developers, Inc. v. Fulton Cty., Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006)).

[150] *See, e.g., Mt. Holly Gardens,* 658 F.3d at 382 (finding a housing policy had a disparate impact on minorities because "22.54% [*x%*] of African–American households and 32.31 % [*x%*] of Hispanic households in Mount Holly will be affected by the [housing policy]. The same is true for only 2.73% [*y%*] of White households [*x* is significantly greater than *y*]"); *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir.), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.,* 488 U.S. 15 (1988) (finding a disparate impact in a case in which a policy impacted 28% [*x%*] of minorities but only 11% [*y%*] of whites [*x* is significantly greater than *y*]); *United States v. Tropic Seas, Inc.,* 887 F. Supp. 1347, 1360 (D. Haw. 1995) ("Clearly, Tropic Seas' occupancy provision has a direct "discriminatory effect" on the Sallees . . . based on their familial status . . . [because the] occupancy provision regarding studio and one-bedroom apartments would exclude 92 to 95 percent [*x%*] of all families with children, but only 19 to 21 percent [*y%*] of all families without children [*x* is significantly greater than *y*].")). In *Rhode Island Commission for Human Rights v. Graul,* 120 F. Supp. 3d 110, 126 (D.R.I. 2015), the Court found "2 heads per bedroom policy" had a disparate impact on families with children because, based on Dr. Bradford's analysis, even under the most favorable scenario to the defendants, "households with children are more than three times as likely to be adversely impacted by the rule when compared to comparable households with no children." This is similar to Analyses A and B in *Veasey.*

The relatively straightforward *Veasey/Tsombanidis* formula outlined above may be applied to the Perrier Condominium's 250 square foot rule, which prohibits households of six from residing in Unit 6036, and to the 400 square foot rule which prohibits households of 4 from residing in Unit 6036, to determine whether the policies have a disparate impact on families with children.[151]

Regarding the 250 square foot rule:

1. Of the 19,034 renter families with children in New Orleans, 758, or 3.98% [$x\%$], are families with children of six affected by the PCOA's occupancy rule.[152]

2. Of the 62,969 renter households without children in New Orleans, 24, or .038% [$y\%$], are households of six affected by the occupancy rule.[153]

3. 3.98% [$x$] is 104.7 times as large as .038% [$y$] [$x$ is greater than $y$].[154]

Regarding the 400 square foot rule:

---

[151] *United States v. St. Bernard Par.,* No. CIV.A. 12-321, 2013 WL 1707829, at *4 (E.D. La. Apr. 19, 2013).

[152] R. Doc. 204, at 8; R. Doc. 212-2 ¶¶ 1–10; R. Doc. 262, at 7–8; R. Doc. 262-1, at 3; R. Doc. 268-1, at ¶¶ 1–10; U.S. Census Bureau, https://data.census.gov/cedsci/table?q=New%20Orleans%20s2501&tid=ACSST5Y2017.S2501&layer=place&cid=S2501_C01_001E&vintage=2018&hidePreview=false. The parties do not dispute the use of city-wide statistics to analyze a disparate impact claim. R. Doc. 207-2, at 22 (Plaintiffs' expert using city-wide statistics); R. Doc. 206-3, at 9 (Defendants' expert using city-wide statistics); *see also Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.,* 801 F. Supp. 2d 12, 17 (D. Conn. 2011) (citing *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 577 (2d Cir. 2003); *Huntington Branch,* 844 F.2d at 937–38) (approving of the use of city-wide data in determining whether a facially neutral policy has a disparate impact on a particular group).

[153] R. Doc. 204, at 8; R. Doc. 212-2 ¶¶ 1–10; R. Doc. 262, at 7–8; R. Doc. 262-1, at 3; R. Doc. 268-1, at ¶¶ 1–10; U.S. CENSUS BUREAU, https://data.census.gov/cedsci/table?q=New%20Orleans%20s2501&tid=ACSST5Y2017.S2501&layer=place&cid=S2501_C01_001E&vintage=2018&hidePreview=false. Defendants have taken conflicting positions about the "$y$" number. In their statement of undisputed facts, they state it is ".1%." R. Doc. 204-1, at 8. Elsewhere they state it as "1%." R. Doc. 204-1, at 18. In Dr. Robins report, the math clearly shows it is .04%." R. Doc. 206-3, at 9. The Court will use ".04%" as the $y$ going forward because it is mathematically accurate, but any of these potential "$y$" numbers would lead to the same result.

[154] 3.98 / .038 = 104.7. The Court uses the phrase "as large as" because "some people believe that 'three times more than' means the original quantity multiplied by the 'more than' quantity, plus the original quantity. In that interpretation, 'three times more than' your 3 percent fee is 12 percent: three times your fee (9 percent) plus the original 3 percent. To avoid that confusion, saying you charge 'three times as much as' appeases the mathematical geniuses in your audience." Merrill Perlman, *The Phrase You're Three Times More Likely to Write Wrong,* COLUMBIA JOURNALISM REV. (June 12, 2017), https://www.cjr.org/language_corner/three-times-more.php.

1. Of the 19,034 renter families with children in New Orleans, 7,844, or 41.2% [*x%*], are families with children of four to six affected by the PCOA's occupancy rule.[155]

2. Of the 62,969 renter households without children in New Orleans, 851, or 1.35% [*y%*], are households of four to six affected by the occupancy rule.[156]

3. 41.2% [*x*] is 30.5 times as large as 1.35% [*y*] [*x* is greater than *y*].[157]

The Court finds there are statistical disparities with respect to the 250 and the 400 square foot rules.

