UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| DWAYNE TREECE, ET AL., | CIVIL ACTION |
| --- | --- |
| Plaintiffs | |
| VERSUS | NO. 17-10153 |
| PERRIER CONDOMINIUM OWNERS ASSOCIATION, INC., ET AL., | SECTION: "E" |
| Defendants | |

## ORDER AND REASONS

Before the Court is a motion to lift stay and for reconsideration under Federal Rule of Civil Procedure 59 filed by Defendants.[1] Plaintiffs oppose the motion.[2] For the following reasons, Defendants' motion is **DENIED**.

## BACKGROUND

In August 2017, Plaintiffs Dwayne and Phallon Treece, along with their four children, rented a condominium unit (Unit 6036) in a four-unit building located at 6032–6038 Perrier Street, New Orleans, Louisiana ("the Perrier Condominium").[3] Plaintiff Clifford Harlan owns the unit the Treeces rented.[4] Defendants Acuff, Jablonowski, and Haile individually own the other three units.[5] The four unit owners are the sole members of the Perrier Condominium Owner's Association (PCOA), which governs the Perrier Condominium regime.[6]

Plaintiffs allege Defendants violated the Fair Housing Act by enacting and enforcing an occupancy limit on the Perrier Condominium that has a disparate impact on

---

[1] R. Doc. 336.
[2] R. Doc. 337.
[3] R. Doc. 16 ¶ 1; R. Doc. 49 ¶ 1.
[4] R. Doc. 16 ¶ 13; R. Doc. 49 ¶ 13.
[5] R. Doc. 16 ¶¶ 14–17; R. Doc. 49 ¶¶ 14–17.
[6] *Id.*

1

families with children, discriminating against the Treeces based on their familial status, attempting to evict the Treeces based on their familial status, and attempting to force Harlan to evict the Treeces based on their familial status.[7] Plaintiffs seek declaratory relief, injunctive relief, and damages for these alleged violations.[8]

The parties cross moved for partial summary judgment on Plaintiffs' disparate impact claim under 42 U.S.C. § 3604(a).[9] Defendants moved for summary judgment on Plaintiffs' § 3617 claim.[10] The parties also sought to exclude each other's expert witnesses.[11] In a prior Order and Reasons, the Court denied Defendants' motion for summary judgment; denied in part, granted in part, and deferred in part Plaintiffs' motion for summary judgment; granted Defendant's motion to exclude the testimony of Dr. Bradford; and granted Plaintiffs' motion to exclude the testimony of Dr. Robins.[12] Defendants now file the instant motion requesting the Court reconsider its prior entry of a stay of this case and denial of Defendants' motion for summary judgment.[13]

## **LEGAL STANDARD**

Generally, the courts in this district evaluate a motion to reconsider an interlocutory order under the same standards as those governing a motion to alter or amend a final judgment brought pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.[14]

---

[7] R. Doc. 16. ¶¶ 2–3.
[8] *Id.* at 17–18.
[9] R. Doc 204; R. Doc. 212.
[10] R. Doc 204.
[11] R. Doc. 206; R. Doc. 207.
[12] R. Doc. 332.
[13] R. Doc. 336.
[14] *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. CIV.A. 09-4369 R, 2010 WL 1424398, at *4 (E.D. La. Apr. 5, 2010) ("The general practice of this court has been to evaluate motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment.").

2

A motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure "must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued."[15] A motion for reconsideration, however, "is 'not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of [the order].'"[16] "The Court is mindful that '[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.'"[17] "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted."[18]

In deciding motions under the Rule 59(e) standards, the courts in this district have considered the following factors:

(1) whether the movant demonstrates the motion is necessary to correct manifest errors of law or fact upon which the judgment is based;
(2) whether the movant presents new evidence;
(3) whether the motion is necessary in order to prevent manifest injustice; and
(4) whether the motion is justified by an intervening change in the controlling law.[19]

