UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DWAYNE TREECE, ET AL.,                          CIVIL ACTION
     Plaintiffs

VERSUS                                          NO.  17-10153

PERRIER CONDOMINIUM OWNERS                      SECTION: "E" (3)
ASSOCIATION, INC., ET AL.,
     Defendants

ORDER AND REASONS

Before the Court is Plaintiffs' Motion for Partial Summary Judgment.[1] In the February 14, 2020 Order and Reasons partially deciding this motion, the Court determined "Plaintiffs are entitled to summary judgment that there is a substantial statistical disparity between the effect of Perrier Condominium's 250 square foot per person and 400 square foot per person occupancy limits on families with children and households without children."[2] The last element of Plaintiffs' prima facie case, "robust causality," is the only issue remaining to be decided on Plaintiffs' summary judgment motion.  Specifically, the Court must determine whether Plaintiffs have completed the elements of their prima facie case by offering evidence that Defendant Perrier Condominium Owners Association's ("PCOA") 250 square foot per person occupancy limit (hereinafter "250 square foot rule") and 400 square feet per person occupancy limit (hereinafter "400 square foot rule")  *robustly caused* a disproportionate impact on families with children in violation of 42 U.S.C. § 3604(a) of the Fair Housing Act ("FHA").

---

[1] R. Doc. 212.
[2] R. Doc. 332 at 42.

1

Also before the Court is Defendants' cross Motion for Partial Summary Judgment regarding Plaintiffs' § 3604(a) disparate impact claim and § 3617 claim to the extent it is based on the violation of § 3604(a).[3] In the previous Order and Reasons dated February 14, 2020, the Court denied Defendants' cross-motion for partial summary judgment on the § 3604(a) claim in its entirety.[4] On reflection, the Court's February 14, 2020 order decided only that there is a substantial statistical disparity between the effect of Perrier Condominium's 250 square foot rule and 400 square foot rule on *families with children* and *households without children*. Whether Plaintiffs have established the robust causation element of their § 3604(a) prima facie case remains before the Court. The better course for the Court would have been to deny in part Defendants' Motion for Partial Summary Judgment on the § 3604(a) claim rather than denying it entirely. In the February 14, 2020 Order, the Court also denied Defendants' Motion for Partial Summary Judgment on Plaintiffs' § 3617 claim based on the violation of § 3604(a). The Court's denial was based on the Court's assumption in the December 2, 2019 Order that the Plaintiffs had underlying § 3604(a), (b), and (d) claims.[5] The Court will now consider the Defendants' cross motion for partial summary judgment to determine whether it should be granted as to Plaintiffs' § 3604(a) claim and, if so, also as to Plaintiffs' § 3617 claim to the extent it is based on a § 3604(a) violation.

## **BACKGROUND**

In August 2017, Plaintiffs Dwayne and Phallon Treece, along with their four children, rented condominium Unit 6036 in a four-unit building located at 6032–6038

---

[3] R. Doc. 204.
[4] R. Doc. 332.
[5] R. Doc. 174 at 17.

Perrier Street, New Orleans, Louisiana ("the Perrier Condominium").[6] Plaintiff Clifford Harlan owns the unit the Treeces rented.[7] Defendants Acuff, Jablonowski, and Haile individually own the other three units.[8] The four unit owners are the sole members of the Perrier Condominium Owner's Association (PCOA), which administers the Perrier Condominium regime.[9] Plaintiffs allege Defendants violated the FHA by enacting and enforcing occupancy limits for the Perrier Condominium that have a disparate impact on families with children, discriminating against the Treeces based on their familial status, attempting to evict the Treeces based on their familial status, and attempting to force Harlan to evict the Treeces based on their familial status.[10]

This Court already has determined Plaintiffs have shown Defendants' policies have a discriminatory effect on families with children and the statistical disparities are substantial.[11] In its previous Order and Reasons on Plaintiffs' partial motion for summary judgment, the Court held "Plaintiffs are entitled to summary judgment that there is a substantial statistical disparity between the effect of Perrier Condominium's 250 square foot and 400 square foot occupancy limits on families with children and households without children."[12]

After issuing its Order and Reasons, the Court stayed this case and reserved ruling on the element of robust causation pending grant or denial of a writ of certiorari to the Supreme Court in the matter of *Inclusive Communities Project, Inc. v. Lincoln Property*

---

[6]  R. Doc. 16 ¶ 1; R. Doc. 49 ¶ 1.
[7]  R. Doc. 16 ¶ 13; R. Doc. 49 ¶ 13.
[8]  R. Doc. 16 ¶¶ 14–17; R. Doc. 49 ¶¶ 14–17.
[9]  *Id.*
[10]  R. Doc. 16. ¶¶ 2–3.
[11] R. Doc. 332.
[12] *Id.* at 42.

*Company et al.* (hereinafter "*Lincoln Property*").[13] On October 14, 2019, the plaintiffs in *Lincoln Property* petitioned the Supreme Court for a writ of certiorari.[14] On March 23, 2020, the Supreme Court denied the writ[15] and this Court lifted its stay.[16]

Following the Supreme Court's denial of the writ and the lifting of the stay, the Court allowed the parties to submit supplemental briefs and expert reports on the element of causation.[17] The parties both submitted supplemental memorandums, Plaintiffs submitted two additional expert reports in support of their summary judgment motion (the reports of Dr. John Logan and Dr. Allan Parnell),[18] and Defendants submitted four additional expert reports (the reports of Dr. Paul Jargowsky, Dr. Russell Robins, Dr. Michael Eriksen, and Defendant Christopher Jablonowski).[19] Plaintiffs filed a reply in opposition[20] to Defendants' supplemental memorandum in support of their motion for summary judgment.  Defendants filed a reply in support of their motion for partial summary judgment.[21]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22] "An issue is material if its resolution could affect the outcome of the action."[23] When assessing whether a material factual dispute exists, the Court considers "all of the

---

[13] 920 F.3d 890 (5th Cir. 2019), petition for reh'g denied, 930 F.3d 660 (5th Cir. 2019), cert. denied, 140 S. Ct. 2506 (Mar. 23, 2020).
[14] *Id.*
[15] *Id.*
[16] R. Doc. 339.
[17] R. Doc. 347.
[18] R. Doc. 363.
[19] R. Doc. 364.
[20] R. Doc. 371.
[21] R. Doc. 376.
[22] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[23] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

evidence in the record but refrains from making credibility determinations or weighing the evidence."[24] All reasonable inferences are drawn in favor of the nonmoving party.[25] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[26]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[27] If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[28]

When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter

---

[24] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

[25] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[26] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

[27] *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 323).

