## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DWAYNE TREECE, ET AL.,** | **CIVIL ACTION** |
|    **Plaintiffs** | |
| | |
| **VERSUS** | **NO.  17-10153** |
| | |
| **PERRIER CONDOMINIUM OWNERS** | **SECTION: "E" (3)** |
| **ASSOCIATION, INC., ET AL.,** | |
|    **Defendants** | |

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by Defendants the Perrier Condominium Association ("PCOA"), Katherine Acuff, Chris Jablonowski, and Hanna Haile.[1] Plaintiffs Dwayne Treece, Phallon Treece, and Clifford Harlan have filed an opposition.[2] Defendants have filed a reply.[3] Having considered the briefs, the facts, and the applicable law, the Court now issues its ruling.

## BACKGROUND[4]

Plaintiffs Dwayne and Phallon Treece allege that in 2017 they sought to rent a unit in the Perrier Condominium for themselves and their four young children.[5] The Treeces first contacted Defendant Hanna Haile about renting her unit at the Perrier Condominium.[6] They allege she did not rent to them because they have young children.[7]

In August 2017, Plaintiffs Dwayne and Phallon Treece, along with their four children, rented a different unit at the Perrier Condominium owned by Plaintiff Clifford Harlan.[8] Defendants Katherine Acuff, Christopher Jablonowski, and Haile individually

---

[1] R. Doc. 424.
[2] R. Doc. 435.
[3] R. Doc. 443.
[4] The Background facts come from the First Amended Complaint.
[5] R. Doc. 16 at ¶¶ 20-26.
[6] *Id.* at ¶¶ 21-24.
[7] *Id.*
[8] R. Doc. 16 at ¶¶ 1, 13; R. Doc. 49 at ¶¶ 1, 13.

own the other three units.[9] The four unit owners are the sole members of the Perrier Condominium Owner's Association (PCOA), which administers the Perrier Condominium regime.[10] The Treeces allege that, after they moved into their unit, the Defendants took various actions to harass and attempt to evict them based on their having four children living in the unit.[11]

This case has a long and complex history.[12] In its October 29, 2021, Order and Reasons, the Court clarified which of Plaintiffs' claims remained pending at that time:

Claim 1.  All Plaintiffs' claims against all Defendants for intentional disparate treatment discrimination under 42 U.S.C. § 3604(a) and implementing regulations, 24 C.F.R. § 100.500, for "adopting occupancy limitations that have the intent . . . of making unavailable or denying housing to families with children."

Claim 2.  Harlan's claims against all Defendants under 42 U.S.C. § 3604(a) and (b) for "discriminat[ing] against Harlan by refusing to allow him to sell his Unit by discriminating against prospective buyers of Harlan's Unit."

Claim 3.  All Plaintiffs' claims against all Defendants under 42 U.S.C. § 3617 and implementing regulations, 24. C.F.R. § 100.400, for "unlawfully coerc[ing], intimidat[ing], threaten[ing], or interfere[ing] with Harlan, Dwayne, and Phallon in the exercise of, or an [sic] account of their having exercised or enjoyed, their rights granted or protected by the Fair Housing Act, 42 U.S.C. § 3604 on the basis of familial status."

Claim 4.  Dwayne and Phallon Treece's claims against Haile under 42 U.S.C. § 3604(a) for intentionally "discriminat[ing] against Dwayne and Phallon Treece by refusing to rent her Unit to them or by otherwise making unavailable or denying that Unit because of their familial status."

Claim 5.  Dwayne and Phallon Treece's claims against Haile under 42 U.S.C. § 3604(d) for "discriminat[ing] against Dwayne and Phallon Treece by representing to them that Haile's Unit was not available for rental when such dwelling was in fact so available because of their familial status."[13]

---

[9] R. Doc. 16 at ¶¶ 14–17; R. Doc. 49 at ¶¶ 14–17.
[10] R. Doc. 16 at ¶¶ 14–17; R. Doc. 49 at ¶¶ 14–17.
[11] R. Doc. 16 at ¶¶ 34-57.
[12] The Court previously granted summary judgment on Plaintiffs' 42 U.S.C. § 3604(c) claims, R. Doc. 174, and Plaintiffs' disparate impact claims under 42 U.S.C. § 3604(a), R. Doc. 377.
[13] R. Doc. 420 (quoting R. Doc. 16 at ¶¶ 74-75, 77, 78-79).

The time for dispositive motions on Claims 4 and 5 passed without motions being filed.[14] Defendants now move for summary judgment on Claims 1-3 listed above.[15]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] "An issue is material if its resolution could affect the outcome of the action."[17] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[18] All reasonable inferences are drawn in favor of the nonmoving party.[19] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[20]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[21] If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's

---

[14] *See* R. Doc. 400.

[15] R. Doc. 424; *see* R. Doc. 421 (giving time for dispositive motions on Claims 1-3).

[16] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[17] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

[18] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

[19] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[20] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

[21] *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 323).

claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[22]

When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[23] When proceeding under the second option, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[24] The burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[25] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[26] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the

---

[22] *Celotex*, 477 U.S. at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the movants to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).
[23] *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[24] *Celotex*, 477 U.S. at 332–33.
[25] *Id.*
[26] *Id.* at 332–33 & n.3.

moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[27]

"[U]nsubstantiated assertions are not competent summary judgment evidence."[28] The opposing party must "identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[29]

## FACTS

### I.    Undisputed Facts

The Perrier Condominium contains four units.[30] Plaintiff Harlan and Defendants Acuff, Jablonowski, and Haile each own one of the units.[31] The four unit owners are the sole members of the Perrier Condominium Owners Association (PCOA), which governs the Perrier Condominium regime.[32] The Perrier Condominium is subject to a facially neutral use and occupancy rule included in the Condominium Declaration, which requires 250 square feet per occupant of each unit.[33] According to the Condominium Declaration, the occupancy limit is "to provide for congenial occupation of the Buildings and for the protection of the values of each Unit."[34]

---

[27] *Id.*; *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).
[28] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324).
[29] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[30] R. Doc. 424-1, at ¶ 1; R. Doc. 451, at ¶ 1.
[31] R. Doc. 424-1, at ¶ 2; R. Doc. 451, at ¶ 2.
[32] *Id.*
[33] R. Doc. 424-1, at ¶ 4; R. Doc. 451, at ¶ 4.
[34] R. Doc. 424-1, at ¶ 7; R. Doc. 451, at ¶ 7.