Although Plaintiffs agree the above statistical disparity analysis validates their disparate impact claim,[158] they also argue that, rather than using the *Veasey/Tsombanidis* formula, the Court should base its analysis on the absolute numbers showing that families with children make up 96.93%, or 758 out of 782, of six person renter households in New Orleans[159] while households without children make up only 3.07%, or 24 out of 782, of six person renter households in New Orleans.[160] Plaintiffs argue these figures demonstrate there are 31.58 times as many renter households of 6 in New Orleans with children than without children and this shows a substantial disparity.[161]

Plaintiffs' methodology is to compare the absolute number of six person families with children (758) with the absolute number of six person households without children

---

[155] R. Doc. 204, at 8; R. Doc. 212-2 ¶¶ 1–10; R. Doc. 262, at 7–8; R. Doc. 262-1, at 3; R. Doc. 268-1, at ¶¶ 1–10; U.S. CENSUS BUREAU, https://data.census.gov/cedsci/table?q=New%20Orleans%20s2501&tid=ACSST5Y2017.S2501&layer=place&cid=S2501_C01_001E&vintage=2018&hidePreview=false.

[156] R. Doc. 204, at 8; R. Doc. 212-2 ¶¶ 1–10; R. Doc. 262, at 7–8; R. Doc. 262-1, at 3; R. Doc. 268-1, at ¶¶ 1–10; U.S. Census Bureau, https://data.census.gov/cedsci/table?q=New%20Orleans%20s2501&tid=ACSST5Y2017.S2501&layer=place&cid=S2501_C01_001E&vintage=2018&hidePreview=false.

[157] 30.5 / 1.35 ≈ 30.5.

[158] R. Doc. 262, at 6.

[159] According to Dr. Bradford, there are 782 renter households of six in New Orleans. R. Doc. 207-2, at 23. 758 of those are families with children. *Id.* Accordingly, families with children make up 96.9% of the renter households of six in New Orleans (758 / 782 = .969). *Id.*

[160] According to Dr. Bradford, there are 782 renter households of six in New Orleans. *Id.* Of those, 24 are households without children. *Id.* Accordingly, households without children make up 3.1% of the renter households of six in New Orleans (24 / 782 = .031).

[161] 24 x 31.58 = 758. R. Doc. 212-1, at 14. Plaintiffs employ the same methodology to analyze the impact of the 400 square foot rule. R. Doc. 212-1, at 15.

(24) and calculate the percentage of six person households that are families with children (96.93%) to show that families with children are 31.58 times as likely to be affected. The Court finds this is not the correct method of determining whether a statistical disparity exists in this case. Those absolute numbers (even if couched as percentages), rather than proportional numbers, do not reveal whether the PCOA occupancy rules have a *proportional* or *disparate* impact on families with children who rent when compared to the total population of renters.[162] The mere fact that more members of a protected class than non-members of a protected class are affected by a given policy shows a statistical imbalance, but that alone does not establish the statistical disparity necessary to prove a disparate impact claim.[163] Indeed, the Court has found no examples in which a court used

---

[162] *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 n.6 (1971) (finding an employer's policy requiring job applicants to have a high school diploma or pass a standardized test had a disparate impact on African-Americans because "1960 census statistics show[ed] that, while 34% of white males had completed high school, only 12% of Negro males had done so" and "58% of whites pass[ed] the tests, as compared with only 6% of the blacks." The Court did not compare the absolute number of African-American and White individuals who failed to meet the requirements nor did the Court calculate the percentage of African-Americans who made up the pool of individuals who failed to meet the requirements. Instead, it relied on the "proportional" number of African Americans and Whites who met the policy's requirements.); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2nd Cir. 1988), *aff'd*, 488 U.S. 15, 19 (1988) (analogizing the Supreme Court's use of proportional statistics rather than absolute numbers in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), to the FHA context)).

[163] *Bailey v. Lawler-Wood Hous., LLC*, No. CIV.A. 05-5193, 2007 WL 101191, at *3 (E.D. La. Jan. 9, 2007), *aff'd sub nom. Bonvillian v. Lawler-Wood Hous., LLC*, 242 F. App'x 159 (5th Cir. 2007); *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 653 (1989) ("Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills (as is arguably the case for cannery and unskilled noncannery workers). As long as there are no barriers or practices deterring qualified nonwhites from applying for noncannery positions, if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities." (internal citation omitted)); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 426 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile HomePark Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026 (2019) ("[e]xpound[ing] the Supreme Court's explanation into a more concrete example," by hypothesizing "there would likely be no prima facie case of a disparate impact on nonwhites if 5% of the workers were non-white as long as approximately 5% of the qualified applicants were non-white").

The percentages of renter households of six, or four to six, that are families with children may be relevant in determining whether the policies in this case have a disparate impact on families with children so long as those percentages are compared to the protected class's representation in the total population. *See Hous. Inv'rs, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999) ("Whether the measure of disparate impact used is disproportional representation, in which the percentage of minority representation in the affected group is compared against that minority's representation in the general

Plaintiffs' methodology to analyze the impact of an occupancy limit on a protected class.[164]

In sum, to analyze Plaintiffs' disparate impact claim, the Court "compare[s] the percentage of [families with children] affected by the [Perrier Condominium's occupancy limits] with the percentage of [households without children] affected by the [limits]."[165] After conducting this comparison the Court finds the 250 square foot rule affects 3.98% of renter families with children in New Orleans and .038% of renter households without children in New Orleans rule; 3.98% is 104.7 times as large as .038%. This means families with children are 104.7 times as likely to be affected by the 250 square foot rule as households without children. Likewise, the 400 square foot rule affects 41.2% of renter families with children in New Orleans and 1.35% of renter households without children in New Orleans; 41.2% is 30.5 times as large as 1.35%. This means families with children are 30.5 times as likely to be affected by the 400 square foot rule as households without

population, or disproportionate adverse impact, in which the minority group's percentage representation in the affected group is compared against the majority group's representation in the affected group, the starting point is always the subset of the population that is affected by the disputed decision.").