---

[15] *Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (citations omitted) (internal quotation marks omitted).
[16] *Lacoste v. Pilgrim Int'l*, No. 07-2904, 2009 WL 1565940, at *8 (E.D. La. June 3, 2009) (quoting *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004)).
[17] *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *4 (alteration in original) (quoting *Templet,* 367 F.3d at 479).
[18] *Lightfoot v. Hartford Fire Ins. Co.*, No. 07-4833, 2012 WL 711842, at *3 (E.D. La. Mar. 5, 2012).
[19] *Castrillo*, 2010 WL 1424398, at *4. The Court notes that the time limits of Rule 59 do not apply in this matter because the order appealed is interlocutory. Rules 59 and 60 set forth deadlines for seeking reconsideration of final judgments. *See Carter v. Farmers Rice Milling Co., Inc.*, 33 F. App'x 704 (5th Cir. 2002); *Lightfoot*, 2012 WL 711842, at *2.

## LAW AND ANALYSIS

In the instant motion, Defendants argue reconsideration is necessary "to correct manifest errors of law."[20] Defendants' primary argument for reconsideration is that the Court erred in basing its disparate impact analysis on a comparison of the percentage of renter families with children and renter households without children in New Orleans that are *excluded* from residing in Unit 6036 by the PCOA's occupancy limit (the "rejection rates"). Defendants argue, instead, the Court should have compared the percentage of renter families with children and renter households without children in New Orleans that are *permitted* to reside in Unit 6036 under the occupancy limit (the "acceptance rates") and found the limit has no disparate impact on families with children.

Initially, Defendants' argument stands on weak footing as Defendants fail to identify any legal authority that either prohibits the comparison of rejection rates or requires the comparison of acceptance rates in a case, such as this one, involving a disparate impact claim under the FHA. Defendants cite to one case, *Langlois v. Abington Housing Authority*, in which the District Court for the District of Massachusetts considered the "acceptance rates" of a public housing agencies' residency preference for Section 8 housing to find the preferences worked a disparate impact on racial minorities.[21] The court in *Langlois*, however, considered a wide array of tests for analyzing the disparate impact claim and held "no single test leaps off the page as ideal."[22] The *Langlois* court did not purport to mandate that acceptance rates must be considered when

---

[20] R. Doc. 336-1, at 2. Defendants attached three new exhibits to their motion to reconsider. R. Doc 336-2; R. Doc. 336-3; R. Doc. 336-4. Defendants do not argue these exhibits are "new evidence" that was previously unattainable and now calls for reconsideration. Instead, they rely on these exhibits merely to bolster their argument that reconsideration is necessary to correct manifest errors of law. The Court will not consider these exhibits because new evidence cannot be used to demonstrate a manifest error of law warranting reconsideration.
[21] 234 F. Supp. 2d 33 (D. Mass. 2002).
[22] *Id.* at 62.

analyzing a disparate impact claim under the FHA. Further, even if the court had made such a ruling, it would not be binding on this Court, it would not have overcome the mountain of precedent supporting the comparison of rejection rates in cases such as this one,[23] and it would have been distinguishable as it arose in the context of a voucher program, not a housing occupancy limit.

Despite the dearth of legal authority supporting Defendants' position, Defendants provide several other reasons they believe the Court should consider only acceptance rates in this case. First, Defendants argue a comparison of rejection rates creates a "no-win" scenario for landlords because every occupancy limit would have a disparate impact on families with children. This cannot be right, according to Defendants, because the FHA permits landlords to have occupancy limits.