[28] *Celotex*, 477 U.S. at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the movants to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).

of law.[29] When proceeding under the second option, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[30] The burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[31] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[32] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[33]

"[U]nsubstantiated assertions are not competent summary judgment evidence."[34] The opposing party must "identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[35]

## UNDISPUTED FACTS

---

[29] *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[30] *Celotex*, 477 U.S. at 332–33.
[31] *Id.*
[32] *Id.* at 332–33 & fn.3.
[33] *Id.*; *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).
[34] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324).
[35] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

On March 31, 2020, the Court allowed the Plaintiffs and Defendants to produce additional expert reports and file supplemental memorandums.[36] Because the Court already had identified the undisputed facts relevant to the cross-motions for partial summary judgment, the Court did not give the parties leave to submit additional statements of undisputed fact. The Plaintiffs did not submit an additional statement of undisputed facts with their supplemental memorandum.[37] The Defendants, however, did incorporate a discussion of what they claim are additional undisputed facts in their supplemental memorandum, without leave of court.[38] Plaintiffs, in a reply to Defendants' supplemental memorandum, identified which of Defendants' statements they dispute.[39] Because the Court already had determined the undisputed facts relating to the pending cross-motions for summary judgment, and did not give the parties leave to submit additional statements of undisputed facts, the Court will not consider the Defendants' additional list of undisputed facts[40] or the Plaintiffs' response.[41]

As mentioned above, in its previous Order and Reasons granting Plaintiffs' Motion for Summary Judgment in part, the Court determined the following facts are undisputed:

> The Perrier Condominium contains four units. Plaintiff Harlan and Defendants Acuff, Jablonowski, and Haile each own one of the units. The four unit owners are the sole members of the Perrier Condominium Owners Association (PCOA), which governs the Perrier Condominium regime. In August 2017, the Treeces, a family of six, rented Unit 6036 from Plaintiff Harlan.

> The Perrier Condominium is subject to a facially neutral use and occupancy rule stated in the Condominium Declaration. The occupancy rule states "no unit shall be occupied, even for permitted use, by more than one (1) person making such Unit

---

[36] R. Doc. 347.
[37] R. Doc. 363.
[38] R. Doc. 364.
[39] R. Doc. 371-1.
[40] R. Doc. 364 at 2-4. The vast majority of the undisputed facts listed by the Defendants already were included in the Court's listing of the undisputed facts in its previous Order and Reasons. Most of the others are quotes from expert reports, which the Court allowed the parties to provide in support of the motions.
[41] R. Doc. 371-1.

his or her residence for each two hundred fifty (250) square feet of floor area within the Unit." The occupancy rule allows up to five people to occupy Unit 6036. The Treece family exceeds the occupancy limit as applied to Unit 6036.

The PCOA, in part, justifies the occupancy limit as necessary to reduce wear and tear on the Perrier Condominium and its infrastructure. PCOA governing documents empower the PCOA to make repairs to units at the expense of the unit owners. The PCOA has not computed the maximum number of residents that the Perrier Condominium's infrastructure can handle.

The PCOA also justifies its occupancy rule based on "quality of life" concerns such as street parking, backyard space, garbage can management, laundry use, and noise. The Perrier Condominium does not have a parking lot. The Perrier Condominium has four garbage cans. The PCOA rules include a rule governing noise and nuisance. Harlan's unit could be modified to ameliorate noise concerns.

On August 16, 2017, Harlan informed Acuff, Jablonowski, and Haile by email that he had rented his unit to the Treeces. Acuff, whose unit abuts Harlan's unit, responded by email asking, "How long is their lease? And how many children do they have? They are moving in as I write this and I am listening to a kid screaming through the wall and running all over the floors." Haile responded to Harlan's email and stated, "[t]his renter, Dwayne, had actually contact me in regards to renting my unit the very first week I posted it. He came to look with his youngest child. He is a nice guy but I decided the condo was not the best fit as they have 3 small children." Acuff responded by stating "this could be a serious issue. Reasonable limitations on occupancy are 2 people per bedroom. I don't even know that the systems in this building can handle that many people in one unit."

The next day, Acuff emailed the unit owners and stated she had conducted a social media search confirming the Treeces had three children, maybe four. Acuff then texted Haile and Jablonowski a picture of the Treeces' stroller parked in a common area of the Perrier Condominium. Haile responded, "This is completely unacceptable, they will not be storing strollers like that." Soon after, Acuff shared with Haile that she had suggested to Harlan he could evict the Treeces for lying on their application by not listing all of their children. Haile said Harlan needed to get this "sorted out" and that he should be able to break the lease. An hour later, Acuff texted Harlan and Haile that "the bylaws also require 250 per square feet, which means you need 1500" square feet to accommodate six people.

The next day, on August 18, 2017, Acuff texted Haile that she was going to propose a change to the bylaws to limit occupancy to three people per unit. Five days later, on August 21, 2017, Acuff emailed the other three owners to say she would like to have a condominium association meeting "to discuss possible amendments to our bylaws in light of recent events. In that same vein, I think we need to have our bylaws reviewed and updated by an attorney." Acuff also emailed Harlan suggesting various bases on which Harlan could seek to terminate the Treeces' lease, including violations of noise restrictions and the occupancy limit. Harlan

8

wrote back that "the fair housing act says one can't be discriminated against based on family status," and he was concerned evicting a family for failing to list their minor children on the lease might violate the Fair Housing Act. Acuff responded on August 21, 2017, stating "[y]ou can't discriminate on family status, but you can reasonably restrict occupancy levels."

On August 22, 2017, Harlan delivered to Dwayne and Phallon Treece a "Five (5) Day Notice to Vacate Premises." The notice stated,

**PLEASE TAKE NOTICE** that you have violated the following terms in your lease agreement dated August 16, 2017: Section 4: USE OF PREMISES Tenants have violated the lease agreement by occupying the premises with six (6) individuals, rather than the two (2) individuals disclosed and named on the lease agreement. Six (6) occupants is over the Landlord's Condominium Owners' Association Use and Occupancy Restrictions which state "The Units are also restricted to occupancy by no more than one (1) person per two hundred fifty (250) square feet of Unit floor space."

That same evening the unit owners met and by a vote of three in favor and one (Harlan) against, voted to change the occupancy restriction to read, "The Units are also restricted to occupancy by no more than one (1) person per FOUR HUNDRED (400) square feet of Unit floor space" (the "400 square foot rule"). The PCOA and its members have not voted to rescind the 400 square foot occupancy standard. The PCOA submitted the 400 square foot occupancy restriction to an attorney for "review, advice, approval, and implementation." The amendment was never recorded on the public record.

Despite the notice to vacate, Harlan never evicted the Treeces, and on August 31, 2017, Acuff emailed Harlan stating, "If this isn't resolved in a timely manner, we, as an association, can also levy penalties for failure to observe the terms and conditions of the rules. Any expenses we incur as an association can also be assessed against the defaulting owner." On September 8, 2017, Harlan informed the condominium association members "I feel that I am being forced to evict by the other members of the condo association."

The other PCOA members then decided to pursue an eviction themselves. Defendant Haile emailed the other PCOA members, "I believe we need to move on with an eviction ASAP. If they sue us, they will sue us. But at least they will be out . . . . I believe time for nice is over. It's been over." The PCOA members held a special meeting on September 29, 2017. The owners voted, over Harlan's objection, to (1) impose a fine of $100 per day against Harlan beginning Monday, October 2, 2017 for his continued lease of his unit to Dwayne and Phallon and their family and violating the occupancy limit; (2) pursue Dwayne and Phallon's eviction; (3) assess legal fees associated with such eviction against Harlan if the eviction were successful; (4) retain the professional services of an attorney to represent the Association; and (5) install a camera in the Perrier Condominium's common stairwell.