The Perrier Condominium contains galvanized pipe.[35] This pipe is subject to corrosion which constricts flow, thereby reducing water pressure.[36] The water pressure at the Perrier Condominium is low.[37] A four-unit building like the Perrier Condominium should be serviced by pipes at least seven-eighths of an inch in diameter.[38] The Perrier Condominium's walls contain no soundproofing.[39] Walls without soundproofing act like a drum and amplify any noise from any unit.[40] Dawn Laufenburg heard voices and running back and forth in the unit occupied by the Treeces during the day and sometimes during the night.[41]

On August 16, 2017, Harlan informed Acuff, Jablonowski, and Haile by email that he had rented his unit to the Treeces.[42] Acuff, whose unit abuts Harlan's unit, responded by email asking, "When will they be moving in," and later, "How long is their lease? And how many children do they have? They are moving in as I write this and I am listening to a kid screaming through the wall and running all over the floors."[43] Haile responded, "this renter, Dwayne, had actually contact [sic] me in regards to renting my unit the very first week I posted it. He came to look with his youngest child. He is a nice guy but I decided the condo was not the best fit as they have 3 small children."[44] Acuff responded by stating "this could be a serious issue. Reasonable limitations on occupancy are 2 people per

---

[35] R. Doc. 424-1, at ¶ 40; R. Doc. 451, at ¶ 40.
[36] *Id.*
[37] R. Doc. 424-1, at ¶ 45; R. Doc. 451, at ¶ 45.
[38] R. Doc. 424-1, at ¶ 36; R. Doc. 451, at ¶ 36.
[39] R. Doc. 424-1, at ¶ 42; R. Doc. 451, at ¶ 42.
[40] *Id.*
[41] R. Doc. 424-1, at ¶ 44; R. Doc. 451, at ¶ 44.
[42] R. Doc. 424-1, at ¶ 10; R. Doc. 451, at ¶ 10.
[43] *Id.*
[44] *Id.*

bedroom. I don't even know that the systems in this building can handle that many people in one unit."[45] Jablonowski then asked, "How long is their lease for?"[46]

The next day, Harlan responded to Acuff, Haile, and Jablonowski stating, "Chris, The lease is 9 months, but like I said it's still for sale. Katie, To the best of my knowledge there aren't 3 children, when I asked he said two and only put down 2 on the lease. So I don't think it's over occupancy."[47] Acuff emailed the unit owners and stated she had conducted a social media search confirming the Treeces had three children, maybe four.[48] Harlan responded to Acuff stating, "You're correct. He told me two kids and listed none of them on the lease but he does have four. I told him if I had known then I would have said that was too many for the size of the condo."[49] That morning, Acuff texted Haile and Jablonowski photos of the Treeces' social media and said "there might be 4."[50] Haile responded that Harlan needed to get this "sorted out" and that he should be able to break the lease."[51] Soon after, Acuff shared with Haile that she had suggested to Harlan he could evict the Treeces for lying on their application by not listing all of their children.[52] An hour later, Acuff texted Harlan and Haile that "the bylaws also require 250 per square feet, which means you need 1500" square feet to accommodate six people.[53]

The next day, on August 18, 2017, Acuff texted Haile that she was going to propose a change to the bylaws to limit occupancy to three people per unit.[54] Five days later, on August 21, 2017, Acuff emailed the other three owners to say she would like to have a

---

[45] R. Doc. 424-1, at ¶ 10; R. Doc. 451, at ¶ 10.
[46] *Id.*
[47] R. Doc. 424-1, at ¶ 11; R. Doc. 451, at ¶ 11.
[48] *Id.*
[49] R. Doc. 424-1, at ¶ 12; R. Doc. 451, at ¶ 12.
[50] R. Doc. 424-1, at ¶ 14; R. Doc. 451, at ¶ 14.
[51] *Id.*
[52] R. Doc. 424-1, at ¶ 15; R. Doc. 451, at ¶ 15.
[53] *Id..*
[54] R. Doc. 424-1, at ¶ 16; R. Doc. 451, at ¶ 16.

condominium association meeting "to discuss possible amendments to our bylaws in light of recent events. In that same vein, I think we need to have our bylaws reviewed and updated by an attorney."[55]

On August 22, 2017, Harlan delivered to Dwayne and Phallon Treece a "Five (5) Day Notice to Vacate Premises," which stated,

> **PLEASE TAKE NOTICE** that you have violated the following terms in your lease agreement dated August 16, 2017: Section 4: USE OF PREMISES Tenants have violated the lease agreement by occupying the premises with six (6) individuals, rather than the two (2) individuals disclosed and named on the lease agreement. Six (6) occupants is over the Landlord's Condominium Owners' Association Use and Occupancy Restrictions which state "The Units are also restricted to occupancy by no more than one (1) person per two hundred fifty (250) square feet of Unit floor space."[56]

That same evening the unit owners met and by a vote of three in favor and one (Harlan) against, voted to change the occupancy restriction to read, "The Units are also restricted to occupancy by no more than one (1) person per FOUR HUNDRED (400) square feet of Unit floor space" and to consult an attorney about the proposal.[57] A final vote to adopt the proposal depended on the advice of an attorney, and the intent of each member was to have an attorney provide advice about the change.[58] The PCOA and its members have not voted to rescind the 400 square foot occupancy standard.[59] The amendment was never recorded on the public record and has thus never gone into effect.[60]

Despite the notice to vacate, Harlan never evicted the Treeces.[61] On September 18, 2017, Haile emailed the other PCOA members, "I believe we need to move on with an

---

[55] R. Doc. 424-1, at ¶ 17; R. Doc. 451, at ¶ 17.
[56] R. Doc. 424-1, at ¶ 20; R. Doc. 454, at ¶ 20; R. Doc. 332 at 8.
[57] R. Doc. 424-1, at ¶ 21; R. Doc. 451, at ¶ 21.
[58] R. Doc. 424-1, at ¶ 22; R. Doc. 451, at ¶ 22.
[59] R. Doc. 451, at ¶ 23; R. Doc. 545 at ¶ 23. Defendants do not deny they have not voted to rescind their previous vote.
[60] R. Doc. 424-1, at ¶ 24; R. Doc. 451, at ¶ 24.
[61] R. Doc. 424-1, at ¶ 25; R. Doc. 451, at ¶ 25.