[164] For example, the court in *Gashi v. Grubb & Ellis Property Management Services* did not compare the number of three person households with children to the number of three person households without children, and it did not determine what percentage of three person households were households with children. 801 F. Supp. 2d 12, 16–17 (D. Conn. 2011). In fact, the court rejected the argument by the defendants in that case that the occupancy policy did not disparately affect families with children because "the number of three person households without children in Stamford is 3,125, while the number of three person households with children is 4,473, suggesting there is no disparate impact on three person households with children." *Id.* at 17 (citing *Huntington Branch*, 844 F.2d at 938 ("[R]elying on absolute numbers rather than on proportional statistics . . . significantly underestimat[es] the disproportionate impact of the Town's policy.")).

In cases involving disparate impact challenges to decisions regarding the construction of public housing, some courts have made a disparate impact finding by comparing the number of minority individuals who would benefit from the housing with the number of non-minority individuals who would benefit. *See, e.g., Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988) ("The evidence presented shows that Hawthorne's refusal to permit construction of the project had a greater adverse impact on minorities. Of the persons who would benefit from the state-assisted housing because they are low-income displacees, two-thirds are minorities. The failure to build the projects had twice the adverse impact on minorities as it had on whites. This showing established a racially discriminatory effect." (internal citation omitted)). These cases have received some negative scrutiny, *see* THE STATISTICS OF DISCRIMINATION § 5:6, and the Court declines to follow them in this case for the reasons set forth above.

[165] *United States v. St. Bernard Par.,* No. CIV.A. 12-321, 2013 WL 1707829, at *4 (E.D. La. Apr. 19, 2013).

children. Because the percentage of families with children affected by the rules is larger than the percentage of households without children affected by the rules, Plaintiffs have shown there is a statistical disparity between the impact of the Perrier Condominium's occupancy rules on families with children and households without children.

### B. Plaintiffs have shown the statistical disparities in this case are substantial.

To prove a policy has a discriminatory effect on a protected class, a plaintiff also must show a statistical disparity between the policy's effect on the protected class and the non-protected class is "substantial"[166] or "significant."[167] This substantiality requirement ensures a statistical disparity is not merely the result of chance.[168]

The Fifth Circuit has not identified exactly how large a statistical disparity must be to be "substantial," but the court's decision in *Veasey* again provides guidance.[169] In *Veasey* the Fifth Circuit determined the district court did not err in holding SB 14, a voter ID law, had a disparate impact on minorities because it disproportionately prevented minority members from voting.[170] The Fifth Circuit pointed out several analyses supporting this finding. Analysis A, which indicated the largest statistical disparity, showed Black voters were "305% more likely than [or 4.05 times as likely as] their Anglo

---

[166] *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) ("[P]rima facie disparate impact case requires a showing of a substantial statistical disparity between protected and non-protected workers in regards to employment or promotion.'" (quoting *Munoz v. Orr*, 200 F.3d 291, 299–300 (5th Cir. 2000)); *St. Bernard Par.*, 2013 WL 1707829, at *4 (same).

[167] *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575–76 (2d Cir. 2003) (holding a plaintiff must show the percentage of protected class members affect by a policy is "significantly" greater than the percentage of non-protected class members affected by a policy.).

[168] *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 126 (D.R.I. 2015) ("The plaintiffs burden does not require any particular methodology, so long as the statistics show that 'the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof.'" (citing *Fudge v. Providence Fire Dep't,* 766 F.2d 650, 658 (1st Cir. 1985)).

[169] 830 F.3d 216 (5th Cir. 2016).

[170] *Id.* at 250–51.

peers to lack SB 14 ID."[171] Other Courts have found similar disparities to be "substantial."[172]

In this case, families with children are 104.7 times as likely as households without children to be affected by the Perrier Condominium's 250 square foot rule. This disparity of "104.7 times as likely" is far greater than any of the statistical disparities relied on in *Veasey*—the biggest of which was a "4.05 times as likely." Accordingly, the Court finds the statistical disparity between the effect of the 250 square foot rule on families with children and households without children is substantial.

Similarly, families with children are 30.5 times as likely as households without children to be affected by the Perrier Condominium's 400 square foot rule. This disparity "of 30.5 times as likely" is again far greater than any of the statistical disparities found substantial in *Veasey*. Accordingly, the Court finds the statistical disparity between the effect of the 400 square foot rule on families with children and households without children is substantial.

Focusing on the 250 square foot rule, Defendants argue that, even though the percentage of families with children excluded by the occupancy limits is many times larger than the percentage of households without children that are excluded, the statistical disparity still is not substantial because (1) in keeping with the "four-fifths" rule, the percentage of families with children of six who can rent unit 6036 is more than 80% of the percentage of households without children of six who can rent unit 6036, and (2) a

---

[171] *Id.* at 250.
[172] *See, e.g., Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 567 (E.D. La. 2009) (finding a substantial disparate impact because African Americans were 1.85 times as likely as Whites to be affected by a housing policy); *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 126 (D.R.I. 2015) (finding "households with children [we]re more than three times as likely to be adversely impacted by the rule when compared to comparable households with no children" and holding that statistical disparity was substantial enough to establish a prima facie disparate impact case).

high percentage—96.9%—of families with children are allowed to live in the Perrier Condominium. Defendants arguments are not persuasive.