Defendants are correct that the FHA permits private landlords to impose occupancy limits that are either nondiscriminatory or, if discriminatory in effect, have a sufficient nondiscriminatory justification.[24] Defendants also correctly point out that very often—though not always[25]—occupancy limits will have a disparate impact on families with children. In fact, the Court has not identified any cases in which another court found an occupancy limit did *not* have a disparate impact on families with children.[26]

---

[23] *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 567 (E.D. La. 2009) (finding a substantial disparate impact because African Americans were 1.85 times as likely as Whites to be affected by a housing policy); *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 126 (D.R.I. 2015) (finding "households with children [we]re more than three times as likely to be adversely impacted by the rule when compared to comparable households with no children" and holding that statistical disparity was substantial enough to establish a prima facie disparate impact case); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 17 (D. Conn. 2011).
[24] *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002).
[25] It is entirely possible that a certain limit in a certain area will not have a disparate impact on families with children. For example, consider a college town in which, potentially, many large households are not "families with children" protected by the FHA but rather are households of college students. The Court does not agree with Defendant's argument that comparing rejection rates will show a prima facie disparate impact claim in all scenarios.
[26] *See, e.g.*, *Graul*, 120 F. Supp. at 126 (finding "households with children [we]re more than three times as likely to be adversely impacted by the rule when compared to comparable households with no children"

Defendants are incorrect, however, in arguing that the Court's ruling impermissibly creates a "no-win" scenario for landlords. Any occupancy limit, including the PCOA's limit, that is sufficiently justified is permissible under the FHA even if, under the Court's methodology, it has a disparate impact on families with children. Accordingly, the Court finds it made no error of law in using a methodology that will often demonstrate an occupancy limit has a disparate impact on renter families with children.

Second, Defendants argue that, if the Court considers only rejection rates, "more inclusive" occupancy limits—limits that accept larger households and more families—will paradoxically have a *more* disparate impact on families with children.[27] A comparison of acceptance rates, the defendants argue, will reflect that "more inclusive" occupancy limits have a *less* disparate impact on families with children.

There is nothing paradoxical about a practice or policy being "more inclusive" but nevertheless "more discriminatory." In fact, such a scenario is entirely commonplace; a law calculated to affect only a small subset of individuals may often be very inclusive but very discriminatory. In *Veasey v. Abbott*, the Fifth Circuit held a law requiring a specific kind of voter identification had a disparate impact on minorities.[28] Although the law in that case was extremely "inclusive"—more than ninety percent of voters in all voter groups had the requisite ID—it was nonetheless discriminatory because its effect fell more harshly on minority voters—minority voters were 2.95 and 4.05 times as likely as white voters to be prohibited from voting.[29]

---

holding that statistical disparity was substantial enough to establish a prima facie disparate impact case); *Gashi*, 801 F. Supp. at 17.

[27] Defendants argue, "the more inclusive the limit, the higher the ratio of rejection rates and the more unacceptable under the Court's paradigm. Accordingly, the more households with children who are included by an occupancy limit, the more substantial the "disparity" of the rejection ratio appears." R. Doc. 336-1, at 5.

[28] 830 F.3d 216 (5th Cir. 2016).

[29] *Id.* at 250–51.

So too in this case, it is not an error in the Court's methodology that, as an occupancy limit increases, it may have a more disparate impact on families with children. It is obvious to most people that higher occupancy limits will often have a harsher impact on families with children because most large households are families with children.[30] That outcome poses no danger to the FHA's allowance of occupancy limits, however, because a high occupancy limit can be more easily justified based on nondiscriminatory rationales.

In sum, Plaintiffs have not brought a "significant" impact claim. They have brought a "disparate" impact claim. As the name suggests, the focus of such a claim is on whether the complained of policy has an effect that falls more harshly on a protected class.[31] The focus is not on whether any certain number or percentage of protected individuals is affected. In this case, there is no doubt the effect of the occupancy limits on Unit 6036

---

[30] For example, imagine that in City X there are 1,000 people, 500 of whom are Black and 500 of whom are White. A landlord in City X prohibits "all Toyota owners" from renting his apartment. There are 200 people who own Toyotas in City X, 100 of whom are White and 100 of whom are Black. The landlord's policy is obviously not facially discriminatory against a racial group, and it also has no disparate impact on any racial group—the "no Toyota" policy affects 20% of Black individuals in City X just like it affects 20% of White individuals.