9

The following material statistics are not in dispute. Based on the United States Census Bureau's Public Use Microdata Sample, there are 82,003 renter households in New Orleans. Of those renter households, 19,034 are families with children, and 62,969 are households without children. Of the renter households with children, 758 are households of six persons, and 7,844 are households of four to six persons. Of the renter households without children, 24 are households of six persons and 851 are households of four to six persons."[42]

## LAW AND ANALYSIS

**I.**    **The Plaintiffs have not made a prima facie case that the 250 square foot rule or the 450 square foot rule robustly caused families with children to be the dominant group of affected renters.**

At the Perrier Condominiums, Plaintiff's unit number 6036 has 1,372 square feet of living space.[43] Five individuals are allowed to live in Unit 6036 under the 250 square foot rule and three individuals are allowed to live in Unit 6036 under the 400 square foot rule. The Court has determined there is a substantial statistical disparity between the effect of Perrier Condominium's 250 square foot rule and 400 square foot rule on families with children and on households without children.[44] The Court must now determine whether Plaintiffs have established that Defendants' 250 square foot rule or 400 square feet rule *robustly caused* this disproportionate impact on families with children in violation of § 3604(a) of the FHA. The Supreme Court and the Fifth Circuit have recently provided guidance on this topic.

In *Inclusive Communities Project, Inc. v. Texas Dept. of Housing and Community Affairs* (hereinafter "*ICP I*"), the Fifth Circuit held the FHA allows for disparate impact claims and the burden-shifting standard set forth in the Secretary of Housing and Urban Development (hereinafter "HUD") regulations applies in disparate impact housing

---

[42] R. Doc. 332 at 5-10 (internal citations omitted).
[43] R. Doc. 363-2 at 4.
[44] R. Doc. 332 at 6-7.

discrimination cases.[45] The Fifth Circuit's decision was appealed to the Supreme Court. The Supreme Court affirmed and remanded the case to the Fifth Circuit in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (hereinafter *"ICP II")*.[46] While the appeal to the Supreme Court was pending, HUD issued a regulation interpreting the FHA to provide disparate impact liability and establishing a burden shifting framework for disparate impact claims.[47] Under the HUD regulation, the plaintiff "has the burden of proving that a challenged practice *caused or predictably will cause* a discriminatory effect."[48] The Supreme Court in *ICP II* agreed with the HUD regulation that both disparate treatment claims (claims asserting "discriminatory intent or motive") and disparate impact claims (claims asserting an "unjustified, disproportionally adverse effect on minorities") are cognizable under the FHA. The Supreme Court went further than the HUD regulation and adopted the more stringent causation requirement that a plaintiff must show, not just that a practice caused a discriminatory effect, but the practice robustly caused the effect.[49]

The Supreme Court in *ICP II* explained, "[a] robust causality requirement ensures that '[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create."[50] In other words, "a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to

---

[45] 747 F.3d 275 (5th Cir. 2014).
[46] 135 S. Ct. 2507 (2015).
[47] The HUD regulation requires that a plaintiff first make a prima facie showing of disparate impact. After a plaintiff makes a prima facie showing of disparate impact, the burden shifts to the defendant to show the challenged policy or practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. 24 CFR 100.500(c)(1) (2014).
[48] *ICP II,* 135 S. Ct. at 2514 (quoting 24 CFR 100.500(c)(1) (2014)) (emphasis added).
[49] *Id.* at 2523.
[50] *Id.* at 2523 (quoting *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 653 (1989)).

show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units."[51] The Supreme Court emphasized:

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A *robust causality* requirement ensures that "[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create." Without adequate safeguards *at the prima facie stage*, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas and serious constitutional questions then could arise.

> \*\*\*

> Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.[52]

In 2019, the Fifth Circuit applied the new standard laid out by the Supreme Court in *ICP II* in *Lincoln Property*.[53] In *Lincoln Property*, the plaintiff, a fair housing nonprofit organization, brought suit against owners and management companies of apartment complexes, asserting claims of disparate treatment, disparate impact, and perpetuation of racial stereotypes in violation of the FHA and 42 U.S.C. § 1982. The action arose from the defendants' refusal to accept Section 8 vouchers in apartment complexes in largely White, high-opportunity areas in the metropolitan Dallas area.[54] The plaintiff alleged the defendants' "policy of declining to negotiate with or rent to voucher holders disparately impacted black households, as evidenced by statistics establishing that more than 80% of

---

[51] *Id.* at 2523-24.
[52] *Id.* (internal citations omitted) (emphasis added).
[53] 920 F.3d 890 (5th Cir. 2019).
[54] *Id.* at 895.

the voucher holders in the Dallas area are black."[55] The Fifth Circuit considered whether defendants' "no voucher policy" robustly caused Black people to be the dominant group of voucher holders in the Dallas metropolitan area.[56]

The Fifth Circuit found it was bound to apply *ICP II*'s more demanding version of the burden-shifting analysis for determining disparate impact claims under the FHA rather than the HUD regulation.[57] The Fifth Circuit explained the Supreme Court's decision in *ICP II* "undoubtedly announce[s] a more demanding test than set forth in the HUD regulation."[58] The Fifth Circuit did acknowledge debate exists on whether the Supreme Court adopted the HUD regulation's approach or modified it,[59] but the Fifth Circuit "read the Supreme Court's opinion in *ICP* [*II*] to announce a more demanding test than that set forth in the HUD regulation."[60] In support of its interpretation that the Supreme Court modified and strengthened the requirements of the HUD regulation, the Fifth Circuit relied on the Supreme Court's reasoning:

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A *robust causality* requirement ensures that "[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise.[61]

> The litigation at issue here provides an example. From the standpoint of determining advantage or disadvantage to racial minorities, it seems difficult to say as a general matter that a decision to build low-income

---

[55] *Id.* at 898.
[56] *Id.* at 902.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *ICP II*, 135 S.Ct. at 2522-23.

housing in a blighted inner-city neighborhood instead of a suburb is discriminatory, or vice versa. If those sorts of judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas—a circumstance that itself raises serious constitutional concerns.

Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units. And as Judge Jones observed below, if the ICP cannot show a causal connection between the Department's policy and a disparate impact—for instance, because federal law substantially limits the Department's discretion—that should result in dismissal of this case.[62]

After *ICP II*, a plaintiff must establish a prima facie case by showing that a challenged practice robustly causes a discriminatory effect. Only if the plaintiff makes a prima facie case, including robust causation, does the burden shift to the defendant to show the challenged practice is necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests.[63] If the defendant meets this burden, the plaintiff must then show the defendant's interests could have been served by another practice or policy that has a less discriminatory effect.[64]

The Fifth Circuit makes it clear the Supreme Court's decision in *ICP II* added "purposeful" and "significant" safeguards to the burden shifting analysis, including a "robust causality requirement" at the prima facie case stage, and, once the burden shifts,

---

[62] *ICP II,* 135 S. Ct. at 2523-24 (internal citations omitted) (emphasis added).
[63] *Lincoln Property*, 920 F.3d at 901-02.
[64] *Id*.

leniency must be given to defendants to explain the valid interest served by their policy.[65] In discussing the robust causality requirement, the Fifth Circuit noted "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."[66] Further, "[i]f a statistical discrepancy is caused *by factors other than the defendant's policy*, a plaintiff *cannot* establish a prima facie case, and there is no liability."[67]

The Supreme Court in *ICP II* established the requirement of robust causation but did not "clearly delineate its meaning or requirements."[68] Because no Supreme Court or Fifth Circuit opinion had considered the robust causality requirement after *ICP II,* the Fifth Circuit in *Lincoln Property* considered four approaches used by other circuits.[69] The first approach considered is the Eighth Circuit's decision in *Ellis v. City of Minneapolis* (hereinafter "*Ellis*").[70] In *Ellis,* plaintiffs, low-income housing landlords, alleged the city targeted their properties through inspections, citations, and threats to revoke their rental licenses and, as a result, hundreds of FHA-protected individuals were displaced.[71] The Eighth Circuit denied the plaintiffs' claim, explaining the plaintiffs' complaint lacked "factually supported allegations that those provisions are arbitrary or unnecessary to health and safety."[72] The Eighth Circuit construed *ICP II* to require that a plaintiff "point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity."[73] To succeed under this test, the complaint "must ... allege facts plausibly demonstrating

---

[65] *Id.* at 902.
[66] *Id.*
[67] *Id.* (quoting *ICP II,* 135 S. Ct. at 2514).
[68] *Id.* at 903.
[69] *Id.* at 904.
[70] 860 F. 3d 1106, 1114 (8th Cir. 2017).
[71] *Id.* at 1109-09.
[72] *Id.* at 1112.
[73] *Id.* at 1114.

that the [policies] complained of are arbitrary and unnecessary under the FHA."[74] The Fifth Circuit interpreted this decision as allowing an actionable FHA claim only if the policy is "artificial, arbitrary, and unnecessary" and that a policy cannot be "artificial, arbitrary, and unnecessary absent the existence of pertinent, contrary factual allegations sufficiently rendering a plaintiff's claimed entitlement to disparate impact relief plausible."[75]

The second approach considered is the Fourth Circuit's majority decision in *Reyes v. Waples Mobile Home Park LP* (hereinafter "*Reyes*").[76] In that case, a mobile home park began enforcing a previously unenforced policy requiring all adult occupants of the park to provide documentation showing they were legally present in the United States in order to renew their leases, or face eviction.[77] Plaintiffs brought suit, alleging the policy disproportionately affected the Latino community, as Latinos comprised 64.6% of the undocumented population in Virginia and were ten times more likely than non-Latinos to be adversely affected by the policy.[78] The Fourth Circuit majority required plaintiff to plausibly allege "statistical disparities . . . sufficiently substantial that they raise [the necessary] inference of causation."[79] The majority opinion held  plaintiffs had properly stated a prima facie disparate impact case by alleging the first-time enforcement of a previously unenforced policy "caused a disproportionate number of Latinos to face eviction ... compared to the number of non-Latinos who faced eviction."[80] "The majority concluded the statistical evidence that the plaintiffs provided satisfied the robust causality

---

[74] *Id.* at 1112.
[75] *Lincoln Property,* 920 F.3d at 907.
[76] 903 F.3d 415 (4th Cir. 2018).
[77] *Id.* at 419-20, 428.
[78] *Id.* at 421.
[79] *Id.* at 426 (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994-95 (1988)).
[80] *Id.* at 428.

requirement when considered in the context of the newly enforced policy."[81] The Fifth Circuit interpreted the *Reyes* majority opinion as requiring the disparate impact to be caused by a change in the defendant's enforcement of a policy that increased the number of Latinos facing eviction from the park than faced eviction before.

The third approach considered is Judge Keenan's dissenting opinion in *Reyes*. Judge Keenan explained "the defendants' policy disproportionately impacts Latinos not because they are Latino, but because Latinos are the predominant sub-group of undocumented aliens in a specific geographical area."[82] Judge Keenan would require plaintiffs to plausibly allege "defendants' policy caused the statistical disparity" meaning that "defendants' policy … caused [the relevant minority group] to be the dominant group" affected.[83] The Fifth Circuit interpreted Judge Keenan's dissenting view to mean, "robust causation was not satisfied by pre-existing conditions (Latinos status as the predominant sub-group of undocumented aliens) *not* brought about by the challenged policy."[84] In other words, the *Reyes* dissent would require the plaintiffs to establish the mobile home park's policy caused Latinos to be the dominant group of undocumented aliens in the park, which Judge Keenan found they had not done.

The fourth approach considered is the Eleventh Circuit's unpublished per curiam opinion in *Oviedo Town Center, II, L.L.P. v. City of Oviedo, Florida* (hereinafter "*Oviedo*").[85] In *Oviedo*, plaintiffs, owners of an affordable housing complex, brought suit against the city, challenging a utility rate increase. The Eleventh Circuit interpreted *ICP II* as "promulgat[ing] detailed causation requirements as a means of cabining disparate-

---

[81] *Lincoln Property,* 920 F.3d at 904 (internal quotations omitted).
[82] *Reyes,* 903 F.3d at 434 (Keenan, J., dissenting).
[83] *Id.* at 434-35.
[84] *Lincoln Property*, 920 F.3d at 905.
[85] 759 Fed. Appx. 828, 833-35

impact."[86] The Eleventh Circuit, quoting the Supreme Court, urged courts to "avoid interpreting disparate impact liability to be so expansive to inject racial considerations into every housing decision."[87] The Eleventh Circuit opined the Supreme Court imposed "[a] robust causality requirement ensure[ing] that '[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact.'"[88] The Eleventh Circuit found the plaintiffs in *Oviedo* had not established a prima facie case because the data they submitted did "not establish a disparate impact, let alone any causal connection between the 2012 Policy and the disparate impact."[89]

In the end, the Fifth Circuit in *Lincoln Property* did not explicitly adopt any one approach as controlling. The Fifth Circuit did affirm the district court's finding the plaintiffs had shown "a possible statistical imbalance with the amount of voucher households in the census tract" but "had not provided facts linking the 'no vouchers' policy to the 'possible statistical disparity.'"[90] The Fifth Circuit found the plaintiffs had not shown the no vouchers policy caused Latinos to be the dominant group affected in the census tract.[91] Instead, Latinos already were the predominant sub-group of undocumented aliens in the census tract (pre-existing condition) rather than this condition being brought about by the challenged no vouchers policy.[92] The Fifth Circuit found plaintiffs failed to allege facts sufficient to provide the robust causation necessary for an actionable disparate impact claim under any of the enumerated approaches.[93] The

---

[86] *Id.* at 833.
[87] *Id.* at 834 (quoting *ICP II,* 135 S. Ct. at 2524).
[88] *Id.* (quoting *ICP II,* 135 S. Ct. at 2523).
[89] *Id.* at 835.
[90] *Lincoln Property,* 920 F.3d at 906.
[91] *Id.*
[92] *Id.* at 905.
[93] *Id.* at 906.