eviction ASAP. If they sue us, they will sue us. But at least they will be out . . . . I believe time for nice is over. It's been over."[62] On September 19, 2021, Acuff emailed Harlan stating, "This Thursday marks 5 weeks that this has been going on. What course of action have you agreed upon with your attorney? If you are not willing to go through with an eviction, I think we (as an HOA) should do it ourselves."[63] The PCOA members held a special meeting on September 29, 2017.[64] The owners voted, over Harlan's objection, to (1) impose a fine of $100 per day against Harlan beginning Monday, October 2, 2017 for his continued lease of his unit to Dwayne and Phallon and their family and violating the occupancy limit; (2) pursue Dwayne and Phallon's eviction; (3) assess legal fees associated with such eviction against Harlan if the eviction were successful; (4) retain the professional services of an attorney to represent the Association; and (5) install a camera in the Perrier Condominium's common stairwell.[65]

## II.    Disputed Facts

Defendants assert these additional facts are undisputed: that the Perrier Condominium building is over a hundred years old and has a mixture of galvanized steel and terra cotta piping, which is beyond its useful life and subject to failure;[66] the size of the sole water supply pipe at the Perrier Condominium is only three-quarters of an inch in diameter;[67] the water supply line provided one-quarter to one-half of the proper flow for the number of units and expected occupants;[68] the building's galvanized piping is

---

[62] R. Doc. 424-1, at ¶ 27; R. Doc. 451, at ¶ 27.
[63] R. Doc. 424-1, at ¶ 28; R. Doc. 451, at ¶ 28
[64] R. Doc. 424-1, at ¶ 30; R. Doc. 451, at ¶ 30.
[65] *Id.*
[66] R. Doc. 424-1 at ¶¶ 33-35 (citing Ehlinger Deposition; Favalora Deposition; Harlan Deposition); R. Doc. 454 at ¶¶ 33-35.
[67] R. Doc. 424-1 at ¶ 37 (citing McIntyre Deposition; Favalora Deposition); R. Doc. 454 at ¶ 37.
[68] R. Doc. 424-1 at ¶ 39 (citing McIntyre Deposition); R. Doc. 454 at ¶ 39.

corroded and clogged;[69] the occupancy rule ensures the owners do not overburden the water and sewerage system;[70] and it will cost approximately $63,685.00 to correct the Perrier Condominium's existing terra cotta piping and $15,000 to $20,000 to replace the galvanized piping.[71]

Plaintiffs argue these factual assertions are in dispute. They offer evidence the piping has not been fully inspected, so exactly how much of the building's piping and water line are made of galvanized steel or terra cotta is unknown.[72] Moreover, they assert the PCOA has not conducted a study to quantify the risk to the building's infrastructure that would be caused by additional occupants above what current rules allow.[73] Plaintiffs also dispute the amount it will cost to repair the plumbing in Perrier Condominium.[74]

Defendants also assert it is an undisputed fact the occupancy rule is based on quality of life concerns, such as street parking, backyard space, garbage can management, laundry use, water pressure, and noise.[75] They assert it is undisputed that the number of occupants increases demand for these limited resources.[76]

Plaintiffs argue these facts are in dispute by pointing to evidence that (1) the PCOA was unable to identify how an additional child, who cannot drive, would impact street parking; (2) a rule restricting the number of cars, rather than the number of occupants, is a possible alternative to reducing congestion; (3) the PCOA was unable to quantify how many additional garbage cans they might need to acquire if the total occupancy of the building increased; (4) two of the four units, including the one in which the Treeces

---

[69] R. Doc. 424-1 at ¶ 41 (citing Jablonowski 1/17/2020 Deposition); R. Doc. 454 at ¶ 41.
[70] R. Doc. 424-1 at ¶ 47 (citing PCOA Deposition); R. Doc. 454 at ¶ 47.
[71] R. Doc. 424-1 at ¶ 35 (citing Ehlinger Deposition; PCOA Deposition).
[72] R. Doc. 424-1 at ¶ 47 (citing PCOA Deposition).
[73] R. Doc. 451, at ¶¶ 33-35, 39, 41, 47 (citing PCOA Deposition; Ehlinger Deposition; McIntyre Deposition).
[74] R. Doc. 451 at ¶¶ 35, 46 (citing Ehlinger Deposition; PCOA Deposition).
[75] R. Doc. 424-1 at ¶ 9 (citing PCOA Deposition); R. Doc. 454 at ¶ 9.
[76] *Id.*

resided, had their own, in-unit washing machines; (5) a rule restricting usage, rather than occupancy, would ameliorate wear and tear concerns with the laundry facilities; (6) there have been no issues coordinating back yard usage to date, even when unit owners had parties and houseguests increasing the number of people in the backyard; (7) the Treeces' additional one-year-old child did not cause measurable wear and tear in the six days before the PCOA adopted its resolution to amend the occupancy limit; and (8) there are structural modifications to Harlan's unit that could be made to ameliorate noise concerns.[77]

Finally, Plaintiffs assert it is undisputed that the Defendants locked the Treeces out of a common storage unit, which contained their children's bicycles;[78] the Treeces were unable to store their stroller in the shed and were not allowed to store it in the laundry room;[79] as decided at the September 29, 2017, PCOA meeting, Acuff installed a camera in the common stairwell to monitor the Treeces;[80] and Acuff also installed an acoustic monitoring device and began to record the Treeces from her unit.[81] Plaintiffs assert it is an undisputed fact that, for the entirety of their tenancy, the Treeces feared Harlan would capitulate to the PCOA's pressure and evict them,[82] and as a result they moved out in May 2018 before their lease was up in June 2018.[83]

Defendants respond that these facts are in dispute by pointing to evidence that, once the lock was changed on the shed, the new code was given to Harlan, and no one told

---

[77] R. Doc. 451 at ¶¶ 9, 25 (citing PCOA Deposition; Phallon Treece Deposition; Acuff Deposition; Haile Deposition; Jablonowski Deposition; PCOA Meeting Minutes).
[78] R. Doc. 451 at ¶ 13 (citing Exhibit 14, PCOA Email; Exhibit 15, Dwayne Treece Email).
[79] *Id.* (citing Exhibit 15, Dwayne Treece Email).
[80] *Id.* (citing Exhibit 12, PCOA Meeting Minutes; R. Doc. 117-3, Acuff Declaration; R. Doc. 117-3, Acuff Interrogatory Responses; R. Doc. 117-3, Haile Interrogatory Responses).
[81] *Id.* (citing R. Doc. 117-3, Acuff Interrogatory Responses).
[82] *Id.* at ¶ 18 (citing R. Doc. 128-2, Dwayne Treece Declaration).
[83] R. Doc. 435 at 8 (citing R. Doc. 128-2, Dwayne Treece Declaration; Exhibit 20, PCOA Email).