First, the "four-fifths" rule is inapplicable in this case. The four-fifths rule derives from the EEOC Uniform Guidelines on Employment Selection Procedures and has been looked to by courts for guidance in gauging the significance of statistical evidence of discrimination in employment cases. The rule states:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths ( $4/5$ ) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.[173]

This rule is not binding on courts and is merely a "rule of thumb" to be considered in appropriate circumstances.[174] In fact, the guideline itself recognizes it does not work in some situations by including the statement that, "Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin."[175]

In this case, 99.96% of households without children in New Orleans are permitted to rent Unit 6036. Eighty percent of 99.96% is 79.97%.[176] Accordingly, the four-fifths rule would not support an inference of a substantial statistical disparity in this case so long as more than 79.97% of families with children are permitted to rent Unit 6036 under the 250 square foot rule. Defendants point out that 96.9% of families with children, a far high

---

[173] 29 C.F.R. § 1607.4(D).
[174] *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 118 (2d Cir. 1999). The Supreme Court has approved the use of a case-by-case approach for disparate impact claims, recognizing that statistics "come in infinite variety and . . . their usefulness depends upon all of the surrounding facts and circumstances." *Teamsters v. United States,* 431 U.S. 324, 339–40 (1977).
[175] 29 C.F.R. § 1607.4(D).
[176] 99.96 x .8 = 79.97.

percentage than 79.97%, are permitted to rent Unit 6036, and, as a result, they argue the four-fifths rule shows the occupancy limit has no substantial discriminatory effect on families with children.

Though Defendants are correct that the four-fifths rule does not demonstrate a substantial statistical disparity in this case, there are several reasons why the nonbinding four-fifths rule does not and should not apply. To start, the four-fifths rule can lead to incorrect inferences in cases, such as this one, in which the highest acceptance rate is near 100% (in this case, 99.96% of households without children are accepted in Unit 6036). As one treatise author has put it,

> One important limitation inherent in the ratio-of-selection-rates measure used by the four-fifths rule is that it is insensitive to sample size . . . [which may] result in findings of no adverse impact when nonrandomly produced disparities are present. The four-fifths rule, for example, would yield a permissible disparity if 5,000 of 5,000 favored group members and 4,000 of 5,000 disfavored group members passed the test. The ratio of selection rates would be 80%, which is acceptable. With such a large sample, however, the result was quite unlikely to have been produced by chance.[177]

Further, the Court has found no precedent applying the four-fifths rule in the FHA context.[178] It was not designed even to be a rule a thumb in this context, and accordingly, the Court will not afford it any weight in reaching its decision.

Second, Defendants are simply incorrect in stating that an acceptance rate of 96.9% precludes any possibly of finding a disparate impact. In *Veasey* the Fifth Circuit

---

[177] STATISTICS OF DISCRIMINATION § 5:6.

[178] In *R.I. Comm'n for Human Rights v. Graul*, the court discussed the four-fifths rule and ultimately applied a version of the so called "five-fourths" rule Dr. Bradford put forth in that case and has put forth in the instant case. 120 F. Supp. 3d 110, 126 n.23 (D.R.I. 2015). The court in *Rhode Island* correctly noted that the four fifths rule applies only when analyzing acceptance rates, but that "evaluation of occupancy policies compares groups *adversely* affected rather than receiving an advantage." *Id.* The court did, however, rely to some degree on the "five-fourths" rule, which is wholly different than the four-fifths because it compares fail rates rather than acceptance rates. In the instant case, the Court need not address the five-fourths rule as the statistical disparities are all substantial under the Fifth Circuit's precedent in *Veasey*. 830 F.3d 216, 250–51 (5th Cir. 2016).

found the Texas voter ID law had a disparate impact on minority voters even though, according to Analysis C, 94.7% Black voters and 93.1% of Hispanic voters were unaffected by the law.[179] What was crucial to the disparate impact finding in *Veasey* was that minority voters were significantly more likely to be affected by the law than White voters.[180] The high acceptance rate for minority voters was not dispositive. The Court acknowledges an acceptance rate could, in some cases, be so high that it defeats the substantiality requirement.[181] This case, however, is not such a case. It is undisputed that hundreds or thousands of families with children could be affected by the PCOA's occupancy rules.[182] Accordingly, the Court finds the statistical disparity between the effect of the PCOA's occupancy rules on families with children and households without children is substantial.

## III. The Court Defers Ruling on Whether the Robust Causality Requirement Has Been Met.

The last element of Plaintiffs' prima facie case is "robust causality." In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*

---

[179] 830 F.3d 216, 250–51 (5th Cir. 2016) ("4% of eligible White voters lacked SB 14 ID, compared to 5.3% of eligible Black voters and 6.9% of eligible Hispanic voters.").

[180] *Id.* Defendants reliance on *Moore v. Southwestern Bell Telephone Company* is incorrect. 593 F.2d 607 (5th Cir. 1979). In *Moore* the Fifth Circuit stated, "The District Court here found that the pass rate for black applicants in the relevant geographical district and time period was 93% That of white applicants. This Court is bound by findings of "subsidiary fact" adopted by a district court unless they are clearly erroneous, which these findings are not. We affirm the District Court's holding: a 7.1% Selection differential between black and white applicants does Not evidence the required disproportionate impact needed to make out a Prima facie case of discrimination." 593 F.2d at 608 (internal citations omitted). This is simply a restatement of the four-fifths rule. The Fifth Circuit by no means held that so long as a minority group's overall selection rate is above 93% there can be no disparate impact.

[181] For example, if, hypothetically, the 250 square foot rule excluded only 1 family with children and 1 household without children from living in Unit 6036, then technically families with children would be 2.5 times as likely to be affected by the rule (1 / 19,034 = .005% and 1 / 62,969 = .002% and .005% is 2.5 times as large as .002%). However, the Court agrees this would likely not be a "substantial" statistical disparity because it does not show the disparity is anything other than the result of chance.

[182] The acceptance rate for the 400 square foot rule is lower than for the 250 square foot rule. As a result, the Court likewise finds the statistical disparity born out by 400 square foot rule is substantial.