Then imagine, though, that another landlord in City X begins prohibiting "all Toyota Camry owners" from renting his apartment. There are only 50 Toyota Camry owners in City X, 49 of whom are Black and 1 of whom is White. The "no Camry" policy, like the "no Toyota" policy," is facially neutral. The "no Camry" policy, however, works a disparate impact on Black individuals. The "no Camry" policy affects 9.8% of Black individuals in City X, while it only affects .2% of white individuals. That means a Black individual in City X is 49 times more likely to be affected by the "no Camry" policy.

Defendants would argue the "no Camry" policy should not be said to work a disparate impact on Black individuals for two reasons. First, the acceptance rates do not violate the four-fifths rule; 99% of White individuals are permitted to live in the apartment under the policy and 90% of Black individuals—more than 80% of the acceptance rate of White individuals—are permitted to live there. Second, Defendants might argue the "no Camry" policy is "more inclusive" than the "no Toyota policy" because it allows more individuals—and even more Black individuals—to reside at the apartment; 451 Black individuals may reside at the apartment under the "no Camry" policy while only 400 Black individuals may reside at the apartment under the "no Toyota" policy.

The Court understands these arguments but does not find them persuasive. Instead, the Court would find the "no Camry" rule has a disparate impact on Black individuals because it affects Black individuals far more often than it affects White individuals. The four-fifth's rule, while telling in certain contexts, does not paint an accurate picture in the FHA realm. And though it is true the "no Camry" policy is "more inclusive," it is also "more discriminatory" because the smaller group it excludes is almost entirely made up of Black individuals.

[31] *Inclusive Comtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 901 (5th Cir. 2019) (citing *ICP*, 135 S. Ct. at 2513 (2015)) (holding a disparate impact claim asserts a policy or practice has an "unjustified, disproportionately adverse effect on [a protected class]").

falls more harshly on renter families with children than renter households without children because renter families with children are 30.5 or 104.7 times as likely to be affected by them.[32]

Besides Defendants' primary contention that the Court should not have relied on rejection rates to make its disparate impact finding, Defendants also quibble with a few other aspects of the Court's ruling. Defendants argue the Court's reliance on *Tsombanidis v. West Haven Fire Department* was incorrect because the court in *Tsombanidis* restricted the "affected group" to individuals "who needed the type of housing at issue."[33] Defendants complain, however, that the Court in this case did not restrict the group affected by the PCOA's occupancy limit to families with children who would be likely to rent Unit 6036.

The Court finds this argument by Defendants is disingenuous because Defendants have consistently relied on "all renters in New Orleans," "all renter households without children in New Orleans," and "all renter families with children in New Orleans" as the appropriate comparison groups.[34] Defendants' own expert compared the effect of the PCOA's occupancy limit on renter families with children in New Orleans and did not limit the affected group to only those families that would be likely to rent Unit 6036.[35] Further, the Court's comparison of these groups is in accord with the analysis of other courts.[36]

Defendants also argue "[j]udging an occupancy limit by the ratio of the rejection rates makes redressability impossible, because an increase in the occupancy limit to

---

[32] R. Doc. 332, at 25.
[33] 352 F.3d 565, 575 (2d Cir. 2003).
[34] R. Doc. 336-1, at 8; R. Doc. 206-3, at 9.
[35] R. Doc. 206-3, at 9.
[36] *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 17 (D. Conn. 2011); *Huntington Branch,* 844 F.2d at 937–38) (approving of the use of city-wide data in determining whether a facially neutral policy has a disparate impact on a particular group).

8

accommodate more households with children results in a higher rejection ratio, which would be more 'disparate' in its impact under the Court's paradigm."[37] This is incorrect. There is an obvious means of remedying any *unlawfully* discriminatory occupancy limit—remove it. The Court's ruling in no way eliminates this remedy.