Fifth Circuit held neither the "city-level data" nor the "census-level data" cited by the plaintiffs supported an inference that the implementation of the blanket "no vouchers" policy, or any change therein, caused Black people to be the dominant group of voucher holders in the Dallas metropolitan area.[94] The Fifth Circuit noted the plaintiffs pleaded no facts showing Dallas's racial composition before the defendants implemented their "no vouchers" policy or how that composition changed, if at all, after the policy was implemented.[95]

According to the dissent in *Lincoln Property*, the majority applies too stringent a test for causation. The dissent stated that, "To require such proof for a plaintiff to establish causation would render disparate-impact liability under the FHA a dead letter."[96] The dissent explained the Second Circuit's 1988 opinion in *Huntington Branch, NAACP v. Town of Huntington*,[97] a case of first impression, held that disparate impact claims are cognizable under the FHA and recognized two types of discriminatory effect claims: (1) "adverse impact on a particular minority group," and (2) "harm to the community generally by the perpetuation of segregation," also known as "segregative-effect" claims.[98] The dissent also explained *Huntington Branch* detailed the types of statistical data that can be used to establish a prima facie case of segregative effect under the FHA:

> Specifically, the data for a disparate-impact claim should indicate that the group affected adversely by the challenged policy is predominantly comprised of minorities, while the group unaffected is predominantly White. The data for a segregative-effect claim, which may include census-tract data, should indicate the existing locations of the predominantly White and predominantly minority areas of the town or city and how the policy or ordinance being challenged will continue the existing segregation.[99]

---

[94] *Id.*
[95] *Id.* at 907.
[96] *Id.* at 924.
[97] 844 F.2d 926 (2d Cir. 1988).
[98] *Lincoln Property,* 920 F.3d at 917-18.
[99] *Id.*

The dissent points out that in *ICP II* the disparate impact claim was based on a "novel theory of liability"[100] and the Supreme Court found plaintiff did not identify a specific policy or practice causing the segregated housing patterns. Because the plaintiff had failed to identify a specific, facially neutral policy that caused the disparity in the location of low-income housing, the district court on remand held the plaintiff could not rely on this generalized policy of discrimination to prove disparate impact under the FHA. The dissent pointed out that, in *Lincoln Property*, unlike in *ICP II*, the plaintiff clearly identified a specific policy of not renting to voucher holders as causing a disparate impact on Black persons.[101]

The dissent in *Lincoln Property* believed the statistical evidence offered by the plaintiff was similar to that offered by the plaintiffs in *Huntington Beach* and the evidence should have been sufficient to establish a disproportionate impact on Black people in violation of the FHA. The dissent found the causal connection between the policy and the resulting disparate impact on the Black renter population in the Dallas metropolitan area to be "direct and robust."[102] According to the dissent, in a segregative-effect claim the plaintiff is not required to prove the challenged policy caused the initial segregation, but only that the policy will perpetuate it.[103] The dissent argued a segregative-effect claim, such as the one in *Lincoln Property*, requires a plaintiff to show existing patterns of segregation and that the challenged policy will perpetuate that segregation, not that the policy caused the segregation.[104] The dissent found no indication the Supreme Court, by

---

[100] *Id.* at 919.
[101] *Id.*
[102] *Id.* at 920.
[103] The Plaintiffs do not bring a segregative-effect claim in this case. R. Doc. 363 at 23.
[104] *Id.* at 922.

calling the causation requirement robust, intended to usher in a new requirement for disparate impact claims under the FHA not required in the employment context. The dissent argued the prima facie elements of a traditional disparate-impact claim under the FHA do not require the plaintiff to prove a "before-and-after" effect of the challenged policy.[105]

The application for rehearing en banc in *Inclusive Communities Project v. Lincoln Property Company* was denied.[106] Those judges dissenting from the denial of rehearing en banc cautioned "the panel majority opinion [in *Lincoln Property*] now renders that decision almost meaningless by crafting an impossible pleading standard."[107] First, after praising the original dissent in *Lincoln Property*, the judges dissenting to the denial of rehearing en banc expressed their concern that the majority opinion "expands and overstates the Supreme Court's requirement of 'robust causation,' as set forth in its decision" in *ICP II*.[108] Second, the dissenters found the majority's opinion "makes a plaintiff's burden nearly insurmountable in the initial pleading stage in litigation by requiring immutable proof rather than plausible allegations."[109] The dissenters point out that various circuit courts disagree on the applicability of the HUD standard in FHA cases. The dissenters believe *ICP II* rejected liability based *solely* on a showing of statistical disparity:

> Contrary to the majority opinion's view, the Supreme Court's *Texas v. ICP II* opinion principally rejected liability "based *solely* on a showing of statistical disparity." In addition to statistical disparity, the Court required there be "artificial, arbitrary, and unnecessary barriers": in other words, a policy. This is what the Court describes as a "robust causality requirement," a statistical disparity that is caused by the defendant's policy. The Court

---

[105] *Id* at 921.
[106] *Inclusive Communities Project, Inc. v. Lincoln Property Co. et al.*, 930 F.3d 660, denial of rehearing.
[107] *Id.*
[108] *Id.* at 663.
[109] *Id.* at 662.

observed that a decision between two developments likely would not be considered a policy, and therefore would not constitute a prima facie case of disparate impact.[110]

In addition to showing a statistical disparity, the dissenters believe the Supreme Court required only that there be an allegation the policy is "artificial, arbitrary, and [an] unnecessary barrier."[111] "The majority opinion 'imposes the burden on *ICP [II]* to show that Defendants' blanket 'no voucher' policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area."[112] This, in the dissenters' opinion, is requiring the impossible.

In August 2020, the Fifth Circuit again tackled robust causation in the FHA case of *Inclusive Communities Project, Inc. v. Heartland Community Association* (hereinafter "*Heartland*").[113] The Fifth Circuit stated that "to the extent *Lincoln Property* requires alleging diminishment of rental opportunities for minorities to plead a disparate-impact claim, such an allegation alone does not satisfy robust causality."[114] The Fifth Circuit again discussed the four approaches reviewed in *Lincoln Property* for establishing robust causality and noted *Lincoln Property* did not endorse any one test.[115]

In *Heartland,* the plaintiff argued "the current Fifth Circuit standard is not justified by existing law and should be reversed or modified."[116] The Fifth Circuit declined this invitation and restated that *Lincoln Property* "read 'robust causation' to require either: 'a change in the defendant's enforcement of [a] policy' caused a disparate impact; or a challenged policy 'caused [the relevant minority group] to be the dominant group' of

---

[110] *Id*. at 663.
[111] *Id*.
[112] *Id*. at 665 (quoting *Lincoln Property*, 920 F.3d at 907).
[113] 824 Fed. Appx. 210, 215 (5th Cir. 2020).
[114] *Id*. at 218.
[115] *Id*.
[116] *Id*. at 217.

those affected by the policy."[117] The plaintiffs in *Heartland* argued they met the *Lincoln Property* standard, which "required a showing that the policy ... diminished rental opportunities for Black tenants from those previously available."[118] Ultimately, the Fifth Circuit found the plaintiff in *Heartland* had not met the requirement of *Lincoln Property* for stating a prima facie disparate impact claim because "it fails to plausibly allege any Heartland housing would be available to similarly situated renters after the policy's enactment because no voucher holders of any race will be able to rent in Heartland."[119] In *Heartland*, the Fifth Circuit held the plaintiffs failed to satisfy "the fourth element[120] of the *prima facie* test" because those affected by the policy were dissimilar.[121] Because the Fifth Circuit's decision that the plaintiff failed to demonstrate a prima facie case was based on grounds other than the lack of robust causation, the Fifth Circuit again did not determine which approach to proving robust causation prevails.