him he could not give it to the Treeces;[84] the Treeces did not ask for the new code and were in fact given the code close to the time they moved out;[85] the camera was installed for security purposes seven months after the Treeces moved in;[86] and Acuff began recording noise from the Treece's unit at Harlan's request.[87] Defendants dispute the Treeces were afraid Harlan would capitulate to the PCOA's pressure during the entire term of their lease because Phallon Treece testified she feared eviction only until the end of November 2017.[88] The Defendants also state the Treeces moved out early so that Dwayne Treece could study for the bar, not because they feared eviction.[89]

## LAW AND ANALYSIS

The Fair Housing Act (FHA),[90] "prohibits discrimination in the rental or sale of a dwelling based on certain protected characteristics."[91] The statute "reflects 'the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States.'"[92] "The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin."[93] "In 1988, Congress extended coverage to persons with handicaps and also prohibited 'familial status' discrimination, i.e., discrimination against parents or other custodial persons domiciled with children under the age of 18."[94]

---

[84] R. Doc. 454 at ¶ 13 (citing PCOA Email; Harlan Deposition, Haile Deposition).
[85] *Id.* (citing Dwayne Treece Deposition, Phallon Treece Deposition).
[86] *Id.* (citing Acuff Deposition).
[87] *Id.* (citing Acuff Deposition; Haile Deposition, PCOA Email).
[88] *Id.* at ¶ 18 (citing Phallon Treece Deposition).
[89] R. Doc. 447-1 at 10-11 (citing Dwayne Treece Deposition; Phallon Treece Deposition).
[90] 42 U.S.C. §§ 3601–3631.
[91] *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).
[92] *Id.* at 900–01 (citing 42 U.S.C. § 3604).
[93] *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 728 n.1 (1995).
[94] *Id.* (citing 42 U.S.C. § 3602(k)).

**Claim 1.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs' 42 U.S.C § 3604(a) Claim for Discrimination Against the Treeces and Harlan in Adopting the 250 and 400 Square Feet Occupancy Limits.**

In Claim 1, the Treeces, joined by Harlan, claim they are entitled to relief under the FHA based on Defendants' disparate treatment of them by adopting the 250 and 400 square feet occupancy limits. 42 U.S.C. § 3604(a) provides:

> [I]t shall be unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

Disparate treatment is intentional discrimination.[95] "With discriminatory treatment claims, there can be no liability without a finding that the protected trait (e.g., race) motivated the challenged action."[96] A plaintiff may prove disparate treatment by direct evidence or circumstantial evidence.[97] Whether a plaintiff presents direct or circumstantial evidence of discrimination determines the framework in which the court must analyze the claim.[98]

Direct evidence is "is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions."[99] For example, in *Texas v. Crest Asset Management, Inc.*, the court found "comments by [the defendants] that they did not want Arabs in the complex and that management had been instructed to make his life miserable because he is an Arab . . . constitute direct evidence of discriminatory animus."[100]

---

[95] *Inclusive Cmtys.*, 920 F.3d at 909.

[96] *Id.* at 910 (first citing *Greater New Orleans Fair Hous. Action Ctr., Inc. v. Hotard*, 275 F.Supp.3d 776, 786 (E.D. La. 2017); and then citing *Woods–Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982)).

[97] *Id.* at 909-10; *see also Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 728 (S.D. Tex. 2000).

[98] *Crest Asset Mgmt.*, 85 F. Supp. 2d at 728-30.

[99] *Bodenheimer v. PPG Indus, Inc.*, 5 F.3d 955, 958 (5th Cir. 1993).

[100] *Crest Asset Mgmt.*, 85 F. Supp. 2d at 731.

Plaintiffs first argue the wording of the occupancy limit itself constitutes direct evidence of intentional discrimination,[101] even though the parties agree the occupancy limit is neutral on its face.[102] Plaintiffs argue the stated purpose of the occupancy limit, to "provide . . . for the protection of the values of each Unit," is coded language used to hide intentional discrimination.[103] Plaintiffs point to *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, which found that references to "ghetto," "blight," and "shared values" in comments preceding the parish's enactment of a moratorium on multi-family housing were "racially-loaded" and "nothing more than 'camouflaged racial expressions.'"[104] However, viewed in context, the analysis in *Greater New Orleans Fair Housing Action Center* was part of the court's examination of "circumstantial evidence factors" to determine the intent behind a facially neutral regulation.[105] There was no finding that the use of these words was direct evidence.

To determine whether there is direct or circumstantial evidence in this case, the relevant question is whether the language of the occupancy limit would prove the existence of a fact (i.e., unlawful intentional discrimination) without any inferences or presumptions.[106] The Plaintiffs point to the "coded" language of protecting the values of each unit, but coded language is by definition coded or hidden. Any intent to discriminate from such language would have to be implied. Even analogizing to the analysis in *Greater New Orleans Fair Housing Action Center*, the reference to "values" in the familial context does not carry with it the same connotation it does in the racial context. Furthermore, it

---

[101] R. Doc. 435 at 16.
[102] R. Doc. 174 at 5.
[103] R. Doc. 435 at 16.
[104] *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 571-72 (E.D. La. 2009) (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982)).
[105] *See Greater New Orleans Fair Hous. Action Ctr.*, 641 F. Supp. 2d at 568-69 (citing *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)).
[106] *Bodenheimer*, 5 F.3d at 958.

appears likely the reference to protecting values in this case refers to property values rather than racial or familial attitudes.