(*ICP*), the Supreme Court held a prima facie disparate impact case based on a statistical disparity includes a "robust causality" requirement.[183] The Court stated,

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that "[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise.[184]

The Fifth Circuit expounded on the "robust causality" requirement in *Inclusive Communities Project, Inc. v. Lincoln Properties Co.*[185] In that case, the plaintiffs claimed a property management company's policy of refusing to rent to individuals using Section 8 vouchers violated the FHA because African American's were the dominate group of voucher holders and, accordingly, the company's policy had a disparate impact on African Americans.[186] Over a strong dissent, the Fifth Circuit affirmed the trial court's decision to dismiss the plaintiffs' disparate impact claim because the plaintiffs failed to provide statistical evidence to make a prima facie showing that the company's policy robustly caused a disparate impact on African Americans.[187] The court stated,

> Neither the aforementioned "city-level data" nor the "census-level data" cited by ICP supports an inference that the implementation of Defendants-Appellees' blanket "no vouchers" policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area (or any of the other census areas discussed by ICP). . . . Indeed, ICP pleads no facts showing Dallas's racial composition before the Defendants-

[183] 135 S. Ct. 2507, 2523 (2015) (quoting and citing *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 653 (1989), *superseded by statute on other grounds,* 42 U.S.C. § 2000e–2(k)).
[184] *Id.*
[185] 920 F.3d 890 (5th Cir. 2019).
[186] *Id.* at 895, 897.
[187] *Id.* at 906.

Appellees implemented their "no vouchers" policy or how that composition has changed, if at all, since the policy was implemented.[188]

The dissent in *Inclusive Communities* argued the majority took the robust causality requirement too far by requiring a plaintiff to prove a challenged policy caused a "pre-existing condition."[189] According to the dissent, the robust causality requirement merely requires a plaintiff to "identify a policy or practice causing the alleged disparate impact on minorities."[190]

After losing their appeal, the plaintiffs in *Inclusive Communities*, moved for rehearing en banc, which was denied by a 9 to 7 vote.[191] An opinion joined by seven judges dissenting from the denial of rehearing en banc[192] argued, much like dissent from the panel decision, that "requiring plaintiffs to establish the level of proof the majority opinion advocates at this stage of litigation 'would render disparate impact liability under the FHA a dead letter' soon after the Supreme Court established disparate impact liability exists under the FHA."[193] Beyond this division within the Fifth Circuit, there is also some division between the circuit courts of appeal on this issue. For example, in *Reyes v. Waples Mobile Home Park LP,* the Fourth Circuit took a seemingly opposing view to the Fifth Circuit.[194]

---

[188] *Id*. at 907.
[189] *Id*. at 921 (Davis, J., dissenting in part).
[190] *Id*.
[191] *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660 (5th Cir. 2019).
[192] *Id*. at 661 (Haynes, J., dissenting).
[193] *Id*. (citing *Inclusive Comtys.*, 920 F.3d at 924 (5th Cir. 2019) (Davis, J., dissenting in part)).
[194] 903 F.3d 415 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026 (2019). The Fifth Circuit majority stated its holding comported with both the Fourth Circuit majority and dissent in *Reyes*. The dissent in the Fifth Circuit called this statement by the majority into question. *Inclusive Comtys.*, 920 F.3d at 921 (5th Cir. 2019) (Davis, J., dissenting in part).

On October 14, 2019, the plaintiffs in *Inclusive Communities* filed a petition for a writ of certiorari with the United States Supreme Court.[195] On December 9, 2019, the Supreme Court requested the defendant submit a response.[196] The defendant's response was filed on February 11, 2020.[197]

The Court finds Plaintiffs have shown the Perrier Condominium's occupancy rules have a discriminatory effect on families with children and that the effect is substantial, but the proof necessary to establish the "robust causality" element of a prima facie disparate impact case may be affected by the Supreme Court's potential decision in *Inclusive Communities*.[198] In light of the Supreme Court's potential review of the Fifth Circuit opinion in the near future, the Court will stay this case pending the Supreme Court's decision.[199]

## IV. Disputed Issues of Material Fact Preclude Summary Judgment on Whether There Are Justifications for the Occupancy Limits.

Defendants argue that, even if Plaintiffs have established a prima facie case that the PCOA occupancy rules cause a substantial discriminatory effect on a protected class under the FHA, Defendants have proven the challenged practice is necessary to achieve a valid, nondiscriminatory interest and summary judgment in their favor is in order.[200] It

---

[195] Petition for Writ of Certiorari, *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co., et al.*, U.S. (No. 19-497).

[196] *No. 19-497*, Supreme Court of the United States, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19-497.html.

[197] *Brief in Opposition to Petition for Writ of Certiorari, Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co., et al.*, U.S. (No. 19-497).

[198] 920 F.3d 890 (5th Cir. 2019).

[199] The expert testimony of Dr. Robins and Dr. Bradford concerned only Plaintiffs' prima facie case. Because the Court has resolved all aspects of whether Plaintiffs have made a prima facie case, but causation, the Court finds the testimony of Dr. Robins and Dr. Bradford is not needed to make that determination and, as a result, will not be helpful to the jury. Accordingly, under Federal Rule of Evidence 403, the Court grants Defendants' motion in limine to exclude the testimony of Dr. Bradford, R. Doc. 207, and Plaintiffs' motion in limine to exclude the testimony of Dr. Robins, R. Doc. 206. In the event the parties believe expert testimony is needed and would be helpful after the Supreme Court's decision in *Inclusive Communities*, the parties may request leave to provide additional expert testimony.