In Defendants' reply in support of their motion for reconsideration, Defendants raise several issues not presented in their initial motion for reconsideration, such as asserting there is "newly discovered evidence" the Court must consider.[38] After extensive briefing and oral argument, Defendants now seek to introduce what is, in essence, a new expert report in the form of a reply brief in support of a motion for reconsideration. "[A]rguments cannot be raised for the first time in a reply brief." Accordingly, the Court will not consider to the novel—but ultimately unpersuasive—arguments Defendants put forth at this late stage in the proceedings. A motion for reconsideration "is 'not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of [the order].'"[39]

The Court does note the reply brief makes a number of incorrect statements. For example, contrary to Defendants' assertion, Plaintiffs' did advocate the comparison of rejection rates prior to the Court's ruling,[40] and Defendants directly replied to Plaintiffs' comparison.[41] As a result, whether to rely on a comparison of rejection rates to form the basis of a disparate impact claim was squarely before the Court.[42] Also, in their initial

---

[37] R. Doc. 336-1, at 6.
[38] *Little Tchefuncte River Ass'n v. Artesian Util. Co., Inc.*, 155 F. Supp. 3d 637, 657 (E.D. La. 2015) (citing *Benefit Recovery, Inc. v. Donelon,* 521 F.3d 326 (5th Cir.2008)).
[39] *Lacoste v. Pilgrim Int'l*, No. 07-2904, 2009 WL 1565940, at *8 (E.D. La. June 3, 2009) (quoting *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004)).
[40] R. Doc. 262-1, at 6–7.
[41] R. Doc. 293, at 2.
[42] Even if it was not before the Court, the Court could have applied the clear law allowing the comparison of rejection rates to the undisputed facts before it. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986)

9

motions, Defendants also explicitly relied on, and did not contest, the statistics they now take issue with, such as Dr. Bradford's finding that there are 758 renter families with children and 24 renter families without children in New Orleans.[43] Defendants cannot now, in a motion for reconsideration, alter the record to treat previously uncontested facts as being in dispute.

Further, the Court would like to clarify a few points about its prior order. In footnote 181 of the Court's order, the Court did not, as Defendants suggest,[44] hold a showing that families with children are 2.5 more likely to be affected by a policy would not be a "substantial statistical disparity." Instead, the Court made clear that, in the hypothetical posed in footnote 181, the acceptance rate would "be so high that it defeats the substantiality requirement."[45] The Court also previously addressed why the four-fifths rule does not control this case.[46]

Lastly, Defendants argue the Court should have deferred ruling on the "robust causality" requirement of its motion for summary judgment pending the Supreme Court's review in *Inclusive Communities*.[47] The Court denied Defendants' motion for summary judgment because, regardless of the Supreme Court's decision in *Inclusive Communities*, Defendants did not show there are no disputed issues of material fact and they are entitled to judgment as a matter of law on the robust causality requirement. Now that the Supreme Court has ruled on the pending petition for writ of certiorari in *Inclusive Communities*, all parties will have an opportunity to address the robust causality requirement as it

---

("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.").
[43] R. Doc. 332, at 10.
[44] R. Doc. 336-1, at 4–5.
[45] R. Doc. 332, at 30.
[46] *Id.* at 28–29.
[47] 920 F.3d 890 (5th Cir. 2019).

relates to this case.[48] Accordingly, the Court will not defer ruling on Defendants' motion for summary judgment.

'[R]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.'"[49] "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted."[50] Defendants have not met their heavy burden of showing the Court committed a manifest error of law or that new evidence should be admitted that warrants a different result.

## **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Defendants' motion to lift the stay and for reconsideration is **DENIED**.[51]

**New Orleans, Louisiana, this 23rd day of March, 2020.**

                                                                       _____
                                                                        **SUSIE MORGAN**
                                                   **UNITED STATES DISTRICT JUDGE**

---

[48] Order List: 589 U.S. (Mar. 23, 2020).
[49] *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *4 (quoting *Templet*, 367 F.3d at 479).
[50] *Lightfoot v. Hartford Fire Ins. Co.*, No. 07-4833, 2012 WL 711842, at *3 (E.D. La. Mar. 5, 2012).
[51] R. Doc. 336.