In this case, Plaintiffs identified "families with children" as the affected protected class under the FHA.[122] Plaintiffs have shown the 250 square foot rule and the 400 square foot rule have a discriminatory impact on families with children and that the statistical disparities in this case are substantial.[123] The issue is whether, under *Lincoln Property*, the proof provided by the Plaintiffs can support an inference that the 250 square foot rule

---

[117] *Id.* at 218 (quoting *Lincoln Property Company,* 920 at 906 (emphasis omitted)).

[118] *Id.*

[119] *Id.* at 220.

[120] The Fifth Circuit determined that in order to prove a prima facie case, the fourth element plaintiffs needed to show was that "the housing thereafter remained open to similarly situated applicants after ... plaintiff was rejected." *Id.* at 217.

[121] *Id.* at 220.

[122] 42 U.S.C. § 3602 ("(K) 'Familial status' means one or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals . . . ."). This is undisputed by the Defendants.

[123] R. Doc. 332.

or the 400 square foot rule robustly caused a disproportionate impact on families with children in violation of 42 U.S.C. § 3604(a) in light of *Lincoln Property*.

It is clear the dissent in *Lincoln Property* and the dissent to the denial of the rehearing en banc in that case were quite concerned the majority opinion had decimated disparate impact FHA cases. The dissent to the denial of rehearing en banc notes the FHA allows for disparate impact claims and the Supreme Court has affirmed this—"[y]et the panel majority opinion now renders that decision almost meaningless by crafting an impossible pleading standard."[124] As expressed by the dissenters, establishing a disparate impact case under the FHA in the Fifth Circuit will now be very difficult, if not impossible. Apparently, the Fifth Circuit has taken the Supreme Court at its word that it did not intend for it to be easy to establish robust causation in an FHA case and did not intend to hold a defendant liable for a disparity it did not create.

The Fifth Circuit explained in *Lincoln Property* that the majority and dissenting opinions in *Reyes* and the per curiam in *Oviedo* required the plaintiff's statistical data to support an inference that implementation of the "no vouchers" policy, or any change therein, caused Black persons to be the dominant group of voucher holders in the Dallas metro area.[125] Applying the majority decision in *Lincoln Property* to the case now before the Court, the Plaintiffs must show not only a substantial statistical imbalance but also that the occupancy rules at issue caused the statistical imbalance. In other words, the Plaintiffs must show the 250 square foot rule and the 400 square foot rule caused families with children to be the dominant group of renters affected by the occupancy limit rules.[126] The Plaintiffs and their experts have not argued the 250 square foot rule or the 400 square

---

[124] *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 930 F.3d 660 (5t h Cir. 2019).
[125] *Lincoln Property,* 920 F.3d at 906.
[126] *Id.*

foot rule caused households with children to have more members than households without children. The statistical data they provided does not support an inference that implementation of the 250 square foot rule or the 400 square foot rule, or any change therein, caused families with children to be the dominant group of renters affected. The Plaintiffs have provided no facts showing any change in statistical data after the 250 square foot rule was enforced or any argument there would be a change in statistical data if the 400 square foot rule were enforced.[127] In this case, families with children already were the predominant sub-group of households with more members and therefore affected by the rule (pre-existing condition) rather than this condition being brought about by the challenged occupancy limits.[128]

Because of concern about the effect of *Lincoln Property* on this case, after the Supreme Court denied the plaintiff's writ of certiorari the Court allowed the parties to submit additional briefing and expert reports addressing the Fifth Circuit standard for proving robust causality in a disparate impact claim under the FHA.[129] In their supplemental briefing, Plaintiffs argue the Fifth Circuit requires either: (1) a change in the defendant's enforcement of a policy caused the disparate impact, or (2) a challenged policy caused the relevant minority group to be the dominant group of those affected by the policy.[130] Plaintiffs' first argument, that a change in policy—from the 250 square foot rule to the 400 square foot rule—resulted in a substantial disproportionate effect, is addressed in Section II below.

---

[127]Plaintiffs have not shown the 400 square foot rule was enforced. See Section II below.
[128] *Lincoln Property*, 920 F.3d at 905.
[129] R. Doc. 347.
[130] R. Doc. 363 at 8 (quoting *Lincoln Property*, 920 F.3d at 907).

Plaintiffs' second argument is that the Defendants' occupancy policies robustly caused the identified disproportionate adverse effect on families "because there are no material facts in dispute that a change in Defendants' occupancy standard causes a change in the resulting statistical disparities alleged."[131] Plaintiffs argue Defendants' density-based occupancy limits are *single-qualification* policies that operate to exclude certain households based on only one qualification—in this case, the number of members in the household.[132] Plaintiffs argue the single qualification excluded all other factors, outside of household size, and results in a "pass/fail outcome."[133] Plaintiffs' expert Dr. Allen Parnell notes "[t]he density-based occupancy restriction policy (the cause) directly precludes families with a certain number of children from renting a Perrier Condominium (the effect)."[134] Plaintiffs argue that, because Defendants' policies depend upon a single-qualification that leads directly to either acceptance or rejection, there can be no genuine dispute of material fact that the identified discriminatory effect is caused by the policies.[135]

Plaintiffs seek to distinguish this case from previous cases in which courts determined there was no causation because there were *multiple* factors at play.[136] Plaintiffs argue they satisfied the *Lincoln Property* standard in that "Plaintiffs' (1) statistical evidence coupled with (2) evidence of how the policies will operate to exclude identifiable households has established that Defendants' pass/fail single-qualification occupancy policies robustly cause the 'dominant group' of those affected (denied housing

---

[131] R. Doc. 363 at 3.
[132] R. Doc. 363 at 10.
[133] R. Doc. 363 at 10-11.
[134] R. Doc. 363-2 at 7.
[135] R. Doc. 363 at 11.
[136] *Inclusive Communities*, 135 S. Ct. at 2524.

opportunities) to be families with children in proportional terms."[137] In light of this, Plaintiffs argue the "multiple factors" that were present in the investment decisions about where to construct or renovate homes in *ICP II,* or the many factors considered in *Reyes* that contributed to segregated housing patterns, are not present in this case.[138]