Plaintiffs next argue the Defendants' communications leading up to the adoption of the occupancy limit are direct evidence of discrimination.[107] Specifically, they cite Acuff's statement after Harlan informed Defendants he had rented to the Treeces, "How long is their lease? And how many children do they have? They are moving in as I write this and I am listening to a kid screaming through the wall and running all over the floors."[108] Asking how many children someone has and stating those children are making excessive noise does not provide direct evidence that Acuff intentionally discriminated against families in the Perrier Condominium.[109] Instead, any intent to discriminate must be implied. Plaintiffs also point to Haile's response to Acuff as being direct evidence. Haile's response was, "This renter, Dwayne, had actually contact [sic] me in regards to renting my unit the very first week I posted it. He came to look with his youngest child. He is a nice guy but I decided the condo was not the best fit as they have 3 small children."[110] Stating her condo is not the "best fit" for a family does not provide direct evidence Haile intentionally discriminated against families in the Perrier Condominium, especially since a different condo, Harlan's, is involved in Claim 1. Similarly, the other actions Plaintiffs point to—confirming the number of the Treece's children through social media; complaining about the placement of the Treeces' stroller and the noise from their unit; and suggesting Harlan break the Treeces' lease because they exceed the occupancy

---

[107] R. Doc. 435 at 16-17.
[108] *Id*. at 17.
[109] *See Crest Asset Mgmt*., 667 F. Supp. 2d at 731 ("[C]omments by [the defendants] that they did not want Arabs in the complex and that management had been instructed to make his life miserable because he is an Arab . . . constitute direct evidence of discriminatory animus.").
[110] *Id*.

limit—do not facially show familial discrimination. Because a finding of discrimination by the adoption of the occupancy limit's wording, or through the Defendant's emails and actions after the Treeces moved in, would have to be done by inference, there is no direct evidence of discrimination.[111]

In the absence of direct evidence, claims of disparate treatment based on circumstantial evidence are evaluated using the burden-shifting evidentiary standard established for discrimination cases in *McDonnell Douglas v. Green*.[112] Under this framework, the plaintiff must first establish a prima facie case of disparate treatment.[113] If the plaintiff does so, the burden then shifts to the defendant to articulate a "legitimate, non-discriminatory reason for the" action.[114] Then, the burden shifts back to the plaintiff to rebut the reason offered by the defendant by showing it was a "pretext for discrimination."[115]

Section 3604(a) makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of" a protected characteristic.[116] Because the Defendants did not refuse to rent to the Treeces or refuse to negotiate with them about renting, the Plaintiffs' only basis for liability under § 3604(a) is that

---

[111] Although Plaintiffs argue there is direct evidence of discrimination, they do not go through the applicable mixed-motive analysis laid out in *Price Waterhouse v. Hopkins* that governs cases of direct evidence. *See Crest Asset Mgmt.*, 667 F. Supp. 2d at 729-30 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989)); R. Doc. 435 at 15-27. Instead, they mention this supposedly direct evidence to show the reasons given for the occupancy limit were pretextual, which is an element of the *McDonnel Douglas* analysis applicable in cases of circumstantial evidence. R. Doc. 435 at 16.

[112] *Crain v. City of Selma*, 952 F.3d 634, 641 (5th Cir. 2020) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)); *Inclusive Cmtys.*, 920 F.3d at 910. The parties in fact analyze the case using the *McDonnell Douglas* analysis. R. Doc. 424-1 at 25-26 (analyzing Plaintiffs' "prima facie" case); *see* R. Doc. 435 at 16 (referring to the occupancy rule as a "pretext" for discrimination).

[113] *Crain*, 952 F.3d at 640-41.

[114] *Id.* (quoting *Inclusive Cmtys.*, 920 F.3d at 911).

[115] *Id.* (quoting *Inclusive Cmtys.*, 920 F.3d at 911).

[116] 42 U.S.C. § 3604(a).

Defendants "otherwise made [housing] unavailable" to the Treeces.[117] Defendants first argue that, because availability under § 3604(a) refers only to acts that prevent the acquisition of housing, and because the acts Plaintiffs complain of occurred *after* Plaintiffs acquired housing, § 3604(a) is inapplicable.[118]

Defendants cite to *Cox v City of Dallas* for the proposition that the protections under § 3604(a) do not extend to post-acquisition conduct. However, their reading of *Cox* is incorrect. Indeed, as other circuit courts have noted, "nothing in section 3604 limits its scope to discriminatory conduct occurring before or at the time of signing a lease."[119] Rather, in *Cox* the Fifth Circuit clarified that when proceeding under § 3604(a)'s "otherwise make unavailable" language, there is a distinction between availability and mere habitability, the latter of which § 3604(a) generally does not protect. "[T]he simple language of § 3604(a)," the court reasoned, "does not apply to current homeowners whose complaint is that the value or 'habitability' of their houses has decreased because such a complaint is not about 'availability.'"[120] While many of the examples of claims regarding availability the Fifth Circuit cited occurred before the plaintiff acquired housing, the court noted availability under § 3604(a) does apply to some post-acquisition conduct. For instance, § 3604(a) protects against barring access to "*owners* of one race but not another."[121] Because access was denied to an owner, the action obviously occurred after the acquisition of the property. The Fifth Circuit in *Cox* cited *Evans v. Tubbe* as an example.[122] In *Evans*, the Fifth Circuit held there were sufficient allegations of racial

---

[117] *See id.*
[118] R. Doc. 424-1 at 22-25.
[119] *Webb v. U.S. Veterans Initiative*, 993 F.3d 970, 973 (D.C. Cir. 2021) (analyzing a claim for availability under § 3604(a) and collecting cases from other circuits holding the same).
[120] *Cox v. City of Dallas*, 430 F.3d 734, 741 (5th Cir. 2005).
[121] *Id.* at 741-742 (citing *Evans v. Tubbe*, 657 F.2d 661, 663 n. 3 (5th Cir. 1981)) (emphasis added).
[122] *Id.* at 741-42 & n.18 (citing *Evans*, 657 F.2d at 663 n. 3).

discrimination under § 3604(a) when, after a Black buyer purchased land, a neighbor, whose land contained the only access road to the buyer's land, placed a locked gate over the access road and only provided the key to White residents.[123] Similarly, in *Petty v. Portofino Council of Coowners, Inc.*, the court held there were sufficient allegations of familial status discrimination under § 3604(a) when, after the plaintiff purchased a condo, the defendant condo association "prohibit[ed] Plaintiffs' children from the condominium's common areas, disable[ed] Plaintiffs' phone, disable[ed] the electric gate used by Plaintiffs' children to enter the complex, and direct[ed] the condominium manager to not let the children inside the complex."[124]

The Fifth Circuit in *Cox* also noted § 3604(a) may extend to eviction and constructive eviction.[125] Constructive eviction occurs when "the 'habitability' has so decreased that continued residency is not objectively reasonable."[126] For example, in *Clifton Terrace Associates., Ltd. v. United Technologies Corp.* the D.C. Circuit noted "the denial of certain essential services relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities, might result in the denial of housing" under § 3604(a).[127] Similarly, in *Bloch v. Frischolz*, the Seventh Circuit held that "§ 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction."[128]

Courts have extended this rationale to threats of eviction that, for various reasons, are not carried through. In *Whyte v. Alston Management, Inc.*, the court held that a