[200] *Inclusive Comtys.*, 920 F.3d at 901 (5th Cir. 2019) (citing 24 C.F.R. § 100.500(c)(2)).

is true that a housing provider has "leeway to state and explain the valid interest served by [the] polic[y]."[201] Nevertheless, a defendant's proffered reasons for a policy cannot be merely speculative and must be supported by facts or documentation.[202] Because disparate impact liability "mandates the removal of policies that create artificial, arbitrary, or unnecessary barriers for members of a protected class," the interest proffered must be "sufficiently compelling to justify the challenged practice."[203] A reason is not "legitimate" or "valid" if it was not present at the time a rule's adoption, but rather is a *post hoc* rationalization for a discriminatory policy, or when the justification is otherwise arbitrary.[204]

In *Fair Housing Center of Washington v. Breier-Scheetz Properties, LLC*, the defendants attempted to justify an occupancy limitation of "one person per studio apartment" by arguing the limitation ensured fair billing, because the utilities for the studio apartments were billed as a group, not individually, and by arguing the apartments were too small for more than one person.[205] The District Court for the Western District of

---

[201] *Id*. at 902 (quoting *ICP*, 135 S. Ct. at 2522–23). This requirement is different for public and private defendants. The FHA exempts governmental entities from liability by stating "[n]othing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. 3607(b)(1). The "reasonableness" standard applied to the review of occupancy limits enforced by public entities does not carry over to private entities. *United States v. Badgett*, 976 F.2d 1176, 1179 (8th Cir. 1992) (holding 3607(b)(1) did not apply to restrictions that were not "not governmentally imposed"). Instead, a private entity must demonstrate a specific, valid, non-discriminatory justification for an occupancy limit.

[202] *See Gashi v. Grubb & Ellis Prop. Mgmt. Servs.*, 801 F. Supp. 2d 12, 18 (D. Conn. 2011) (granting summary judgment and noting that, "[a]bsent any []documentation, defendants cannot show that structural limitations are a legitimate concern, and accordingly, fail to raise a material issue of fact to support the assertion that the occupancy policy furthers a legitimate interest in addressing structural concerns").

[203] *Fair Hous. Ctr. of Wash. v. Breier-Scheetz Props., LLC*, No. C16-922 TSZ, 2017 U.S. Dist. LEXIS 73037, at *3 (W.D. Wash. May 11, 2017) (citing *Inclusive Communities*, 135 S. Ct. at 2522); *see also R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 127 (D.R.I. 2015) (holding a defendant's purported justifications did not "overcome" the discriminatory impact of his housing policy).

[204] *E.g., Fair Hous. Ctr. of Wash.*, 2017 U.S. Dist. LEXIS 73037, at *4 (finding the defendant's interest in equalizing utility usage was an impermissible *post hoc* rationale for an occupancy limit and that limiting occupancy to one person per studio apartment to reduce wear and tear was arbitrary absent evidentiary support).

[205] *Id*.

Washington found the fair billing rationale was pretextual because the "free-rider" problem would arise even in the absence of the occupancy limit as not each person uses utilities equally.[206] Moreover, the court held the defendants' "subjective judgment that installing new meters for each apartment would be necessary if the occupancy policy were removed, without any objective evidence in support of that judgment, [wa]s not sufficient to rebut plaintiff's prima facie case of discrimination under the Fair Housing Act."[207] The defendant also failed to provide any evidence the apartments could not adequately accommodate more than one person other than their own conclusion the apartments are too small.[208]

In this case, Defendants have put forth three interests served by the Perrier Condominium's occupancy limit: (1) protecting the building's infrastructure, particularly its plumbing, (2) preserving the quality of life at the Perrier Condominium, and (3) complying with applicable municipal code provisions. The municipal code at issue in this case does not require the Perrier Condominium to impose an occupancy restriction of 250 or 400 square feet per person.[209] Accordingly, the municipal code does not justify the Perrier Condominiums' occupancy rule. Defendants' two other alleged interests may justify the Perrier Condominium's occupancy rule, but Defendants have not shown there

---

[206] *Id.*
[207] *Id.*
[208] *Id.*
[209] CODE OF THE CITY OF NEW ORLEANS, LOUISIANA § 26-197 ("Every living room shall contain at least 120 square feet and every bedroom shall contain a minimum of 70 square feet, and every bedroom occupied by more than one person shall contain a minimum of 50 square feet of floor area for each occupant thereof."); Code of the City of New Orleans, Louisiana § 26-197 (stating dwelling units with six or more must contain a living room of at least 150 square feet, a dining room of 100 square feet, and 50 square feet per person in bedroom space). Based on these guidelines, the absolute minimum amount of space required for a six person dwelling is 550 square feet (150 + 100 + (50 x 6) = 550). This is far less restrictive than the Perrier Condominium's 250 and 400 square foot rules.

are no disputes of material fact with respect to this issue, and the Court cannot decide the issue as a matter of law.

Protecting the value of a property, by reducing wear and tear, may be a valid, non-discriminatory justification for an occupancy rule. As the Ninth Circuit has put it, it "is certainly reasonable to seek to preserve the value of one's property . . . and a numerical limitation on occupancy clearly advances this legitimate business purpose."[210] In *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, the Tenth Circuit held that, even though the plaintiffs made a prima facie case a mobile home park's occupancy limit of three persons per home had a disparate impact on families with children, the limit was permissible under the FHA because of sewer system limitations.[211] The defendants put forth evidence showing the sewer pipes in the mobile home park were adequate to support an absolute maximum of 916 persons, or 4 persons per home.[212] Because this was an absolute maximum, however, the park lawfully decided to limit occupancy to three residents per home to allow for guests to use the sewer system without overloading it.[213] In contrast, in *Rhode Island Commission for Human Rights v. Graul*, the District Court for the District of Rhode Island rejected a defendant's wear and tear concerns as justifications for an occupancy rule because the defendant did not demonstrate the actual negative impact of plaintiffs violating the rule by housing an additional child residing in a one-bedroom apartment.[214]

---

[210] *Pfaff v. United States HUD*, 88 F.3d 739, 749 (9th Cir. 1996).
[211] 56 F.3d 1243 (10th Cir. 1995).
[212] *Id.* at 1256.
[213] *Id.* at 1257.
[214] 120 F. Supp. 3d 110, 129 n.29 (D.R.I. 2015).