Plaintiffs also argue the proportional disparities in this case are distinguishable from "statistical imbalances." Plaintiffs argue when the "operative disparity is a proportional comparison rather than a statistical imbalance, the plaintiff does not need to demonstrate Defendant's policies caused an overrepresentation (in absolute numbers) of the protected class in the group affected."[139] Citing *Reyes*, Plaintiffs state "robust causation was satisfied where the proportional comparison demonstrated that the single-qualification policy (having legal status documentation) was likely to cause the protected class 'to be disproportionately subject' to the adverse housing action (eviction) than members of the non-protected class."[140] The Plaintiffs argue that, "[b]ecause a statistical imbalance in absolute numbers is not the sole basis for their prima facie case, Plaintiffs here do not need to demonstrate that Defendant's policies caused families with children to have generally larger households than non-families."[141]

After consideration of the Plaintiffs' arguments, the Court finds they have not met the Fifth Circuit standard for establishing the causation element of their prima facie case—that a challenged policy caused the relevant minority group to be the dominant group of those affected by the occupancy limits. Plaintiffs failed to show Defendants' occupancy limits caused families to be the dominant group of those affected, despite being

---

[137] R. Doc. 363 at 13.
[138] *Inclusive Communities*, 135 S. Ct. at 2524.
[139] R. Doc. 363 at 20.
[140] R. Doc. 363 at 21 (quoting *Reyes*, 903 F.3d at 429).
[141] R. Doc. 363 at 21-22.

given every opportunity to do so. Instead, Plaintiffs point out that Defendants' single-qualification policies operate to exclude certain households based on only one qualification—in this case, the number of members in the household—resulting in a "pass/fail outcome." Plaintiffs argue that, because Defendants' policies depend upon a single qualification that leads directly to either acceptance or rejection, there can be no genuine dispute of material fact that the identified discriminatory effect is caused by the policies. Although interesting, this is not an approach endorsed by the Fifth Circuit in *Lincoln Property*.

Plaintiffs have offered no evidence to support an inference Defendants' policies caused households with children to make up a larger percentage of households of six than households without children. As a result, Plaintiffs have failed to establish the robust causation necessary for an actionable disparate impact claim in the Fifth Circuit.

## II.     The 400 square foot rule does not establish robust causation based on a change in policy because it was never enforced.

Citing *Heartland* and *Lincoln Property*,[142] Plaintiffs argue the Fifth Circuit also endorsed establishing robust causation by showing "*a change in the defendant's enforcement of a policy caused a disparate impact*." Plaintiffs argue that, even if they have not established the robust causality element of their prima facie case by showing the occupancy limits caused families with children to be the dominant group of people affected by the policy, the Fifth Circuit has endorsed this alternative approach based on a change in policy. Specifically, Plaintiffs argue the 400 square foot rule is a change in Defendants' enforcement of a policy robustly causing a disparate impact on families. The 250 square foot rule limited occupancy of Unit 6036 to five individuals. The 400 square

---

[142] *Heartland*, 824 Fed. Appx. 210, 217 (emphasis added).

foot rule limited occupancy of Unit 6036 to no more than three people. The Plaintiffs argue causation is robust because there is no dispute this change in Defendants' occupancy rule from 250 square feet to 400 square feet caused a change in the statistical disparities experienced by families.

It is undisputed that within one week of the Treece family moving in, the PCOA voted to change the occupancy restriction to one person per 400 square feet of unit space.[143] On August 22, 2017, the Perrier Condominium unit owners met and, by a vote of three in favor and one (Harlan) against, voted to change the occupancy restriction to read, "The Units are also restricted to occupancy by no more than one (1) person per FOUR HUNDRED (400) square feet of Unit floor space" (the "400 square foot rule").[144] The PCOA and its members have not voted to rescind the 400 square foot rule.[145] The PCOA submitted the four hundred square foot rule to an attorney for "review, advice, approval, and implementation."[146] Nevertheless, the amendment was never recorded in the public record.[147] Defendants correctly point out the 400 square foot rule has never gone into effect because the amendment has not been registered with the Conveyance Office of Orleans Parish, Louisiana, as required by the Perrier Condominium Declaration.[148] Plaintiffs argue that, because a substantial statistical disparity has been established, the amendment to the occupancy restriction, even though it never went into

---

[143] R. Doc. 363 at 9.

[144] R. Doc. 212-2 ¶ 70; R. Doc. 268-1 ¶ 70; R. Doc. 128-10; R. Doc. 128-11. The Defendants do not deny this vote and meeting occurred.

[145] R. Doc. 212-2 ¶ 72; R. Doc. 268-1 ¶ 72; R. Doc. 128-19. Defendants do not contend they have voted to rescind their previous vote.

[146] R. Doc. 212-2 ¶ 73; R. Doc. 268-1 ¶ 73; R. Doc. 128-31, at 8. Defendants do not point to any evidence denying the amendment was submitted to their attorney for implementation.

[147] R. Doc. 204-1, at 8; R. Doc. 262-1, at 2. Plaintiffs do not point to any evidence showing the amendment has been filed on the public record.

[148] Section 14.3(c) of the Perrier Condominium's Declaration states "[an] amendment shall be effective when registered in the Conveyance Office of Orleans Parish, Louisiana." R. Doc. 212-17, at 26.

effect, is a change in policy that robustly caused a substantial disproportionate effect on families.

The Court agrees the Fifth Circuit in *Lincoln Property*[149] endorsed the *Reyes* majority holding that a policy-specific change, such as a change in *enforcement* of a policy, may establish robust causality.[150] The Fifth Circuit stated a statistical disparity illustrating a disproportionate effect may establish robust causality when a policy-specific change occurs, such as a change in enforcement of a policy. In *Reyes*,[151] the plaintiffs alleged the defendant mobile home park operator changed the enforcement of its policy to require all residents present legal immigrant status documentation. The mobile home park originally enforced the policy only against leaseholders, but subsequently enforced the policy against all residents. To establish the changed policy had a disparate impact on Latinos, plaintiffs showed Latinos were 64.6% of the undocumented population in Virginia and that undocumented immigrants constituted 26.4% of the Latino population compared to 3.6 of the non-Latino population. Under these facts, the majority in *Reyes* held "Plaintiffs satisfied the robust causality requirement by asserting that the specific policy . . . was likely to cause Latino tenants to be disproportionately subject to eviction compared to non-Latino tenants at the Park."[152]

The Defendants agree a claim relying on something more than just a statistical disparity to show robust causation can succeed, citing *Reyes*, but argue *Reyes* may be distinguished from this case because *Reyes* involved the *enforcement* of a policy when that same policy had not previously been enforced.[153]

---

[149] *Lincoln Property*, 920 F.3d at 907.
[150] R. Doc. 363 at 7-8 (citing *Lincoln Property*).
[151] *Reyes*, 903 F.3d at 428-429, 433-434.
[152] *Id*. at 428.
[153] R. Doc. 364 at 21.