---

[123] *Evans*, 657 F.2d at 663 & n.3.
[124] *Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 729-30 & n.4 (S.D. Tex. 2010).
[125] *Cox*, 430 F.3d at 742 (first citing then citing *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999); and then citing *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 719-20 (D.C. Cir. 1991)).
[126] *Id.* at 742 n.21.
[127] *Clifton Terrace Assocs.*, 929 F.2d at 719-20.
[128] *Bloch v. Frischolz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc).

landlord's demands that various tenants "must move because of their children" were actionable under § 3604(a) as "threat[s] of eviction" that made housing unavailable.[129] Similarly, in *Carlson v. Sunshine Villas HOA, Inc.*, an analogous case under 42 U.S.C. § 3604(f)(1), which contains identical "otherwise make unavailable" language to § 3604(a), the court held the defendant landlord's attempts to evict a disabled tenant halfway through her monthly lease due to her request for a service dog "attempted to make housing unavailable."[130] The landlord served the tenant with multiple notices to vacate, harassed her, and attempted to evict her, but, ultimately, the day before she was to vacate, the landlord allowed the tenant to remain.[131] The court held the threat of eviction sufficed, and "the fact that [the tenant] was allowed to stay in the apartment [was] not dispositive of her claim."[132] Thus, Plaintiffs' claims that the Defendants attempted to evict the Treeces using the occupancy limits and subsequent harassment fall within the protections of § 3604(a).

Defendants next argue, even if § 3604(a) applies, Plaintiffs cannot make out a prima facie case. "The burden of establishing a prima facie case of disparate treatment is not onerous."[133] In order to establish a prima facie case, a plaintiff "must prove by a preponderance of the evidence that she applied for a [benefit] for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful

---

[129] *Whyte v. Alston Management, Inc.*, No. 10–81041–CIV, 2011 WL 12450320, at *3 (S.D. Fla. Nov. 1, 2011).

[130] *Carlson v. Sunshine Villas HOA, Inc.*, No: 2:18–cv–1–FtM–99MRM, 2018 WL 2317820, at *3-4 (M.D. Fla. May 22, 2018). Defendants argue this case concerned refusal to renew a lease. However, the landlord informed the tenant he was "terminating the lease" and wanted her to vacate by November 1, when her lease would have ended on November 15. *Id.* at *2.

[131] *Id.* at *2, 4.

[132] *Id.* at *4 (citing *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1223 (11th Cir. 2016).

[133] *L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395, 402 (5th Cir. 2013) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

discrimination."[134] Establishing a prima facie case "creates a presumption" of unlawful discrimination, such that "if the [defendant] is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."[135]

The elements of a prima facie case vary depending on the facts and claims of the case.[136] The general elements are 1) the plaintiff is a member of a protected class under the Fair Housing Act (*e.g.*, race, gender, family); 2) the plaintiff was eligible for favorable treatment (*e.g.*, the plaintiff was qualified to rent); 3) the defendant acted adversely toward the plaintiff (*e.g.*, denying a rental application or making housing unavailable); and 4) favorable treatment remained open to non-members of the protected group (*e.g.*, the housing opportunity remained available to similarly situated applicants).[137] Applying those elements to the facts and claims of this case, Plaintiffs must make a prima facie case that 1) the Treeces were members of a protected class; 2) the Treeces were qualified to rent Harlan's unit; 3) Defendants made housing unavailable through threats or acts to evict the Treeces; and 4) housing at the Perrier Condominium and its amenities remained open to other similarly situated individuals. In this case, Plaintiffs have pointed to sufficient facts that a reasonable jury could find they have presented a prima facie case of familial status discrimination.

The first element is that the Treeces are members of a protected class. It is undisputed that the Treeces are members of the protected familial class.

---

[134] *Burdine*, 450 U.S. at 253.
[135] *Id.* at 254.
[136] *McDonnell Douglas*, 411 U.S. at 802 n.13; *Ring v. First Interstate Mortg., Inc.*, 984 F.2d 924, 927 (8th Cir. 1993); *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997) ("adapt[ing] the elements "to this situation").
[137] *See R.I. Comm'n for Hum. Rts. v. Graul*, 120 F. Supp. 3d 110, 123 (D.R.I. 2015); *Inclusive Cmtys.*, 920 F.3d at 910.

The second element is that the Treeces were qualified to rent Harlan's unit. To be "qualified," the Fifth Circuit has stated a proposed tenant must "meet the terms of the [landlord]."[138] This generally refers to the price and "listing terms."[139] Elsewhere, the Fifth Circuit has explained qualification includes compliance with "stated condition[s]" of housing.[140] It is undisputed Harlan found the Treeces qualified and rented to them. The only disqualifying factors Defendants point to are the occupancy limits and the City's ordinance against overcrowding. Plaintiffs directly challenge the legality of the occupancy limits, and the challenged activity cannot defeat Plaintiffs' prima facie case. Moreover, the City's ordinance does not seem to be the sort of "listing term[]" or "stated condition" contemplated by the issue of housing qualification.[141] In any event, beyond summarily stating in one sentence that the City's overcrowding ordinance disqualified the Treeces from renting Harlan's unit, Defendants do not quote the City's ordinance, provide a citation, or explain how the ordinance was violated.[142] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion," and as to the City's ordinance, Defendants have failed to do so.[143] The Treeces have made a prima facie case as to the second element.

The third element is that Defendants made housing unavailable through threats or acts to evict the Treeces. Plaintiffs have pointed to facts showing the Defendants

---

[138] *Petrello v. Prucka*, 484 F. App'x 939, 942 (5th Cir. 2013) (quoting *McDonald v. Coldwell Banker*, 543 F.3d 498, 504 (9th Cir. 2008)).

[139] *See id.*; *see also McDonald*, 543 F.3d at 504.

[140] *Miles v. Hous. Auth. of Texarkana*, 667 F. App'x 450, 452 (5th Cir. 2016).

[141] *See Petrello*, 484 F. App'x at 942; *Miles,* 667 F. App'x at 452.

[142] R. Doc. 424-1 at 26.