Furthermore, quality of life concerns also may justify an occupancy limit.[215] In *Mountain Side*, the Tenth Circuit held an occupancy limit was permissible under the FHA based on concern over the quality of life in a mobile home park.[216] The court stated, "[b]ecause of the parking problems, density of the homes, and overall size of the Park, [the defendant] decided that the quality of life at the Park would be severely diminished if the Park had a maximum of 916 residents." Similarly, in *United States v. Weiss*, the District Court for the District of Nevada found the defendants showed "a compelling business necessity to limit the number of persons who may occupy" the apartments in an apartment complex because the complex lacked hot water.[217] The Court credited the "self-serving" testimony of the complex owner regarding the hot water supply problem and credited the testimony of a plumbing expert despite the fact that the expert was not hired until three years *after* the occupancy limit was put in place.[218] The court found the "defendants . . . submitted under penalty of perjury an analysis of the hot water system in place at the housing complex, made by a duly qualified professional engineer who opined (and gave his reasons) that the housing limitations imposed upon occupancy by defendants had a direct correlation to hot water capacity."[219] Accordingly, the court did not dismiss the expert's opinion as a merely *post hoc* rationale.[220]

In this case, disputed issues of fact remain regarding Defendants' contention that the Perrier Condominium's occupancy limit is necessary to protect the building's infrastructure, particularly its plumbing, and to preserve the quality of life at the Perrier

---

[215] *Mountain Side*, 56 F.3d at 1255.
[216] *Id*. at 1253.
[217] *United States v. Weiss*, 847 F. Supp. 819, 831 (D. Nev. 1994).
[218] *Id*. at 830–31.
[219] *Id*. at 831.
[220] *Id*.

Condominium. According to Defendants, the Perrier Condominium has fragile terra cotta waste piping that is beyond its useful life and subject to failure[221] and is serviced by a single, undersized water supply line made of low quality, galvanized steel, which is beyond its useful life and has corroded from within.[222] Plaintiffs, however, contend the Perrier Condominium's piping has not been fully inspected,[223] exactly how much of the building's systems remain made of galvanized steel or terra cotta is unknown,[224] and the PCOA has not conducted a study to quantify the risk to the building's infrastructure that would be caused by additional occupants above what current rules allow.[225]

Likewise, according to Defendants, the number of occupants in each Perrier Condominium unit bears directly on the quality of life in the Perrier Condominium[226] because more occupants would negatively affect the water supply, increase noise levels,[227] and increase competition for the use of the Perrier Condominium's common areas such as the laundry room, shed, backyard, garbage facilities,[228] and off street parking.[229] Plaintiffs dispute these assertions[230] by pointing out: the PCOA was unable to identify how an additional child, who cannot drive, would impact street parking;[231] the PCOA was unable to quantify how many additional garbage cans it might need to acquire if the total

---

[221] R. Doc. 204-1, at 9 (citing Ehlinger Rep. 2–3; Jablonowski Dep. 253:6–13; PCOA Dep. 295:5–302:12, 329:8–11; R. Doc. 204-2, at 78–86; R. Doc. 204-2, at 96).

[222] *Id.* (citing PCOA Dep. 252:11–259:7; Ehlinger Rep. 3; Ehlinger Dep. 103:23–25; Jablonowski Dep. 254:3–9).

[223] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 15 (citing Ehlinger Dep. 108:17–15, 41:14–43:16; 109:19–110:21; 123:12–21; 97:25–98; 96:10–97:18).

[224] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 17 (citing PCOA Dep. 292:6–13; 300:15–303:3; Ehlinger Dep. 44:17–44:25, 41:14–43:16, 41:14–43:16, 41:14–43:16, 109:19–110:21).

[225] R. Doc. 262-1, at 3; R. Doc. 212-2 ¶ 18 (citing PCOA Dep. 297:13–20).

[226] R. Doc. 204-1, at 10.

[227] *Id.* (citing PCOA Dep. 264:9–275:5; Favalora Dep. 97).

[228] *Id.* (citing PCOA Dep. 264:9–275:5; Favalora Dep. 97).

[229] R. Doc. 204-1, at 10 (citing PCOA Dep. 264:9–275:5).

[230] R. Doc. 262-1, at 3–4.

[231] R. Doc. 212-2 ¶ 32 (citing PCOA Dep. 271:8–271:17).

occupancy of the building increased;[232] two of the four units, including the one in which the Treeces resided, had their own, in-unit washing machines;[233] and there have been no issues coordinating back yard usage to date, even when unit owners had parties and houseguests increasing the number of people in the backyard.[234]

The disputed issues of fact concerning whether the Perrier Condominium's occupancy rules are necessary to protect a valid, nondiscriminatory interest prevent the Court from granting summary judgment to either party regarding the Defendants' proffered justifications for the Perrier Condominium's occupancy rules.

## V.     Disputed Issues of Material Fact Preclude Summary Judgment on Whether Defendants Interests May Be Served by a Non-discriminatory Alternative.