The Defendants are correct. In this case, there has been no enforcement of a policy that had not been previously enforced. The PCOA voted to change the occupancy limit to the 400 square foot rule but the new rule never went into effect. No change in the enforcement of an existing policy has been shown to have occurred in this case.[154]

## III.    The Plaintiffs have no § 3617 claim based on a violation of § 3604(a).

In their first amended complaint, Plaintiffs allege Defendants unlawfully coerced, intimidated, threatened, or interfered with Harlan, Dwayne, or Phallon Treece in the exercise of, or on account of their having exercised or enjoyed, their rights granted or protected by 42 U.S.C. §  3604 on the basis of familial status, in violation of 42 U.S.C. § 3617, and implementing regulations 24 C.F.R. § 100.400.[155] 42 U.S.C. § 3617 provides:

> It shall be unlawful to coerce, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Defendants argue, because there was no violation of 42 U.S.C. § 3604(a), Plaintiffs cannot pursue a claim under 42 U.S.C. § 3617.

The Court previously declined to determine whether or not the Fifth Circuit requires an underlying violation to bring a § 3617 claim because Plaintiffs had outstanding § 3604 claims that had not been decided.[156] At that time, the Court assumed Plaintiffs had underlying § 3604 claims and determined that Defendants were not entitled to summary judgment on Plaintiffs' § 3617.[157] The Court has now determined that Plaintiffs have failed

---

[154]In this action, the Plaintiffs are seeking only to enjoin the Defendants from taking any further action to implement the 400 square foot rule because it allegedly will have a disparate impact on families with children.
[155] R. Doc. 16 at ¶ 78.
[156] R. Doc. 174 at 17.
[157] *Id.*

to show a prima facie case under § 3604(a) and Defendants will be granted summary judgment on that claim.

In a previous order, the Court considered circuit court precedent as to whether the FHA requires an underlying violation for a plaintiff to state a claim under § 3617.[158] Circuit courts disagree on whether § 3617 requires a plaintiff to first establish some underlying violation of §§ 3603, 3604, 3605, or 3606 before proceeding under § 3617. At least six federal appellate courts have rejected this requirement and held § 3617 claims may exist even absent an underlying FHA violation.[159]

As the Court previously noted, however, the Fifth Circuit has held § 3617 claims *do* require an underlying violation of §§ 3603, 3604, 3605, or 3606.[160] In *Hood v Pope*, the Fifth Circuit held a Plaintiff failed to state a claim under § 3604, and therefore, "[a]ny subsequent harassment by any of the defendants did not violate § 3617."[161] Similarly, in *McZeal v. Ocwen Financial Corporation*, the Fifth Circuit held "[b]ecause [plaintiff's] § 3605 claim fails, [his] claim under § 3617 must also fail."[162]

In arguing an underlying violation is not necessary to state a valid § 3617 claim, Plaintiffs attempt to distinguish the Fifth Circuit's holdings in *Hood* and *McZeal* from the

---

[158] R. Doc. 174 at 16.

[159] *Bloch v. Frischholz*, 587 F.3d 771, 781–82 (7th Cir. 2009) ("We know that the Association's enforcement of the Hallway Rule did not constructively evict the Blochs in violation of § 3604(a) or (b). But that does not foreclose the possibility that the defendants 'interfered' with the Blochs' enjoyment of their § 3604 rights or 'coerced' or 'intimidated' the Blochs on account of their having exercised those rights. To hold otherwise would make § 3617 entirely duplicative of the other FHA provisions; though its language is unique in the FHA, § 3617 would have no independent meaning."); *Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 528 (6th Cir. 2013) ("[T]he defendants argue that they may not be charged with violating § 3617 unless they separately violated at least one of the provisions in §§ 3603–3606. We disagree. Section 3617 nowhere says that it comes into play only when a violation of one of these other sections has also occurred."); *Revock v. Cowpet Bay West Condominium Association*, 853 F.3d 96, 112 (3d Cir. 2017); *U.S. v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994); *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991); *Francis v. Kings Park Manor, Inc.*, 944 F.3d 370 (2d Cir. 2019).

[160] R. Doc. 174 at 16.

[161] 627 F. App'x 295, 300 (5th Cir. 2015).

[162] 252 F.3d 1355 (5th Cir. 2001).

instant case.[163] Plaintiffs argue the Fifth Circuit in *Hood* did not hold § 3617 cannot be a freestanding claim, but rather dismissed the § 3617 claim because plaintiffs "have not stated a claim that they at any point exercised or enjoyed any right granted under § 3604."[164] This holding is no different from the instant case, as the Court has now determined Plaintiffs have not stated a claim under § 3604(a). Plaintiffs also argue *McZeal* involved a pro se plaintiff who pleaded no set of facts that would make out a § 3617 violation, did not point to evidence that he engaged in a protected activity, and did not argue that § 3617 can be a freestanding claim.[165] Although the facts of *McZeal* differ from the instant action, the Fifth Circuit's holding remains the same—"[b]ecause [plaintiff's] § 3605 claim fails, [his] claim under § 3617 must also fail."[166]

Plaintiffs separately argue, "in addition to their coercion and interference claim, there is record evidence sufficient to support that Defendants retaliated against them in violation [of] Sec. 3617."[167] Plaintiffs argue a retaliation claim does not require an underlying violation of §§ 3603, 3604, 3605, or 3606.[168] However, Plaintiffs do not state a claim for retaliation in their amended complaint.[169]

Although some circuits have determined no underlying violation is necessary to assert a claim under § 3617, the Court is bound by the Fifth Circuit's precedent. In *Hood*, the Fifth Circuit explained "[a]ny subsequent harassment by any of the defendant did not violate § 3617, because [plaintiffs] have not stated a claim that they at any point exercised

---

[163] R. Doc. 262 at fn. 12.
[164] *Hood*, 627 Fed. App'x. at 300.
[165] R. Doc. 262 at fn. 12.
[166] 252 F.3d 1355 (5th Cir. 2001).
[167] R. Doc. 262 at 15.
[168] *Oxford House, inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 701 (M. D. La. 2013) (noting "the [HUD] regulations indicate that retaliation for making a complaint under the FHA is unlawful conduct in itself, and there is no requirement that the complaint prove underlying discrimination...");
[169] *See* R. Doc. 16.

or enjoyed any right granted under § 3604."[170] Plaintiffs in this case have not asserted a claim under § 3604(a). As a result, Plaintiffs cannot assert a claim that Defendants unlawfully coerced, intimated, threatened, or interfered with Plaintiffs in the exercise of, or on account of their having exercised or enjoyed, their rights granted or protected by § 3604(a).

## **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment[171] is **DENIED**. Defendants' Motion for Partial Summary Judgment[172] is **GRANTED**. Defendants are entitled to summary judgment that Plaintiffs have no claim against them under 42 U.S.C. § 3604(a) or under § 3617 based on a violation of § 3604(a).[173]

**New Orleans, Louisiana, this 12th day of February, 2021.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[170] *Hood*, 627 Fed. App'x. at 300.
[171] R. Doc. 212.
[172] R. Doc. 204.
[173] Plaintiffs' Motion to Strike Certain Expert Opinions (R. Doc. 367) and Defendants' Motion to Strike the Declaration of Clifford Harlan (R. Doc. 315) are denied.