[143] *Celtic Marine Corp*, 760 F.3d at 481; *see Morton v. Social Sec. Admin.*, No. 15-4435, 2016 WL 5724810, at *4 (E.D. La. Sept. 15, 2016) (first citing *Perez v. Barnhart*, 415 F.3d 457, 462 n. 4 (5th Cir. 2005); and then citing *Foster v. Townsley*, 243 F.3d 210, 212 n. 1 (5th Cir. 2001)) (holding arguments without support were waived due to inadequate briefing), *report and recommendation adopted*, No. 15-4435, 2016 WL 5678548 (E.D. La. Oct. 3, 2016).

attempted to evict the Treeces through adoption and enforcement of the occupancy limit and subsequent harassment. When Harlan did not evict the Treeces, Defendants resolved to do so themselves, and they enacted a stricter occupancy limit. Afterward, Acuff installed a camera outside their apartment and recorded any sounds from the Treeces' unit.  The Treeces were locked out of the storage shed, which contained their children's bikes, and were denied the ability to store their stroller there or in common areas of the Perrier Condominium. The Treeces have stated they feared they would be evicted throughout the duration of their lease and ultimately moved out early. The Treeces have made a prima facie case as to the third element.

The fourth element is that housing at the Perrier Condominium and its amenities remained open to other similarly situated individuals. Plaintiffs have stated they were treated differently. Defendants voted to evict only the Treeces.[144] Plaintiffs state Acuff installed a camera only outside their apartment and recorded any sounds only from the Treeces' unit. The Treeces also state they were the only residents of the Perrier Condominium locked out of the storage shed. The Treeces have made a prima facie case as to the fourth element.

At this stage, drawing all reasonable inferences in the nonmoving party's favor,[145] the Court is satisfied a reasonable jury could find Plaintiffs have made a prima facie case of disparate treatment.

---

[144] Facts in the record may show Haile violated the 250 and 400 square feet occupancy limits in 2018. Haile's unit contains approximately 859 square feet, although the exact measurements are disputed. R. Doc. 424-2 at ¶¶ 3, 5; R. Doc. 451 at ¶¶ 3, 5; R. Doc. 454 at ¶ 5. In their opposition, Plaintiffs cite to Haile's response to interrogatories that she allowed a smaller family consisting of her brother, his fiancé, and their two children to stay at her condo in February 2018. R. Doc. 435 at 8 (citing R. Doc. 117-3 at 84-85 (Haile Second Amended Response to Interrogatory 10)). Four people in Haile's unit seemingly would exceed either occupancy limit.

[145] *Little*, 37 F.3d at 1075.

As part of the next step in the *McDonnell Douglas* burden-shifting analysis, Defendants state their legitimate nondiscriminatory reason for attempting to evict the Treeces was concerns over the impact of more residents on the Perrier Condominium's aging infrastructure and quality of life.[146] Defendants have met their burden, and the burden next shifts to the Plaintiff to prove Defendants' non-discriminatory reason was pretextual. Defendants argue the Plaintiffs cannot show that Defendants intended to discriminate and cannot show that Defendants' non-discriminatory reasons for the occupancy limit are pretextual.[147]

Plaintiffs have presented sufficient evidence to show there is a genuine issue of material fact as to Defendants' intent. Many of the Defendants' words and actions are not in dispute; however, some of their actions—and especially the intentions behind them—are disputed.[148] Beginning the day the Treeces moved in, the Defendants focused on the size of the Treeces' family. In particular, Haile stated she "decided [her] condo was not the best fit as they have 3 small children."[149] Defendants quickly began to plan a way to evict the Treeces. When Harlan did not evict the Treeces, Defendants resolved to do so themselves, and they enacted a stricter occupancy limit. The Court has already held this stricter occupancy limit has a substantial discriminatory effect on families with children,[150] and although "[d]isproportionate impact of facially neutral legislation is not the 'sole touchstone' of racially discriminatory purpose," it "'is not irrelevant' and 'may provide an important starting point.'"[151] Plaintiffs allege Acuff installed a camera outside

---

[146] R. Doc. 454 at ¶¶ 8-9.
[147] R. Doc. 447-1 at 13-15.
[148] *See supra* text accompanying notes 78-89.
[149] R. Doc. 424-1, at ¶ 10; R. Doc. 451, at ¶ 10.
[150] R. Doc. 332 at 16-30.
[151] *Inclusive Cmtys.*, 920 F.3d at 910 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

their apartment, Acuff recorded any sounds from the Treeces' unit, the Defendants locked the Treeces out of the storage shed, and the Defedants denied the Treeces the ability to store their stroller in the shed or in the common areas of the Perrier Condominium.  As explained above, many of these acts and their underlying motives have legitimately been placed in dispute. It will be up to the jury to decide these questions of fact and to decide whether Plaintiffs have shown intent to discriminate.

Generally, "[i]ssues of credibility, including questions of intent, should be left to the jury."[152] Moreover, "[o]nce a plaintiff has presented prima facie evidence of housing discrimination, either through direct or circumstantial evidence, 'summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination.'"[153]  Accordingly, the Defendants are not entitled to summary judgment on Claim 1, Plaintiffs' § 3604(a) claim for discrimination against the Treeces and Harlan for adoption of the occupancy limits.

### Claim 2. Defendants Are Entitled to Summary Judgment on Harlan's 42 U.S.C. § 3604(a) and (b) Claims for Barriers to Selling His Unit.

In Claim 2, Harlan sues Defendants under §§ 3604(a) and (b) for disparate treatment discrimination against his prospective buyers by enacting and enforcing an occupancy restriction that prevents him from selling his condo.[154] Section 3604(a), quoted above, "allow[s] current homeowners to sue . . . [when] specific sales and purchases [a]re

---

[152] *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (citing *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985)).

[153] *Crest Asset Mgmt.*, 85 F. Supp. 2d at 729 (alteration in original) (internal quotations omitted) (quoting *Harris*, 183 F.3d at 1051).

[154] *See* R. Doc. 16 at ¶ 79; R. Doc. 435 at 27-28.

being blocked" due to the prospective buyer's inclusion in a protected class.[155] Moreover, 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[156] As with claims under § 3604(a), a plaintiff bringing a claim under § 3604(b) can provide direct or circumstantial evidence of discrimination, and, if the plaintiff provides the latter, the same *McDonnell Douglas* burden-shifting analysis explained above applies.[157] Because, as explained above, there is no direct evidence of discrimination, Harlan must utilize the burden-shifting framework for circumstantial evidence.