Even if Defendants had met their burden of showing a housing policy serves a legitimate interest, disputed issues of fact exist with respect to whether Defendants' interests "could be served by another practice that has a less discriminatory effect."[235] As a result, summary judgment is not in order. In *United States v. Weiss*, the court found the defendant showed "a compelling business necessity to limit the number of persons who may occupy" the apartments in a certain apartment complex because the complex lacked hot water. The court also determined the only alternative solution for the problem was spending 1.63 million dollars to upgrade the complex's hot water capacity, which was not feasible.[236] Accordingly, the court found the defendant's interest in preserving the hot

---

[232] R. Doc. 212-2 ¶ 36 (citing PCOA Dep. 273:25–274:6).
[233] R. Doc. 212-2 ¶ 37 (citing P. Treece Dep. 350:18–24 Acuff Dep. 113:13–114:9).
[234] R. Doc. 212-2 ¶ 39 (citing PCOA Dep. 264:12–266:12).
[235] *ICP*, 135 S. Ct. at 2514 (citing 24 C.F.R. § 100.500(c)(3)).
[236] *United States v. Weiss*, 847 F. Supp. 819, 831 (D. Nev. 1994).

water supply justified an occupancy limit and the interest could not be served by a feasible alternative practice.[237]

Even if the Court had found Defendants' actions justified by their interests in protecting the value of the Perrier Condominium and preserving the quality of life there, disputed issues of material fact prevent the Court from determining whether Defendants' proposed interests "could be served by another practice that has a less discriminatory effect."[238] For example, assuming the Perrier Condominium's fragile plumbing justifies its occupancy limits, Defendants have asserted the plumbing cannot be feasibly replaced because it would cost $63,685 to do so.[239] Plaintiffs have called the replacement cost into dispute.[240] Accordingly, there are disputed issues of material fact regarding whether Defendants alleged interests in protecting the Perrier Condominium may be served by a feasible, nondiscriminatory alternative policy, and the Court will not grant summary judgment to either party on this issue.

## VI. Defendants Are Not Entitled to Summary Judgment on Plaintiffs Claim Under § 3617.

42 U.S.C. § 3617 provides:

> It shall be unlawful to coerce, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

---

[237] *Id.*
[238] *Id.*
[239] R. Doc. 204-1, at 9 (citing Ehlinger Rep. 1).
[240] R. Doc. 262-1, at 3.

Defendants argue a § 3617 claim requires an underlying FHA violation.[241] Even assuming Defendants are correct, the Court has not granted summary judgment for Defendants on Plaintiffs' disparate impact claim, and accordingly, the Court does not grant summary judgment to Defendants on Plaintiffs' § 3617 claim.

## VII. A Stay Is Warranted in this Case to Allow the Supreme Court to Consider Disputes Regarding the Robust Causality Requirement.

A district court has wide discretion to stay a pending matter in order to control its docket and promote the interests of justice.[242] A court may stay an action pending the conclusion of an alternative proceeding, "whether the separate proceedings are judicial, administrative, or arbitral in character."[243] In considering whether to grant a stay, the Court weighs several "'competing interests which will be affected by the granting or refusal to grant a stay.'"[244] These competing interests include the following: (1) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay"; (2) "the possible damage which may result from the granting of a stay"; and (3) "the hardship or inequity which a party may suffer in being required to go forward."[245] The decision to grant or deny a stay is a matter of judgment and is reviewed by the Court of Appeals for abuse of discretion.[246]

---

[241] In *Hood v. Pope*, 627 F. App'x 295, 300 (5th Cir. 2015), the Fifth Circuit held a plaintiff had failed to state a claim under Section 3604, and therefore, "[a]ny subsequent harassment by any of the defendants did not violate § 3617."

[242] *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990); *see, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

[243] *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979).

[244] *Fishman Jackson PLLC v. Israely*, 180 F.Supp.3d 476, 482 (N.D. Tex. 2016) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

[245] *Id.*

[246] *Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 784 (5th Cir. 1997).

The Court finds a stay is warranted in this case to allow the Supreme Court to determine whether it will grant a writ of certiorari in *Inclusive Communities*,[247] and, if so, whether it will clearly resolve the meaning of the "robust causality" requirement of a prima facie disparate impact claim under the FHA. Were the Court to rule on this issue now, the parties in this case may not receive the benefit of a clarifying ruling from the Supreme Court. Further, the parties in this case will not suffer any hardship as a result of a stay because Plaintiffs no longer reside at the Perrier Condominium, and Plaintiffs do not face the risk of eviction. Accordingly, the Court finds it is in the interests of justice to stay this matter pending the Supreme Court's potential review of the Fifth Circuit's decision in *Inclusive Communities*.[248]

## **CONCLUSION**

**IT IS ORDERED** that Defendants' motion for partial summary judgment is **DENIED**.[249]

**IT IS FURTHER ORDERED** that Plaintiffs' motion for partial summary judgment is **GRANTED IN PART**.[250] Plaintiffs are entitled to summary judgment that there is a substantial statistical disparity between the effect of Perrier Condominium's 250 square foot and 400 square foot occupancy limits on families with children and households without children.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for partial summary judgment is **DEFERRED IN PART**. The Court has made no finding regarding whether the "robust causality" requirement of Plaintiffs' prima facie case has been met.

---

[247] 920 F.3d 890 (5th Cir. 2019).
[248] *Id.*
[249] R. Doc. 204.
[250] R. Doc. 212.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for partial summary judgment is **DENIED IN PART** as there are disputed issues of material fact regarding the Defendants' justifications for enforcing an occupancy limit and whether there are nondiscriminatory alternatives to serve those interests.

**IT IS FURTHER ORDERED** that Defendants' motion in limine to exclude the testimony of Dr. Bradford is **GRANTED**.[251]

**IT IS FURTHER ORDERED** that Plaintiffs' motion in limine to exclude the testimony of Dr. Robins is **GRANTED**.[252]

**IT IS FURTHER ORDERED** that this action be **ADMINISTRATIVELY CLOSED** and **STAYED**. The Clerk of Court shall mark this action as "**CLOSED**" for statistical purposes. This Court shall retain jurisdiction, and these cases shall be restored to the trial docket upon motion of a party either upon the U.S. Supreme Court's denial of the petition for a writ of certiorari or, if the petition is granted, issuance of an opinion in *Inclusive Communities*.[253]

**New Orleans, Louisiana, this 14th day of February, 2020.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[251] R. Doc. 207.
[252] R. Doc. 206.
[253] *Id.*