Defendants argue Harlan cannot make a prima facie case of discrimination under §§ 3604(a) or (b) because he has provided no evidence of a prospective buyer who was a member of the protected familial class.[158] To establish a prima facie case under the facts of this case, Harlan must show 1) a member of a protected class attempted to buy Harlan's unit; 2) this prospective buyer was qualified to purchase Harlan's unit; 3) the prospective buyer was prohibited from purchasing Harlan's unit due to the occupancy limits enacted and enforced by Defendants; and 4) Harlan's unit remained available to other similarly situated individuals.[159]

Harlan has not met his burden of making a prima facie case. The only evidence Harlan has provided of prospective buyers is, when asked at his deposition, "Has anyone

---

[155] *Cox*, 430 F.3d at 743 (citing *Hanson v. Veterans Administration*, 800 F.2d 1381 (5th Cir. 1986); *see also Petty*, 702 F. Supp. 2d at 729.
[156] 42 U.S.C. § 3604(b).
[157] *Crain*, 952 F.3d at 640-41.
[158] R. Doc. 424-1 at 26-29.
[159] *See Graul*, 120 F. Supp. 3d at 123; *Inclusive Cmtys.*, 920 F.3d at 910.

refused to buy because there's a [sic] litigation going on," Harlan responded, "Yes. To the best of my knowledge, they have refused to buy due to the liens and the litigation."[160] Harlan's response does not show that any members of a protected class, families, have attempted to purchase his unit but have been prevented from doing so due to the occupancy limit. In fact, the only reason given is not the occupancy limit, but the liens and this litigation. Even if members of a protected class did attempt to buy his unit, Harlan has not shown they were otherwise qualified to do so. In addition, Harlan's response "[t]o the best of [his] knowledge" is unsubstantiated and is thus insufficient on summary judgment.[161] Accordingly, Harlan has not made a prima facie case that families were prevented from buying his unit, and Defendants are entitled to summary judgment as a matter of law on Claim 2, Harlan's § 3604(a) and (b) claims for preventing him from selling his unit.

### Claim 3. Defendants Are Entitled to Partial Summary Judgment on All Plaintiffs' 42 U.S.C. § 3617 Claim for Coercing, Intimidating, Threating, and Interfering with Plaintiffs.

In Claim 3, Plaintiffs sue Defendants under 42 U.S.C. § 3617, which provides:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

As this Court has held in previous Orders, under *Hood v. Pope*,[162] claims under § 3617 require an underlying violation of §§ 3603, 3604, 3605, or 3606.[163]

---

[160] R. Doc. 435 at 27-28 (quoting Harlan Deposition, R. Doc. 435-38 at 2).
[161] *See Smith v. Sw. Bell. Tel. Co.*, 456 F. App'x 489, 492 (5th Cir. 2012).
[162] *Hood v. Pope*, 627 F. App'x 295, 300 (5th Cir. 2015).
[163] R. Doc. 337 at 31-34; *Treece v. Perrier Condo. Ass'n, Inc.*, 519 F. Supp. 3d 342, 364-65 (E.D. La 2021); R. Doc. 174 at 15-17; *Treece v. Perrier Condo. Ass'n, Inc.*, No. 17-10153, 2019 WL 6464984, at *7-8 (E.D. La. Dec. 2, 2019).

Defendants move for summary judgment on Plaintiffs' § 3617 claims because, they argue, Plaintiffs have no underlying claims under § 3604.[164] However, as explained above, for Claim 1 the material facts are in dispute as to whether Plaintiffs have a claim under § 3604(a) for discrimination against the Treeces and Harlan in adopting the occupancy limit. For Claim 2, the Court has concluded the undisputed material facts show Harlan does not have a claim under §§ 3604(a) and (b) for discrimination against his prospective buyers. Accordingly, Defendants are entitled to partial judgment as a matter of law on Claim 3, Plaintiffs' § 3617 claims, to the extent they are based on Harlan's §§ 3604(a) and (b) claims for discrimination against his prospective buyers in Claim 2. The Plaintiffs have raised issues of fact that preclude summary judgment on their remaining § 3617 claims.[165]

## CONCLUSION

**IT IS ORDERED** that Defendants' motion for summary judgment[166] is **GRANTED IN PART**, insofar as it seeks summary judgment on Harlan's claims under 42 U.S.C. §§ 3604(a) and (b) for discrimination against his prospective buyers[167] and Harlan's 42 U.S.C. § 3617 claim for interference with his rights under §§ 3604(a) and (b) to sell his unit to families. In all other respects, Defendants' motion for summary judgment is **DENIED**.

In summary, the claims set for trial on April 18, 2022 are:

Claim 1.   All Plaintiffs' claims against all Defendants for intentional disparate treatment discrimination under 42 U.S.C. § 3604(a) and implementing regulations, 24 C.F.R. § 100.500, for "adopting occupancy limitations

---

[164] R. Doc. 424-1 at 29-31.
[165] R. Doc. 174 at 17-21 (finding Plaintiffs have raised issues of fact on their § 3617 claims). Plaintiffs spend part of their opposition discussing retaliation claims under § 3617. The Court has already determined Plaintiffs did not bring a retaliation claim. R. Doc. 377 at 33.
[166] R. Doc. 424.
[167] R. Doc. 16 at ¶ 79.

that have the intent . . . of making unavailable or denying housing to families with children."[168]

Claim 2.   [Summary judgment granted by this Order.]

Claim 3.   All Plaintiffs' claims against all Defendants under 42 U.S.C. § 3617 and implementing regulations, 24. C.F.R. § 100.400, for "unlawfully coerc[ing], intimidat[ing], threaten[ing], or interfere[ing] with Harlan, Dwayne, and Phallon in the exercise of, or an [sic] account of their having exercised or enjoyed, their rights granted or protected by the Fair Housing Act, 42 U.S.C. § 3604 on the basis of familial status."[169]

Claim 4.   Dwayne and Phallon Treece's claims against Haile under 42 U.S.C. § 3604(a) for intentionally "discriminat[ing] against Dwayne and Phallon Treece by refusing to rent her Unit to them or by otherwise making unavailable or denying that Unit because of their familial status."[170]

Claim 5.   Dwayne and Phallon Treece's claims against Haile under 42 U.S.C. § 3604(d) for "discriminat[ing] against Dwayne and Phallon Treece by representing to them that Haile's Unit was not available for rental when such dwelling was in fact so available because of their familial status."[171]

**New Orleans, Louisiana, this 23rd day of March, 2022.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[168] *Id.* at ¶ 77.
[169] *Id.* at ¶ 78. This claim does not include Harlan's claim under § 3617 for interference with his rights under §§ 3604(a) and (b) to sell his unit to families. Summary judgment was granted on Harlan's §§ 3604(a) and (b) claims for discrimination against his prospective buyers.
[170] *Id.* at ¶ 74.
[171] *Id.* at ¶ 75.